**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oberweis Dairy, Inc., *et al*.,[1] | ) | Case No. 24-05385 |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | Honorable David D. Cleary |
| | ) | |

## DECLARATION OF ADAM KRABER IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Adam Kraber, under penalties as provided by law pursuant to 28 U.S.C. § 1746, hereby certify that the following (the "**Declaration**") is true and correct to the best of my knowledge, information, and belief:

1.      I am the president of Oberweis Dairy, Inc. ("**ODI**"); The Oberweis Group, Inc. ("**TOGI**"); North Aurora Ice Cream, LLC ("**NAIC**"); TOGI RE I, LLC ("**TRI**"); Third Millennium Real Estate L.L.C. ("**TMRE**"); and TOGI Brands, LLC ("**Brands**," and collectively with ODI, TOGI, NAIC, TRI, and TMRE, the "**Debtors**").

2.      On April 12, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary case under Chapter 11 of the U.S. Bankruptcy Code (the "**Bankruptcy Code**") in the above-captioned court (the "**Chapter 11 Cases**"). The filing of the Chapter 11 Cases was authorized by a unanimous resolution of the Debtors' respective boards of directors and managers.

3.      I am familiar with the Debtors' past and present operations. I began working for ODI as a third-shift delivery driver in 2000, and was successively promoted to management roles of increasing responsibility until 2015, when I elected to resign from ODI to join another

---

[1] The Debtors in this case, and the last four digits of their respective federal employer identification numbers, are Oberweis Dairy, Inc. ('7516); The Oberweis Group, Inc. ('1378); North Aurora Ice Cream, LLC ('8506); TOGI RE I, LLC ('5952); Third Millennium Real Estate L.L.C. ('1589); and TOGI Brands, LLC ('7072).

company in the food-service sector. In 2022, I was rehired by ODI, and occupied several management positions before being elevated to chief operating officer of home delivery, retail, and supply chain in 2023. In this role, I managed ODI's marketing, manufacturing plant, distribution, and human resources. In 2024, I became the Debtors' president.

4.      I am also familiar with the events leading to the filing of the Chapter 11 Cases; the Debtors' prepetition marketing and sale efforts and the sale process they seek to undertake in the Chapter 11 Cases; the senior secured indebtedness of CIBC Bank USA, an Illinois state chartered bank, f/k/a The PrivateBank and Trust Company (the "**Bank**"); the proposed debtor-in-possession financing from the Bank; the Debtors' cash management system; the Debtors' employees, wages, and healthcare and other benefits; the gift cards and existing customer programs; and the Debtors' utilities, taxing authorities, and other creditors, all of which are the subjects of the various "first-day motions" filed in the Chapter 11 Cases (collectively, the "**First-Day Motions**") and other motions to be filed in the first several weeks of the Chapter 11 Cases. Based on my familiarity with these subjects, I have formed opinions regarding the necessity for the relief sought in the First-Day Motions, especially to the extent such relief will enable the Debtors to continue to operate in the ordinary course of business as they pursue a sale of substantially all their assets.

5.      I submit this Declaration in support of the First-Day Motions described herein, as well as other motions and applications that the Debtors expect to file in the first several weeks of the Chapter 11 Cases. Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records of the Debtors, and/or my opinions based on my experience and knowledge of the Debtors' operations and financial condition. If I am called upon to testify, I can and will testify competently to the matters set forth herein.

# I.    PRELIMINARY STATEMENT

6.    Collectively, the Debtors operate a business (the "**ODI Business**") that manufactures, packages, and distributes milk, ice cream, and other dairy and non-dairy foods (collectively, the "**ODI Products**"), and sells the ODI Products through both retail and wholesale channels, primarily in the Midwest. The retail side of the ODI Business comprises three distinct segments: 40 "Oberweis Dairy" branded retail stores (each a "**Dairy Store**") that serve ice cream products and other foods (the "**Dairy Store Segment**"); direct-to-doorstep home delivery (the "**Home Delivery Segment**"); and sales to consumers in national grocery stores and regional supermarkets (the "**Grocery Retail Segment**").

7.    The ODI Business has processed and sold premium dairy products since 1927; from then on, it has been continuously owned and operated by four generations of the Oberweis family. In many parts of the country, the Oberweis brand has become synonymous with dairy products of unparalleled quality. Most of these products are manufactured at the ODI Business's 72,000 square foot headquarters in North Aurora, Illinois ("**ODI Headquarters**"). The ODI Business currently employs approximately 1,100 individuals, the majority of whom work part-time in the Dairy Store Segment. In the summer months, when demand increases for ice cream products, the workforce often swells to over 1,500 employees.

8.    Despite the popularity of its products, the ODI Business has faced increasing financial challenges in recent years, driven primarily by a combination of demand fluctuations and operational inefficiencies. Of late, for example, consumer demand has shifted away markedly from conventional milk and other dairy products, in favor of dairy alternatives such as plant-based, high-protein, and extended-shelf-life products. Meanwhile, the ODI Business made a series of improvident uses of its capital (such as under-investing in its manufacturing

equipment and over-investing in its distribution capacity) that left it unable to weather a period of diminishing sales.

9.      The Debtors have taken dramatic steps to reverse their financial decline, including retaining a financial consultant, cutting millions of dollars in annual operating costs, substantially reducing their workforce, selling certain delivery routes and consolidating others, obtaining additional capital contributions from their members and shareholders, and selling equipment. But these efforts have merely postponed the ODI Business's inevitable deterioration.

10.     Upon concluding that they could not continue operating in the ordinary course, the Debtors retained an investment banker who initiated a large-scale marketing process. The investment banker prepared a confidential information memorandum, established a data room, and contacted a wide range of potential operational and strategic buyers, many of whom signed NDAs and conducted due diligence. Eventually, the Debtors signed a letter of intent, drafted an asset purchase agreement, and engaged in months of drawn-out negotiations with a potential stalking-horse bidder for the entire ODI Business. But in late March 2024, this party decided not to proceed with the bid it had proposed. With liquidity problems mounting by the day, the Debtors had no choice but to file the Chapter 11 Cases without a stalking-horse bidder in place. Yet negotiations with a prospective purchaser remain ongoing on a day-to-day basis, and may result in the identification of a stalking-horse bidder by the time the Debtors file a motion to approve a sale process.

11.     I believe that selling the ODI Business expeditiously in the Chapter 11 Cases represents the best—and indeed the only—realistic means of maximizing value for the secured and unsecured creditors of the Debtors while preserving over one thousand jobs.

12.     To familiarize the Court with the Debtors, the ODI Business, the circumstances leading to the Chapter 11 Cases, and the relief the Debtors are seeking in the First-Day Motions,

this Declaration is organized as follows: Part II describes the history of the ODI Business and the circumstances surrounding the filing of the Chapter 11 Cases, the nature of the ODI Business and the functions performed by each of the Debtors, and the Debtors' debt structure. Part III sets forth relevant facts in support of the First-Day Motions and the documents filed concurrently therewith.

## II.   BACKGROUND

### A.   History of the ODI Business

#### i.   Four Generations of Growth

13.   In 1915, an Aurora, Illinois dairy farmer named Peter Oberweis began selling milk to his neighbors out of the back of a horse-drawn wagon. Demand grew, and in 1927, Peter became the co-owner of the predecessor of the ODI Business, Big Woods Dairy. He purchased the remaining interest and renamed it Oberweis Dairy in 1929. During the Great Depression, Peter's son dropped out of high school to help his father operate the dairy. In 1951, Peter's son opened the first Dairy Store in Aurora. He developed recipes for what is now known as "super premium" ice cream – many of which are still used in the ODI Business today.

14.   In the early 1960s, Peter's grandson John Oberweis began working for the dairy, eventually leading it until the mid-1980s. In 1986, John's brother Jim D. Oberweis, along with his wife Elaine, purchased the ODI Business and began positioning for larger-scale growth. In 1991, the ODI Business opened a second Dairy Store, in Glen Ellyn. Thereafter, the ODI Business steadily expanded by opening more Dairy Stores, cultivating relationships with grocery stores for retail sales, and commencing its home delivery program.

15.   In 1996, the ODI Business relocated to ODI Headquarters, which combines a production facility, corporate offices, and a Dairy Store. This relocation allowed for a threefold

increase in milk production capacity and a tenfold increase in ice cream production capacity. A later expansion provided an additional tenfold increase in ice cream production capacity.

16.     In 2007, Joe Oberweis, a son of Jim D. Oberweis, took over leadership of the ODI Business. During his tenure, the ODI Business grew its annual revenue from approximately $63 million in 2007 to over $95 million in 2023. Joe oversaw the introduction of That Burger Joint and Woodgrain Pizzeria as companion brands to Oberweis Dairy (in 2012 and 2017, respectively), and the expansion of the home delivery segment to include Virginia and North Carolina (in 2009 and 2017, respectively). And in 2019, the ODI Business began production on a line of USDA-certified organic milk.

17.     In October 2022, Joe's siblings Julie and Jim W. Oberweis were appointed to the board of TOGI (parent company to the other Debtors) alongside Joe. Joe resigned from his positions with the Debtors in May 2023 and TOGI's number of directors was reduced to two, leaving Julie and Jim W. Oberweis as the remaining directors and managers of the Debtors.

### ii.     Business Challenges

18.     Despite its significant growth over the years, the ODI Business made a series of business decisions that, when viewed in hindsight, may have sown the seeds for its present financial distress, including:

- Insufficiently investing in preventative maintenance and modernization of the manufacturing plant at ODI Headquarters;

- Relying on managers who lacked sufficient industry experience;

- Maintaining the books and records of the Debtors in a suboptimal manner, including failing to adjust standard costs regularly, leaving management with an inaccurate understanding of labor and overhead costs;

- Failing to establish broker relationships that could yield placements with national grocery chains;

- Attempting to enter markets in Asia that did not ultimately result in any business;

- Transitioning to amber-colored bottles for use in the Grocery Retail Segment, to which customers did not respond well;

- Expending capital on assets the ODI Business did not ultimately need;

- Over-spending on marketing channels, such as mass mailings and digital marketing, that did not result in proportionate increases in product sales;

- Agreeing to high minimum purchases from vendors, resulting in over-ordering and the need to drop prices (sometimes below cost) merely to move perishable inventory;

- Responding too slowly to consumer trends such as organic milk, or in the case of increasingly popular plant-based, high-protein, or shelf-stable dairy alternatives, not responding at all; and

- Entering into a co-manufacturing relationship with a dairy (the "**Co-Manfacturer**") located in Dallas, Texas, which led to underutilization of internal manufacturing capacity and excessive shipping expenses.

19.     Even in retrospect, it cannot be said that any one decision led to the ODI Business's current financial condition. But in combination, the above factors left the ODI Business poorly equipped for survival in an industry already suffering major declines.

20.     As the following graph indicates, the last 50 years have seen per capita consumption of fluid milk decrease by approximately half. Even in the years between 2010 and 2019, after consumer trends had already shifted dramatically, per capita milk consumption fell by approximately 20%.



**U.S. per capita consumption of fluid cow's milk has fallen further each decade since 1970s**

Cups per person per day

Source: USDA, Economic Research Service Food Availability (Per Capita) Data System. [2]

21.     There is nothing the ODI Business could have done to reverse this precipitous decline in consumer demand for its chief product. Yet—again in hindsight—if the ODI Business had been more agile, efficient, or innovative, it might have better withstood the decline. In reality, however, the ODI Business has been particularly vulnerable to changes in the marketplace for several years.

### iii.     COVID and its Aftermath

22.     Initially, the emergence of the global COVID-19 pandemic did not take a major toll on the ODI Business. Because Dairy Stores sold grocery products in addition to made-to-order items, many were allowed to remain open (albeit at reduced capacity) when most of their fast-casual competitors were required to close entirely. And with many consumers staying home and eschewing trips to the grocery store, the Home Delivery Segment thrived. Propelled by these fortuitous circumstances, the ODI Business's annual gross revenue jumped from $79 million in 2019 to an all-time high of $116 million in 2020, tapering off to $113 and $104 million in 2021 and 2022, respectively.

---

[2] Hayden Stewart & Fred Kuchler, U.S. Dep't of Agric., *Fluid Milk Consumption Continues Downward Trend, Proving Difficult to Reverse* (June 21, 2022), https://www.ers.usda.gov/amber-waves/2022/june/fluid-milk-consumption-continues-downward-trend-proving-difficult-to-reverse/.

23.     Gross revenue, however, is an incomplete measure of a business's overall health. High costs—many of them attributable to the aging of the manufacturing plant, such as labor, inventory dumps, and maintenance—consumed a significant portion of the ODI Business's revenue. And a portion of the money received by the ODI Business during the pandemic resulted not from sales growth or cost-cutting, but from one-time infusions of government money. In 2020, the ODI Business received $5,672,500 from a Paycheck Protection Program (PPP) loan that was forgiven in 2021.[3]

24.     In approximately 2021-2022, management attempted to use the influx of capital to make the ODI Business stronger. In an attempt to capitalize on consumers' shift toward home delivery, the Home Delivery Segment expanded its product line from approximately 150 SKUs to over 600, including numerous non-dairy items such as tomahawk steaks and seafood. The Home Delivery Segment opened new delivery routes in Texas, and spent aggressively to gain new customers. The ODI Business also invested in a new fleet of delivery trucks, as well as new equipment such as thousands of milk crates and bottles, and opened a new production line to produce milk in quart-size glass bottles, in addition to their traditional half-gallon bottles.

25.     Unfortunately, many of these uses of capital proved to be ineffective. Instead of boosting sales, the expansion of the Home Delivery Segment's product line diluted the ODI Business's reputation as a seller of premium dairy products; the new delivery routes did not add nearly as many customers as expected; and many of the new delivery trucks, milk crates, and bottles sat underutilized, including many of the new quart-size bottles—approximately $100,000 of which still have not been used. Moreover, all of these investments saddled ODI with ongoing costs and complexities that detracted from their core business: valuable refrigerated space was

---

[3]   The ODI Business later received a tax refund in the amount of $7,960,493 (the "**ERC Refund**") under the Employee Retention Credit (ERC) program (relating to tax year 2021).

taken up by slow-moving steaks and seafood; labor and marketing dollars were diverted to support unprofitable delivery routes; offsite storage fees escalated (at times reaching $50-60,000 per month), and the ODI Business was forced to maintain, and in some cases service debt for, trucks and other equipment they did not need.

26.     The ODI Business found itself in a deeper hole when, in early 2023, it expanded its agreement with the Co-Manufacturer. Under this agreement, the ODI Business had already outsourced production of organic milk to the Co-Manufacturer, and under the expanded agreement, the ODI Business further outsourced production of half-gallon sweet drinks and caused the the Co-Manufacturer to implement a new line of quart-sized milk bottles.  Intending to facilitate the ODI Business's growth, management underestimated the costs and logistical hurdles involved in transporting milk and empty bottles between Texas and Illinois. The Co-Manufacturer agreement ultimately imposed, and continues to impose (despite a subsequent restructuring of the agreement that provided some relief), high transportation costs, increased dumps of milk due to expired code dates, and under-utilization of the manufacturing plant at ODI Headquarters.

### iv.     Cash Flow Problems and Turnaround Efforts

27.     As a business that derives a major portion of its revenue from sales of ice cream in the Midwest, the ODI Business always faces its slowest season in the winter. To provide much-needed cash during the slow winter months, the ODI Business has occasionally needed to obtain short-term cash contributions from its shareholders—more precisely, the shareholders of TOGI, which distributes funds to its subsidiaries—or the sale of surplus property.

28.     Two such transactions occurred in the winter of 2022-2023, when the ODI Business faced acute cash flow problems from a combination of increased costs and soft seasonal sales. The ODI Business anticipated receiving a nearly $8 million infusion in the form of the

ERC Refund sometime in 2023, but needed cash to bridge the period before the ERC Refund was received. Consequently, the ODI Business sold (a) vacant real property in Zionsville, Illinois to an insider-owned company, for a purchase price of $1,150,000, and (b) shares of TOGI stock to existing shareholders for a payment of approximately $1,000,000.

29.     In May 2023, when the ODI Business received the ERC Refund and temporarily alleviated their cash crunch, it repurchased the TOGI shares it had recently sold. And because the ERC Refund substantially increased the ODI Business's 2021 taxable income, TOGI distributed approximately 30% of the funds received to shareholders, to cover their additional tax burden. The rest of the ERC Refund was used to fund the ODI Business's operating expenses, including paying off overdue trade payables and other debts.

30.     In July 2023, the ODI Business retained Fort Dearborn Partners, Inc. ("**FDP**") to provide consulting services, in the hope of reviving its flagging financial health. The same month, I was elevated to chief operating officer of ODI. In consultation with FDP, the ODI Business made a series of major changes aimed at reducing costs and generating working capital, including:

- Conducting a series of reductions in force, ranging from plant employees to upper-level management;

- Selling 36 underutilized trucks;

- Reducing the company's product portfolio;

- Restructuring the ODI Business's agreement with the Co-Manufacturer;

- Implementing price increases;

- Reducing usage of outside storage facilities;

- Slashing marketing expenditures;

- Eliminating and streamlining delivery routes by approximately 35%;

- Closing certain underutilized transport centers; and

- Soliciting offers for the sale of the East Coast operations of the ODI Business.

31.     Shareholders of TOGI pitched in as well, making a total of $1.5 million in additional capital contributions during the months of July, August, and September 2023. These contributions, when coupled with the turnaround efforts by FDP and senior management, provided the ODI Business with millions of dollars in sorely needed working capital.

32.     But by October 2023, it became apparent to all involved that the ODI Business was unsustainable in its current form. The ODI Business simply could not operate at a profit, and would require regular and substantial capital contributions from shareholders merely to survive, with no end in sight. Understandably, the shareholders were unwilling to continue making such contributions. So Julie and Jim W. Oberweis, the directors and managers of the business that bore their family's name, made the sad but necessary decision to sell the ODI Business.

### v.     Sale Process

33.     On or about October 11, 2023, the ODI Business retained Livingstone Partners LLC ("**Livingstone**"), a global investment banking firm well known in the Midwest and experienced in the sale of companies experiencing cash-flow issues. The same day, the ODI Business entered into a new engagement letter with FDP, under which FDP agreed to provide the ODI Business with a chief restructuring officer to lead the ODI Business through its sale efforts, as well as supporting staff and services. On or about October 16, 2023, Mr. Kevin Cleary (the "**CRO**") was appointed as the ODI Business's chief restructuring officer.

34.     Commencing in November 2023, Livingstone—working in cooperation with the CRO and other management—embarked upon a sale process to solicit suitors for the ODI

Business. Livingstone prepared a detailed, 46-slide confidential information presentation showcasing the ODI Business, and communicated with 160 potential buyers (86 strategic and 74 financial) known to have sufficient resources and industry knowledge to potentially realize value in purchasing it. Forty-seven of these parties ultimately signed NDAs and conducted due diligence, accessing a data room prepared by Livingstone with hundreds of relevant documents. In mid-December 2023, the ODI Business's management team, with the assistance of Livingstone and FDP, hosted in-person meetings and/or facility tours with five potential purchasers.

35.     Ultimately, on January 19, 2024, the Debtors signed an exclusive letter of intent with a group of investors (collectively, the "**Prospective Stalking Horse**") that had offered to serve as a stalking-horse bidder for substantially the entire ODI Business. The Prospective Stalking Horse possessed extensive resources, industry connections, and experience. And unlike other prospective bidders, the Prospective Stalking Horse had the immediate ability (through its members' existing business interests) to utilize the ODI Business's full production capacity, and thereby cause the ODI Business to operate more profitably than it ever had.

36.     On January 31, 2024, the Debtors sent the Prospective Stalking Horse an initial proposed draft of an asset purchase agreement. Thereafter, throughout February and March 2024, the Debtors and the Prospective Stalking Horse engaged in significant due diligence efforts, including regular site visits and virtually daily communications between FDP and the Debtors' management, on the one hand, and the Prospective Stalking Horse, on the other. Meanwhile, in late February 2024, counsel to the Prospective Stalking Horse sent counsel to the Debtors a list of approximately 50 comments and questions regarding the proposed asset purchase agreement. The Debtors responded in short order, expecting the Prospective Stalking Horse to return a revised draft of the purchase agreement shortly thereafter. When it became apparent a revised

draft was not forthcoming, the Debtors revised their own draft and circulated a new version in mid-March.

37.     But as the Prospective Stalking Horse's due diligence progressed, the Stalking Horse began making material changes to the terms it had initially proposed, including significant modifications to the assets it sought to acquire and material reductions in the purchase price. Then, in late March 2024, the Prospective Stalking Horse notified the Debtors it had decided not to submit a stalking-horse bid at all.

38.     After terminating exclusive negotiations with the Prospective Stalking Horse, the Debtors reopened their marketing process. Livingstone and FDP re-engaged with potential bidders who, during the initial marketing outreach, had expressed interest in acquiring some or all of the Debtors' assets. As a result, while no additional parties have made offers for the entire ODI Business, several parties have now made informal proposals to purchase large portions of the business.

39.      The deteriorating financial condition of the ODI Business, however, made it advisable to file the Chapter 11 Cases without lining up another stalking horse bidder (or bidders). Informal discussions with possible stalking-horse candidates did not yield offers so compelling as to justify postponing the bankruptcy filing (and thereby suffering a further decline in the value of the ODI Business) while the Debtors negotiated and entered into a stalking-horse asset purchase agreement. The management of the Debtors therefore concluded it was necessary to file the Chapter 11 Cases without a stalking-horse bidder in place, but continued their discussions with the Prospective Stalking Horse and other parties.

40.     The Debtors intend, within a short period after the Petition Date, to file a motion seeking the Court's approval of a sale of the ODI Business as a going concern. As of the filing of this Declaration, however, negotiations with interested parties remain ongoing on a day-to-day

basis; thus it would be premature for the Debtors to disclose the proposed terms of the sale in this Declaration.

**B.      Nature of the ODI Business**

41.     Each product sold by the ODI Business falls into one of the following categories:

| Type | Fountain | Fluid | Ice Cream | Resale | Other |
|---|---|---|---|---|---|
| **Percentage of Revenue[4]** | 30.5% | 29.2% | 15.2% | 19.7% | 5.4% |
| **Description** | Served at Dairy Stores. Includes scooped ice cream, shakes, sundaes, etc. | Fluid milk and sweet drink products. | Packaged ice cream products and cakes. | Third-party breakfast and dinner products for Dairy Stores and home delivery. | Includes That Burger Joint and Woodgrain Pizzeria sales. |

The ODI Business relies on vertically integrated processes of manufacturing, distribution, and sales to provide these products to the consumer.

**i.      Manufacturing**

42.     The process of manufacturing Oberweis milk and ice cream begins with farm-fresh milk. Most days of the week, multiple 5,000-gallon trucks from nearby cooperative farms arrive at ODI Headquarters. After undergoing tests for contaminants, the milk is pasteurized (i.e., heated to sufficient temperature to kill harmful germs); separated into cream and skim milk; recombined to the extent appropriate to become whole, reduced fat, or skim milk; and homogenized (*i.e.*, processed to emulsify fat droplets that would otherwise separate from the liquid in the bottle). In some cases, flavors such as chocolate are mixed into the milk. It is then bottled in distinctive glass bottles and loaded into milk crates.

43.     To manufacture ice cream, some of the cream separated during the milk-production process, as well as additional cream purchased from dairy farmers, is mixed with

---

[4] Trailing 12 months, as of September 2023.

sugar and other ingredients to form "ice cream mix." The ice cream mix is heated using proprietary methods and equipment in a manner that gives Oberweis ice cream a distinctive and unique "cooked" flavor characteristic. The ice cream mix is also combined with various solid and liquid ingredients such as vanilla, chocolate, cookie dough, etc. according to the desired flavor. The ice cream mix, which is kept at a very cold temperature for the entire process except the heating stage, is allowed to set in a hardening room whose temperature is maintained at 40 degrees below zero. Produced in accordance with the very highest standards of quality, Oberweis ice cream is considered a "super premium" ice cream because of its very high overrun (*i.e.*, ratio of cream to air) and butterfat content.

44. In addition to milk and ice cream, ODI Headquarters produces several popular Oberweis-branded "sweet drinks": lemonade, raspberry lemonade, fruit punch, and an ice tea/lemonade blend. ODI Headquarters also produces pie and ice-cream-cake bases which are later decorated offsite.

45. Not all products sold by the ODI Business, however, are produced at ODI Headquarters' manufacturing facility. As noted above, an agreement in early 2023 outsourced production of all organic milk, as well as sweet drinks, to the Co-Manufacturer. The agreement was later restructured to bring production of sweet drinks in-house; thus, as of the Petition Date, no further ODI Products are being produced by the Co-Manufacturer. Additionally, all "resale" products sold in Dairy Stores and through home delivery, such as eggs, cheese, and breakfast meats, are manufactured by third parties.

## ii. Distribution

46. Every product sold by the ODI Business is either delivered to, or produced at, ODI Headquarters; 1,000-1,500 pallets of inventory fill its refrigerated storerooms and freezers.

From there, many of the products sold by the Grocery Retail Segment are picked up by third-party distributors, who then make deliveries to national and regional grocery chains.

47.     All other products, including a portion of those sold by the Grocery Retail Segment and all those sold by the Dairy Store and Home Delivery Segments, are transported using the ODI Business's own fleet of trucks. Drivers employed by the ODI Business deliver these products to their destinations by utilizing a network of 6 transport depots (the "**Transport Depots**"). The same drivers pick up used milk bottles returned by customers, which are cleaned and re-used at ODI Headquarters (or, in some cases, driven to the Co-Manufacturer to be used in organic milk production).

### iii.     Sales

48.     As noted above, sales of ODI Products to consumers occur through three segments: the Dairy Store Segment (approximately 46.3% of annual gross revenue), the Home Delivery Segment (approximately 41.2% of annual gross revenue), and the Grocery Retail Segment (approximately 11.5% of annual revenue).

### a.     Dairy Store Segment

49.     In Dairy Stores, employees scoop ice cream and provide various other made-to-order products in a fast-casual format. Each Dairy Store also contains a refrigerated area housing bottles of fluid milk and other drinks, cartons of ice cream, and third-party resale items such as eggs and cheese, all of which can be purchased at the counter. Store layouts vary, but all include interior dining, and others feature outdoor patio seating and/or drive-through service. Customers may return used Oberweis milk bottles at all Dairy Stores.

50.     Nine Dairy Store locations also include a "That Burger Joint" or "Woodgrain Pizzeria" store within the same building. These supplementary fast-casual brands operate as separate restaurants, with their own dedicated employees, cooking areas, and service counters.

That Burger Joint and Woodgrain Pizzeria account for a relatively small percentage of the Dairy Store Segment's sales; in 2022, approximately 85% of the segment's sales of menu items (*i.e.*, excluding sales of packaged ice cream, bottled milk, and various resale products) came from Oberweis Dairy-branded stores, while only 13% and 2% of such sales came from That Burger Joint and Woodgrain Pizzeria, respectively.

51.     The ODI Business currently operates 40 Dairy Store locations in 4 states; each Dairy Store produces an average of approximately $1.1 million in annual gross revenue and occupies an average of approximately 3,200 square feet. ODI is the operator of each of these Dairy Stores, as well as the lessee of the property where it is located. Of the 40 locations from which these Dairy Stores operate, 8 are owned by Debtors; 11 are owned by non-Debtor affiliates of the Debtors; and the remaining 21 are owned by unaffiliated third parties. A table listing the Dairy Store locations, with their respective addresses and the owners of the real property where they operate, is attached hereto as **Exhibit A**.

52.     In addition to the Dairy Stores operated by the ODI Business,[5] one "Oberweis Dairy" branded store, located in Bradley, Illinois, is operated by an unaffiliated third party pursuant to a franchise agreement. The ODI Business also licenses the Woodgrain Pizzeria brand and related intellectual property to another third party that operates a standalone installment of this restaurant in Midway Airport.

### b.     Home Delivery Segment

53.     The Home Delivery Segment offers scheduled delivery of products manufactured by the ODI Business, as well as many resale products, direct to consumers' homes. Customers place orders on the ODI Business's website or mobile app, specifying their preferred delivery

---

[5] For purposes of this Declaration, the term "Dairy Stores" refers only to the 40 stores operated by the ODI Business; the franchised Oberweis Dairy in Bradley, Illinois and the licensed Woodgrain Pizzeria in Midway Airport are not included in this definition, although they are considered part of the Dairy Store Segment.

schedule on a weekly or biweekly basis. Orders are prepared at a nearby Transport Depot, packaged into delivery trucks owned by the ODI Business, and delivered to customers' doorsteps.

54.    The Home Delivery Segment is characterized by high customer loyalty; from 2020 through 2022, it boasted a 75% average customer retention rate, on a year-over-year basis. Harking back to the days of the neighborhood milkman, Home Delivery Segment's appeal lies in the convenience of purchasing fresher, higher-quality products than those typically available to consumers, without the need to make a trip to the grocery store.

55.    The Home Delivery Segment currently operates 44 delivery routes in Illinois, Indiana, Wisconsin, Missouri, and Michigan. Previously, the segment also offered deliveries in Texas, North Carolina, and Virginia. During my tenure as chief operating officer, however, it was decided that the cost of maintaining delivery routes outside the Midwest was too high in comparison to the revenue they generated, particularly in light of the ODI Business's pressing cash-flow problems. The ODI Business therefore closed its Texas route (which had never been profitable), and in late January 2024, sold its North Carolina and Virginia operations—including their customer lists, leases of supporting Transport Depots, and certain equipment used in their business—to South Mountain Creamery, L.L.C., an unrelated third party.

### c.    Grocery Retail Segment

56.    The Grocery Retail Segment sells over 80 ODI Products—consisting of various varieties of traditional milk, organic dairy, sweet drinks, and packaged ice cream—in seven states.  It enables ODI Products to be sold by major grocery chains, including Jewel Osco, Kroger, Whole Foods, and Woodman's Markets. ODI  Products are currently sold in approximately 830 grocery stores.

57.     In what may be described as a typical grocery retail relationship, a distributor will submit a purchase order to the ODI Business via email. The ODI Business processes the order by entering it into its internal inventory-management system and sending a "load sheet" to the warehouse department at ODI Headquarters. Workers at ODI Headquarters will load the goods onto a truck owned by the distributor, at which point the sale is complete: the distributor pays ODI an agreed-upon price for the purchased goods, including, in the case of glass bottles, a $2.00 deposit for each bottle. The distributor sells the goods to the grocery store, charging the store for the bottle deposit. The grocer then sells the goods to the end consumer, passing on the cost of the bottle deposit in its price. Consumers later return empty bottles to the grocery store, with the grocery store refunding the deposit in cash. The distributor regularly picks up the used bottles, crediting the grocer for all bottle deposits it paid, and brings back the empty bottles to ODI Headquarters. The ODI Business credits the distributor for all empty bottles returned.

58.     Several variations on this procedure occur, depending on the agreements between the ODI Business and the respective distributors and grocery stores. In many instances, for example, grocery stores purchase goods directly from the ODI Business, without relying on a distributor.

**C.     Structure of the ODI Business**

**i.     TOGI**

59.     TOGI holds all of the equity interests in the other Debtors. In addition to being the 100% shareholder and member (as applicable) of the other Debtors, TOGI holds all the intellectual property used by the ODI Business, including 43 registered trademarks and 3 patents. TOGI licenses this intellectual property to ODI and Brands via separate written agreements. All shareholders of TOGI are, or are directly or indirectly owned by, members of the Oberweis family.

ii.     **ODI**

60.     ODI is the operating entity for the ODI Business. It is: (a) the employer of all employees who work for the ODI Business; (b) the lessee of all Dairy Stores, all Transport Depots, and the ODI Headquarters, and the owner of all leasehold improvements thereto; (c) the owner or lessee of substantially all machinery, equipment, inventory, and other personal property used in the ODI Business; (d) a party to virtually all executory contracts involved in the day-to-day operations of the ODI Business; and (e) the Debtor against whom virtually all trade creditors of the ODI Business hold their respective claims.

iii.    **NAIC**

61.     NAIC is the owner of three real properties: the ODI Headquarters, and Dairy Stores located in Skokie, Illinois and Western Springs, Illinois. NAIC leases the ODI Headquarters and the Dairy Store locations to ODI, although the Western Springs property also includes two residential apartments that are leased to third parties for approximately $1,800 per month.

iv.     **TRI**

62.     TRI is the owner of two real properties: one of the Dairy Stores located in Bolingbrook, Illinois (specifically, the Dairy Store at 860 E. Broughton Road in Bolingbrook, sometimes referred to as the "Bolingbrook East" location); and the Dairy Store located in Glen Ellyn, Illinois. TRI leases both properties to ODI.

v.      **TMRE**

63.     TMRE is the owner of four real properties: the Dairy Stores located in Arlington Heights, Illinois; Glenview, Illinois; and Lincolnwood, Illinois; as well as another parcel of improved real estate in Lincolnwood, Illinois where a Giordano's restaurant is located. TMRE leases the three Dairy Store locations to ODI, and leases the other Lincolnwood parcel to

Labrynth Ventures, LLC (an unrelated third party), which subleases it to the operator of the Giordano's restaurant.

### vi. Brands

64.     Brands is the franchisor of the Bradley, Illinois location, pursuant to a *Franchise Agreement* originally between franchisor Oberweis Franchise Systems, LLC (a now-dissolved former affiliate of the Debtors) and franchisee Happy Cows LLC, executed in 2015. Oberweis Franchise Systems, LLC assigned its rights and obligations under the agreement to Brands pursuant to that certain *Assignment and Assumption of Franchise Agreement* dated as of August 24, 2017.

65.     In addition to franchising the Bradley location, Brands also licenses the Woodgrain Pizzeria brand to NorthAmerican Concessions, Inc. pursuant to that certain *License Agreement* dated March 22, 2018, to enable the latter entity to operate the restaurant in Midway Airport. This license agreement has a seven (7) year initial term, and can be renewed (subject to satisfaction of certain conditions, for up to eight (8) additional years. The agreement provides, among other things, for regular royalty payments to Brands based on a percentage of the licensee's gross sales.

### D.     Employees

66.     As noted above, ODI is the employer of the ODI Business's entire workforce. This workforce currently comprises: (a) approximately 100 full-time salaried employees; (b) approximately 66 full-time hourly employees; (c) approximately 50 full-time commission employees; (d) approximately 933 part-time hourly employees, most of whom work in the Dairy Stores; and (e) one 1099 independent contractor, who serves as the plant manager of ODI Headquarters. The ODI Business's workforce is not unionized.

### E.    Management

67.    The board of directors—or in the case of limited liability companies, the managers—of each Debtor consists of Jim W. Oberweis and Julie Oberweis. As discussed above, their brother Joe Oberweis was formerly a director or member of all of the Debtors, and chief executive officer of ODI, until he resigned from all of his management positions in May 2023. Joe Oberweis remains, however, an indirect shareholder of TOGI.

68.    I am the president of all of the Debtors and oversee the Debtors' day-to-day operations. My second-in-command is James Blaylock, who serves as ODI's chief operating officer of the Dairy Store Segment. Together, we possess approximately sixty-five (65) years of experience in the Debtors' industry.

69.    My immediate predecessor as president of ODI was Kevin Cleary of FDP, who in addition to serving as the company's chief restructuring officer, was appointed on October 16, 2023, as both president and secretary. This temporary appointment—effected to fill the vacancy created by the departure of the former incumbents and otherwise comply with applicable law—concluded on February 15, 2024, when I replaced Mr. Cleary.

70.    Before the Petition Date, I received a retention bonus, which had the effect of inducing me to continue in my role with the ODI Business, and assist as needed with the preparation and filing of the Chapter 11 Cases; the operation of the Debtors during the early days of the Chapter 11 Cases; and the contemplated sale process.

### F.    Financing and Other Indebtedness

#### i.    Bank Loans

71.    The Bank is the Debtors' senior secured lender, under two separate but interrelated sets of loans: credit facilities under which TOGI, ODI, NAIC, TRI, and Brands are primary obligors (the "**TOGI Credit Facilities**"); and a credit facility under which TMRE is the

primary obligor (the "**TMRE Credit Facility**," and together with the TOGI Credit Facilities, the "**Bank Loans**"). As of the Petition Date, the total secured debt under the Bank Loans totaled approximately $14.2 million ($12.7 million of which is outstanding, and $1.5 million of which arises under a letter of credit).

### a.  TOGI Credit Facilities

72.  The TOGI Credit Facilities are governed by that certain *Second Amended and Restated Loan and Security Agreement* dated as of February 24, 2022, as amended from time to time thereafter, by and among the Bank, TOGI, ODI, NAIC, TRI, and Brands. The TOGI Credit Facilities consist of revolving loans, letters of credit, and term loans, and are secured by first-priority mortgages and security interests in substantially all real and personal property of TOGI, ODI, NAIC, TRI, and Brands. The TOGI Credit Facilities are cross-defaulted with any default under the TMRE Credit Facility.

### b.  TMRE Credit Facility

73.  The TMRE Credit Facility is governed by that certain Loan and Security Agreement dated as of May 2, 2012, as amended from time to time thereafter, by and between TMRE and the Bank. The TMRE Credit Facility consists of a term loan, and is secured by first-priority mortgages and security interests in substantially all real and personal property of TMRE. The TMRE Credit Facility is cross-defaulted with the TOGI Credit Facilities, and its repayment has been guaranteed by TOGI, ODI, NAIC, TRI, and Brands.

### c.  Forbearance Agreements

74.  On certain occasions prior to the Petition Date, the Debtors found themselves in default under the Bank Loans. The Bank and the Debtors entered into a succession of four (4) forbearance agreements (and amendments thereto) under which, among other things, the Debtors acknowledged various defaults and the Bank agreed to forbear from exercising its available

remedies for a specified time. The most recent such agreement, the *Fourth Amended Forbearance Agreement*, was dated February 28, 2024 but effective as of February 9, 2024, and provided for a forbearance period ending March 16, 2024 (or earlier, upon the occurrence of certain conditions specified therein).

### ii.    Secured Financing and Capital Leases

75. Certain assets of the Debtors—predominantly machinery, equipment, and vehicles—are subject to perfected liens securing purchase-money financing agreements. As of the Petition Date, the Debtors estimate that their outstanding secured debt owed to parties other than the Bank totaled approximately $3.7 million. The Debtors are also parties to at least forty (40) leases of machinery and equipment. The Debtors have not, however, performed a comprehensive analysis of whether their secured financing agreements constitute "true leases," or their leases constitute secured financing arrangements, and therefore their classification of such contracts may change following the Petition Date.

### iii.    Trade Payables

76. As ODI is the operating entity of the ODI Business, it is typically the party that contracts with outside vendors for goods and services needed in the ODI Business's operations. Such vendors include suppliers of raw materials and packaging; utilities for the ODI Headquarters, Transport Depots, and Dairy Stores; IT vendors; and accounting and legal professionals. The Debtors contract with hundreds of such vendors, and have endeavored to list each entity on the appropriate creditor matrices filed in the Chapter 11 Cases. Many parties have been included for notice purposes because they recently did business with one or more of the Debtors, even though the Debtors' books and records do not show them as holding accounts payable. In the course of preparing the schedules and statements of financial affairs to be filed in

the Chapter 11 Cases, the Debtors will perform further analysis to determine which parties actually constitute creditors of their respective estates.

## III.     FIRST-DAY MOTIONS

77.     A critical element in the Debtors' attempt to maximize the benefit to their creditors is approval of each of the First-Day Motions filed concurrently herewith. Based on my personal knowledge, I believe the relief sought by the Debtors in the First-Day Motions is necessary to enable the bankruptcy estates to be administered effectively and to give the Debtors their best chance to effect a sale process that will maximize the value of their estates for the benefit of all creditors.

78.     While the factual information supporting the First-Day Motions is set forth above and in the motions themselves, there follows a brief summary of each motion.

### A.     <u>Joint Administration of the Chapter 11 Cases</u>

79.      The Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only, pursuant to Federal Rule of Bankruptcy Procedure 1015(b) (the "**Joint Administration Motion**").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of ODI, also request that an entry be made on the docket of each of the Chapter 11 Cases, other than ODI, to reflect the cases' joint administration.

80.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will jointly affect all of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative

filings and objections, and will allow the U.S. Trustee and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

81.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate the ODI Business in chapter 11 without disruption.

**B.      DIP Financing/Cash Collateral**

82.     In order to continue operating in the Chapter 11 Cases, the Debtors require immediate access to post-petition financing and use of the Bank's cash collateral. Absent such relief, the Debtors do not have sufficient unrestricted cash or other financing available to operate their businesses, maintain their estates' properties, and administer the Chapter 11 Cases with a view toward a going-concern sale of substantially all of their assets.

83.     The Debtors are therefore filing a motion (the "**DIP Financing/Cash Collateral Motion**") seeking authority for them to obtain post-petition asset-based financing from the Bank with a maximum borrowing limit in the principal amount of $1,000,000, consisting of $400,000 on an interim basis and an additional $600,000 upon the approval of the Post-Petition Financing on a final basis.  This post-petition financing would bear interest at the rate of ten percent (10%) per annum and will be secured by liens on substantially all assets of the Debtors, which liens would be senior to the Bank's prepetition liens. In addition, the DIP Financing/Cash Collateral Motion seeks authority to allow the Debtors to use cash collateral, and to provide adequate protection to the Bank.

84.     The Debtors, with the assistance of their professionals, conducted an analysis and determined, in their business judgment, that financing under section 364(c) and (d) of the Bankruptcy Code was the only realistic means of obtaining the capital they needed to operate during the Chapter 11 Cases. Following this determination, the Debtors and their professionals

engaged in lengthy and good-faith negotiations with the Bank, resulting in what I believe to be the most favorable terms upon which the Debtors could reasonably obtain the needed financing.

85.     If granted, the DIP Financing/Cash Collateral Motion would provide significant, critically needed, additional liquidity to the Debtors, and thus enable them, among other things, to (a) maintain the continuity of their operations, and (b) maximize the value of the ODI Business as a going concern.

86.     For the foregoing reasons and those set forth in the DIP Financing/Cash Collateral Motion, I believe the relief requested in that motion is in the Debtors' best interests and will enable them to preserve and maximize the value of their estates.

### C.     Cash Management

87.     The Debtors have filed a motion seeking entry of an order, among other things, authorizing (a) maintenance of their existing bank accounts, (b) continued use of their cash management system (the "**Cash Management System**"), (c) continued use of their existing business forms, (d) continued use of their existing books and records, and also seeking a finding that the investment and deposit requirements of section 345(b) of the Bankruptcy Code are satisfied (the "**Cash Management Motion**").

88.      The Cash Management System is described in granular detail in the Cash Management Motion, but in summary, it consists of 49 bank accounts generally described as a centralized operating account, 38 satellite Dairy Store accounts, a merchant card account, a controlled disbursement Account, a payroll account, and affiliate accounts.

89.     For inflows, store managers make manual deposits into the Dairy Store accounts, which are aggregated with food delivery services such as Uber Eats. ODI's management manually sweeps funds in the Dairy Store accounts into the operating account three times per week. Sales from the Dairy Stores paid by credit card are deposited into the merchant card

account, which are automatically then swept into the operating account daily. Sales through the Grocery Retail Segment are typically deposited directly into the operating account, while sales from the Home Delivery Segment are collected by transfer into the operating account or the merchant card account.

90.     For outflows, the Debtors pay creditors by pushing money out, or authorizing creditors to pull money out, of the operating account through electronic funds transfers. For checks, the Debtors use a controlled disbursement account which allows them to monitor which checks are to be cleared and when in order to manage liquidity needs. And for payroll, the Debtors have a dedicated payroll account from which their payroll processor draws funds.

91.     Absent the relief sought by the Cash Management Motion, U.S. Trustee guidelines would require the Debtors to cease utilizing the Cash Management System, existing business, forms, and existing books and records. Such a change would cause untold disruption in the Debtors' business operations and saddle them with considerable additional expense. Moreover, as articulated in the Cash Management Motion, a combination of new and existing safeguards will be sufficient to prevent the inadvertent postpetition payment of prepetition claims.

92.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate the ODI Business in the most efficient manner, while ensuring that the duties of debtors in chapter 11 are properly observed.

### D.      **Prepetition Wages and Benefits**

93.     The Debtors request authority to (a) pay prepetition wages, salaries, wage-related benefits, other compensation, and reimbursable employee expenses and (b) continue employee

benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto (the "**Wages/Benefits Motion**").

94.     There exists a critical need for the Debtors to pay certain prepetition wage and benefit claims of their employees, including outstanding wages, salaries, and commissions, all related withholdings and taxes, employee medical benefits, health and other insurance, accrued prepetition vacation time, reimbursable expenses, and accrued prepetition contributions to employee benefit plans (collectively, the "**Prepetition Employee Obligations**"). If the Wages/Benefits Motion is granted, no single employee would be paid more than the $15,150 limit applicable to priority employee claims under section 507(a)(4)-(5) of the Bankruptcy Code.

95.     The satisfaction of these Prepetition Employee Obligations is critical to the Debtors' ability to retain qualified employees to continue to operate their business for the benefit of the creditors and other interested parties in the Chapter 11 Cases. Indeed, I believe that if the Prepetition Employee Obligations are not timely paid, a significant portion of the Debtors' workforce will find other employment, at a time when the Debtors need them most. Such a loss would take an irreversible toll on the ODI Businesses and jeopardize the Debtors' ability to effectuate a prompt going-concern sale.

96.     I believe the relief requested in the Wages/Benefits Motion is in the Debtors' best interests and will enable them to preserve and maximize the value of their estates.

### E.     Noticing/Claims Agent

97.     The Debtors' counsel has informed me that Local Rule 1007-2 requires any debtor with more than 500 creditors to seek retention of a noticing and claims agent to maintain a claims register. Accordingly, the Debtors are filing a motion seeking authority for them to retain CPT Group, Inc. ("**CPT**"), a nationwide firm specializing in such services, to serve as their noticing and claims agent (the "**Noticing/Claims Agent Motion**").

98.     CPT would, in addition to maintaining the claims register, perform further administrative services as needed and directed by the Debtors, including (a) sending notices to numerous creditors and other parties-in-interest in the Chapter 11 Cases, (b) operating a website with information for creditors regarding the Chapter 11 Cases, and (c) receiving plan ballots if the Debtors propose a chapter 11 plan. Having such services performed by a capable and qualified outside firm would enable the Debtors' management and professionals to dedicate their time and effort to expeditiously administering the assets of the ODI Business without disruption.

99.     I believe the terms of CPT's proposed retention, which are set forth in an agreement attached as an exhibit to the Noticing/Claims Agent Motion, are fair and reasonable under the circumstances, and represent a good value for the Debtors' estates in comparison with other alternatives. Consequently, I believe the relief requested in the Noticing/Claims Agent Motion is in the Debtors' best interests and will enable them to preserve and maximize the value of their estates.

### F.     Utilities[6]

100.    The Debtors have filed a motion requesting entry of an order authorizing payment of deposits as adequate assurance of payments for utility services, and prohibiting utility companies from altering, refusing to provide, or discriminating against the Debtors solely on the basis of the commencement of the Chapter 11 Cases or on account of any unpaid invoice for services provided prior to the Petition Date (the "**Utilities Motion**").

101.    Collectively, the three segments of the ODI Business have over 290 separate utility accounts, with over 65 different utility companies. In order to provide the utility companies with adequate assurance of payment for postpetition services, the Debtors propose a

---

[6]  Unlike the other First-Day Motions, which will be presented the week after the filing of the Chapter 11 Cases, the Utilities Motion will be noticed for hearing the following week, to provide additional time for the Debtors' 65 utility providers to receive notice of the hearing.

process under which utility companies may receive a total of approximately $117,000 in deposits.

102.    During the time it takes the Debtors to consummate a sale of the ODI Business as a going concern, it is imperative that utility services continue uninterrupted. Should any of the Debtors' utility providers refuse or discontinue service, even for a brief period, the ODI Business would be adversely impacted, impairing the Debtors' ability to realize value in a going-concern sale.

103.    I believe the Debtors' proposed procedures governing utility companies' requests for adequate assurance are appropriate in the Chapter 11 Cases, and that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### G.    Customer Obligations

104.    In the ordinary course of their business prior to the Petition Date, the Debtors incurred several customer-facing obligations (the "**Customer Obligations**") that, if not honored, would have a profoundly negative effect on customers' goodwill, and in turn, the value of the ODI Business. Thus the Debtors have filed a motion seeking authorization to honor (a) gift cards, (b) customer loyalty programs, (c) customer delivery subscriptions, and (d) bottle deposit obligations, consistent with their prepetition ordinary course of business (the "**Customer Obligations Motion**").

105.    I believe that honoring the Customer Obligations is necessary to maintain the value of the ODI Business, which relies heavily on brand recognition and loyalty. I also believe that the expenditure of estate funds required to honor the Customer Obligations is relatively minor when compared with the loss in value that the ODI Business would undergo if it refused to honor the Customer Obligations, even for a brief period.

106.    It is therefore my belief that the relief sought in the Customer Obligations Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**H.    Prepetition Taxes**

107.    The Debtors request an order authorizing, but not directing, them to pay prepetition sales, use, trust fund, and similar taxes and related obligations owed to various federal, state, and local taxing or related authorities, consistent with and in the ordinary course of the ODI Business, on an unaccelerated basis, as such payments become due, and to the extent adequate funds are available to make such payments (the "**Prepetition Tax Motion**").

108.    In the ordinary course of their business, the Debtors incur and/or collect certain taxes and remit those taxes to various taxing authorities. Failure to pay such taxes could result in a costly distraction to the Debtors and impair their ability to sell the ODI Business. Moreover, a large portion of these taxes represent "trust fund" taxes, which must be collected from third parties and held in trust for payment to the applicable taxing authorities. The Debtors must continue to pay such taxes because many state statutes hold officers and directors of collecting entities personally liable for nonpayment.

109.    I believe the relief requested in the Prepetition Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and would enable the Debtors to continue to operate the ODI Business in chapter 11 without disruption.

**I.    Time to File Schedules and SOFAs**

110.    The Debtors are filing a motion (the "**Schedules/SOFAs Motion**") seeking an extension of the deadline to file certain documents with the Court, including (a) schedules of assets and liabilities, (b) a schedule of current income and expenditures, (c) a schedule of executory contracts and unexpired leases, and (d) a statement of financial affairs (collectively, the "**Schedules and SOFAs**").

111. Absent an extension, section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 would afford the Debtors only 14 days after the Petition Date within which to file their Schedules and SOFAs. In light of the complexity of the Debtor's business, assets, and financial affairs; the need to continue operating the ODI Business postpetition; and the need for the Debtors' management and professionals to simultaneously work toward an expedited sale of the ODI Business, I believe a 14-day period is insufficient for the Debtors to prepare and file their Schedules and SOFAs with the level of detail required by the Bankruptcy Code and Bankruptcy Rules. An extension of the deadline to May 10, 2024 would alleviate many of the burdens that would otherwise face the Debtors and their professionals, without prejudicing any party.

112. I believe the relief requested in the Schedules/SOFAs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

**J.      Page Limit**

113. The Court's Local Rules provide for a 15-page limit on motions and other filings, which may be extended by the Court. The Debtors have filed a motion to excuse this limit with respect to certain of the First-Day Motions (the "**Page Limit Motion**"). Given the complexity of both the ODI Business and the relief requested in the First-Day Motions, adhering to the 15-page limit would not give the Debtors an adequate opportunity to set forth the factual and legal bases for the relief they request. Because the First-Day Motions are so important to the continued operations and ultimate sale of the ODI Business, I believe that extending the 15-page limit as requested in the Page Limit Motion is in the best interests of the Debtors, their estates, and parties in interest.

**IV.     CONCLUSION**

114. In order to minimize any loss to the value of the Debtors' assets and to maximize the benefit to the Debtors' creditors and estates, the Debtors' objective is to continue operating

the ODI Business in the short term, with a view toward selling the ODI Business as a going concern on an expedited timeframe. I believe that if the Court grants the relief requested in the First-Day Motions and other motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtors' estates and creditors, will be significantly enhanced.

Dated: April 15, 2024        _____
ADAM KRABER