# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 24-05385 |
| Oberweis Dairy, Inc., *et al.*,[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Honorable David D. Cleary |
| Debtors. | ) | |
| | ) | |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. SECTION 364, (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTION 363 AND (C) GRANT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. SECTION 363 AND 364; (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C); AND (III) SHORTENING NOTICE

Upon the motion (the *"Motion"*) dated April 15, 2024, of Oberweis Dairy, Inc. *et al* (the *"Debtors"*) in the above-captioned case (a) seeking this Court's authorization pursuant to sections 105, 361, 363(c), 363(e), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the *"Bankruptcy Code"*) and Rules 2002, 4001(c), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), and Rules 4001-2 and 5005-3(D) of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the *"Local Rules"*) for the Debtors, *inter alia,* (i) to obtain post-petition financing (the *"Post-Petition Financing"*), up to an aggregate principal amount not to exceed $1,000,000 at any time outstanding, plus accrued interest on the aggregate principal amount from CIBC Bank USA, an Illinois state chartered bank (the *"Lender"*); (ii) to grant the Lender first priority liens and

---

[1] The Debtors in this case, and the last four digits of their respective federal employer identification numbers, are Oberweis Dairy, Inc. ('7516) (*"ODI"*); The Oberweis Group, Inc. ('1378) (*"TOGI"*); North Aurora Ice Cream, LLC ('8506) (*"NAIC"*); TOGI RE I, LLC ('5952) (*"TRI"*); TOGI Brands, LLC ('7072) (*"Brands"*); and Third Millennium Real Estate L.L.C. ('1589) (*"TMRE"*).

security interests in all of the Debtors' currently owned and after acquired property to secure the Debtors' obligations under the Post-Petition Financing and (iii) to accord the Lender a super priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the Post-Petition Financing with priority in payment for such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code sections 503(b) and 507(b), other than as described below and specifically excepting and subject and subordinate to the Carve-Out (as defined below in paragraph 13 hereof) and the Approved Budget Expenses under Approved Budgets (as those terms are defined below in paragraph 15 hereof); (b) seeking this Court's authorization to use the Lender's cash collateral within the meaning of Bankruptcy Code section 363(a) (the *"Cash Collateral"*), pursuant to Bankruptcy Code section 363(c), and to provide adequate protection pursuant to Bankruptcy Code sections 361, 363(e) and 364(d) to the Lender; (c) seeking a preliminary hearing (the *"Preliminary Hearing"*) on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (this *"Interim Order"*) authorizing the Debtors to borrow from the Lender under the Post-Petition Financing up to an aggregate of $400,000 at any time outstanding on an interim basis upon entry of the Interim Order, plus accrued interest on the aggregate principal amount, upon the terms and conditions set forth in this Interim Order, pending the Final Hearing referred to below; (d) requesting that a final hearing (the *"Final Hearing"*) be scheduled by this Court to consider entry of a final order (the *"Final Order"* and together with the Interim Order, the "*Financing Orders*"), authorizing upon entry of the Final Order on a final basis the Post-Petition Financing in the total aggregate amount of $1,000,000 at any time outstanding; and (e) requesting that notice of the Motion be shortened under the circumstances, together with all other rights and remedies requested in the Motion.

1308428v11

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the *"Notice"*) was served by the Debtors in accordance with Bankruptcy Rule 4001(c) and Local Rule 4001-2 on: (i) the Lender and its counsel, (ii) all other parties with liens of record on assets of the Debtors as of the Petition Date, (iii) the Office of the United States Trustee of the Northern District of Illinois (the *"U.S. Trustee"*), (iv) the United States Trustee for Region 11, (v) the twenty (20) largest unsecured creditors of the estates and (vi) any other party that has requested notice pursuant to Bankruptcy Rule 2002, all as more fully set forth in, and evidenced by, the Certificate of Service on file herein (collectively, the *"Noticed Parties"*).

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of Adam Kraber in Support of Chapter 11 Petitions and First-Day Motions*, and the other filings and pleadings made by the Debtors, and upon the entire record made at the Interim Hearing, the evidence and testimony presented at the Interim Hearing, and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]:**

A.     On April 12, 2024 (the *"Petition Date"*), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are in possession of their property, and operating and managing their businesses, as Debtors-in-Possession pursuant to Bankruptcy Code sections 1107 and 1108 (the *"Chapter 11 Cases"*).

B.     This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the

---

[2] Findings of Fact shall be construed as Conclusions of Law and Conclusions of Law shall be construed as Findings of Fact, pursuant to Federal Rule of Civil Procedure 52.

Northern District of Illinois. Consideration of the Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (D), (K), (M) and (O), and the Debtors confirm their consent to the entry of a final order or judgment by the Court with respect to the Motion in the event it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

C.    Subject only to the rights of parties in interest that are specifically set forth in paragraph 25, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)    The Debtors have previously entered into two separate lending arrangements with the Lender (the "*CIBC Loans*").  The CIBC Loans are broken down into the "Dairy Loan" and the "TMRE Loan" as those terms are further defined and described below.

(ii)    **Dairy Loan**

a.    Parties.  Lender; ODI; TOGI, NAIC, TRI and Brands (collectively, the "*Dairy Borrowers*").

b.    Operative Documents.

i.    Second Amended and Restated Loan and Security Agreement dated as of February 24, 2022 (the "*Dairy LSA*");

ii.    First Amendment to the Dairy LSA dated as of November 4, 2022;

iii.    Second Amendment to the Dairy LSA dated as of December 21, 2022;

iv.    Third Amendment to the Dairy LSA dated as of March 20, 2023;

v.    Revolving Loan Note dated February 24, 2022 ("*Dairy Revolving Note*");

4

vi.         Term Loan Note dated February 24, 2022 ("*Dairy Term Note*");

vii.        2020 CAPEX LOAN NOTE dated February 24, 2022 ("*Dairy Cap-Ex Note*");

viii.       2022 DDT Loan Note dated February 24, 2022 ("*Dairy DDT Note*");

ix.         Master Letter of Credit Agreement dated March 9, 2009 ("*Dairy MLCA*");

x.          Trademark Security Agreement dated March 9, 2009;

xi.         Mortgage dated March 29, 2016, and recorded April 16, 2016, as amended, for the property commonly known as 929 Burlington, Western Springs, Illinois ("*Burlington Mortgage*");

xii.        Mortgage dated March 9, 2002 and recorded March 11, 2009, as amended, for the property commonly known as 951 Ice Cream Drive, North Aurora, Illinois (the "*Ice Cream Drive Mortgage*");

xiii.       Mortgage dated October 29, 2012 and recorded November 5, 2012, as amended, for the property commonly known as 4811 Dempster, Skokie, Illinois (the "*Dempster Mortgage*");

xiv.       Mortgage dated March 1, 2022 and recorded March 1, 2022, as amended, for the property commonly known as 860 E. Boughton, Bolingbrook, Illinois (the "*Boughton Mortgage*");

xv.        Mortgage dated February 24, 2022 and recorded March 1, 2022, as amended, for the property commonly known as 515 Roosevelt, Glen Ellyn (the "*Roosevelt Mortgage*");

xvi.       Mortgage dated May 2, 2012 and recorded May 10, 2012, as amended, for the property commonly known as 9 E. Dundee Rd., Arlington Heights, Illinois dated May 2, 2012 (the "*Dundee Mortgage*");

xvii.      Mortgage dated May 2, 2012 and recorded May 10, 2012, as amended, for the property commonly known as 967 Waukegan Rd, Glenview, Illinois dated May 2, 2012 (the "*Waukegan Mortgage*");

xviii.     Mortgage dated October 27, 2021 and recorded October 27, 2021, as amended, for the property known as 6469 and 6485 N. Lincoln Ave, Lincolnwood, Illinois (the "*Lincoln Mortgages*");

(The Burlington Mortgage, the Ice Cream Drive Mortgage, the Dempster Mortgage, the Boughton Mortgage, the Roosevelt Mortgage, the Dundee

5

Mortgage, the Waukegan Mortgage and the Lincoln Mortgages shall be referred to collectively, as the "*Dairy Mortgages*.").

xix.     Forbearance Agreement dated as of August 31, 2023 (the "*Original Forbearance Agreement*");

xx.      First Amended Forbearance Agreement dated as of October 31, 2023 (the "*First Amended Forbearance Agreement*");

xxi.     Second Amended Forbearance Agreement dated December 15, 2023 (the "*Second Amended Forbearance Agreement*");

xxii.    Third Amended Forbearance Agreement dated as of January 12, 2024 but effective as of January 5, 2024 (the "*Third Amended Forbearance Agreement*");

xxiii.   Fourth Amended Forbearance Agreement dated February 28, 2024 but effective as of February 9, 2024 (the "*Fourth Amended Forbearance Agreement*");

(the Original Forbearance Agreement, the First Amended Forbearance Agreement, the Second Amended Forbearance Agreement, the Third Amended Forbearance Agreement and the Fourth Amended Forbearance Agreement shall be referred to collectively as the "*Forbearance Agreements*").

xxiv.    Collateral Access Agreement dated as of February 22, 2023;

xxv.     Letter from the Lender to TOGI, ODI, NAIC, Brands, and TRI dated August 1, 2023;

xxvi.    UCC-1 Financing Statement filed with the Delaware Secretary of State on March 9, 2009 as Filing No. 0735883, as amended and continued from time to time;

xxvii.   UCC-1 Financing Statement filed with the Illinois Secretary of State on March 10, 2009 as Filing No. 14103597, as amended and continued from time to time;

xxviii.  UCC-1 Financing Statement filed with the Illinois Secretary of State on May 1, 2014 as Filing No. 19234126, as amended and continued from time to time;

xxix.    UCC-1 Financing Statement filed with the Illinois Secretary of State on July 31, 2020 as Filing No. 26216478, as amended and continued from time to time; and

6

xxx.      UCC-1 Financing Statement filed with the Illinois Secretary of State on April 28, 2017 as Filing No. 22332767, as amended and continued from time to time

(collectively, the "*Dairy Loan Documents*").

c.      <u>Loan Status</u>. The outstanding balances under the Dairy Loans as of April 4, 2024 were are as follows:

i.      Dairy Revolving Note - $456,900.00;

ii.      Dairy Term Note - $7,361,400.00;

iii.      Dairy Cap-Ex Note – $0.00;

iv.      Dairy DDT Note - $2,972,800.00; and

v.      Dairy MLCA – $1,508,000.00

(collectively, the "*Dairy Loan Balances*").

d.      <u>Collateral</u>.

i.      Blanket lien on all or substantially all of the tangible and intangible personal property assets of the Dairy Borrowers;[3]

---

[3] Under Section 6.1 of the Dairy LSA, each of the Borrowers granted a lien and security interest in favor of the Lender in and to the following described assets:

(a)      Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on <u>Schedule 6.9</u>, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities;

(b)      All Software and computer programs;

(c)      All books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of the Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

(d)      All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all

*Footnote continued.*

1308428v11

  ii.  Separate liens on specified trademarks of the Dairy Borrowers; and

  iii.  Dairy Mortgages.

(collectively, the "*Dairy Collateral*")

(iii) <u>TMRE Loan</u>

 a. Parties:  Lender; TMRE[4];

 b. Operative Documents:

  i.  Promissory Note dated May 2, 2012, in the original principal amount of $4,184,000 (the "*TMRE Note*");

  ii.  Loan and Security Agreement dated May 2, 2012 (the "*TMRE LSA*");

  iii.  First Amendment to TMRE LSA, dated April 28, 2017;

  iv.  Second Amendment to TMRE LSA dated October 27, 2021;

  v.  Third Amendment to TMRE LSA, dated December 21, 2022;

  vi.  Guaranty dated May 2, 2012,

  vii.  Amended and Restated Guaranty dated April 28, 2017;

  viii.  Second Amended and Restated Guaranty dated October 27, 2021;

  ix.  The Forbearance Agreements; and

  x.  UCC-1 Financing Statement filed with the Illinois Secretary of State on May 3, 2012 as Filing No. 17254804, as amended and continued from time to time

(collectively, the "*TMRE Loan Documents*")

---

insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

[4] Presently the guarantors of the TMRE Loan include TOGI, ODI, NAIC, Brands and TRI.

c.  <u>Loan Status</u> – The outstanding balances under the TMRE Loans as of April 4, 2024 was $1,915,066.76 (the "*TMRE Loan Balance*").

d.  <u>Collateral</u>

i.  Blanket Lien on all or substantially all of the tangible and intangible personal property assets of TMRE;[5] and

ii.  The Dundee Mortgage; the Lincoln Mortgages, and the Waukegan Mortgage.

(collectively, the "*TMRE Collateral*")[6]

(ii)  In accordance with the terms of the Pre-Petition Loan Documents, the

Debtors are truly and justly indebted to the Lender, without defense, counterclaim or offset of

---

[5] Under Section 6.1 of the TMRE LSA, TMRE granted a lien and security interest in favor of the Lender in and to the following described assets:

(e)  Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on <u>Schedule 6.9</u>, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities;

(f)  All Software and computer programs;

(g)  All books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of the Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

(h)  All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

[6] The Dairy Loan Documents and the TMRE Loan Documents shall be referred to collectively as the "*Pre-Petition Loan Documents*"; the Dairy Loan Balances and the TMRE Loan Balance shall be referred to collectively as the "*Pre-Petition Obligations*"; the Dairy Collateral and the TMRE Collateral shall be referred to collectively as the "*Pre-Petition Collateral*"; and the liens of the Lender against the Pre-Petition Collateral shall be referred to collectively as the "*Pre-Petition Liens*."

any kind. As of the Petition Date the Pre-Petition Obligations totaled not less than $14,215,000, exclusive of all accrued and unpaid interest, costs, expenses, and fees owed to the Lender pre-petition. Subject in all respects to the rights of third parties in paragraph 25 hereof, the Debtors further acknowledge, agree and stipulate that (a) the Pre-Petition Liens (1) are valid, binding, enforceable and perfected liens in the Pre-Petition Collateral, (2) were granted to the Lender pre-petition for fair consideration and reasonably equivalent value, and (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b)(1) all of the Pre-Petition Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Loan Documents, (2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition Obligations exist in favor of the Debtors, and (3) no portion of the Pre-Petition Obligations or any payments made to or for the benefit of the Lender pre-petition are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)     By reason of the Pre-Petition Loan Documents, the Pre-Petition Obligations are secured by the Pre-Petition Liens against the Pre-Petition Collateral.

D.     The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Post-Petition Financing and the use of the Cash Collateral. The Debtors urgently require financing and access to the Cash Collateral to (a) fund the Chapter 11 Cases, and (b) sell their businesses as going concerns. The Debtors' need for financing is critical. In the absence of the Post-Petition Financing and such use of the Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.

E.     Given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain sufficient unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  Financing on a post-petition basis is not otherwise available without: (i) the Debtors granting, pursuant to Bankruptcy Code section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code sections 503(b) and 507(b), other than as described below, and (ii) securing such indebtedness and obligations with the security interests in and the first liens upon the property described below.  The Lender objects to the priming of its prepetition liens and security interests pursuant to Bankruptcy Code section 364(d). The Debtors do not have the resources to secure such funding over the objection of the Lender, and the Lender has indicated it will not consent to such financing.

F.     Based on the record presented to this Court by the Debtors, it appears (and the Debtors and the Lender have stipulated) that the Post-Petition Financing has been negotiated in good faith and at arm's length between the Debtors and the Lender, and any credit extended and loans made to the Debtors pursuant to this Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code section 364(e).

G.     Based on the record before this Court, it appears (and the Debtors and the Lender have stipulated) that the terms of this Interim Order, including the terms of the Post-Petition Financing, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(B). The permission granted herein to use

Cash Collateral, enter into the Post- Petition Financing, and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its immediate entry will, among other things, allow for the Debtors' businesses to continue to operate and facilitate the sale of Debtors' businesses as going concerns.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1. *Motion Granted.* The Motion is granted as set forth herein.

2. *Authorization.* The Debtors are expressly authorized and empowered to (a) borrow money, use Cash Collateral, and perform their obligations pursuant to the provisions of this Interim Order and (b) enter into that certain Secured Super-Priority Post-Petition Credit Agreement dated April 18, 2024 attached hereto as Exhibit A *(the "DIP Credit Agreement,"* together with the documents listed on Annex B of the DIP Credit Agreement, and any other documents, instruments or agreements entered into contemporaneously with the DIP Credit Agreement, as may be amended, restated, supplemented or otherwise modified from time to time, shall be referred to collectively as the "*DIP Loan Documents*")[7]. The aggregate Post-Petition Financing under the DIP Credit Agreement is $1,000,000. The interim request hereinunder is $400,000. To the extent there is a conflict between the terms of the DIP Credit Agreement and this Interim Order, the terms of this Interim Order shall control in all respects. All post-petition loans and all other indebtedness and obligations incurred on or after the Petition

---

[7] The DIP Credit Agreement attached hereto includes the Schedules and Annexes referenced therein but given the voluminous nature of these documents and pleadings, Exhibit B (Interim Financing Order) is not included and Exhibit C (Final Financing Order) is included without Exhibits.

Date by the Debtors to the Lender pursuant to this Interim Order and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are subsequently referred to herein as the *"DIP Obligations,"* and, together with the Pre-Petition Obligations, as the *"Obligations."* The Debtors are jointly and severally liable to the Lender for the DIP Obligations.

3. *Borrowings; Use of Cash Collateral.* Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, (a) the Lender hereby consents to the Debtors' use of the Cash Collateral in accordance with the terms hereof and (b) the Lender will make post-petition loans (the "*DIP Loans*") to the Debtors in accordance with the Approved Budget(s), as defined in and in accordance with the provisions of paragraph 15 hereof.

4. *Events of Default.* Nothing herein or in any of the DIP Loan Documents shall constitute or be deemed to constitute a waiver by the Lender of any existing or future events of default under the Pre-Petition Loan Documents or the DIP Loan Documents ("*Events of Default*"). Without prejudice to, or waiver of, the Lender's rights and remedies against the Debtors in respect of any Post-Petition Defaults (defined below) hereafter arising pursuant to paragraph 6 hereof, the Lender agrees to forbear from foreclosing its liens on any Pre-Petition Collateral, to seek to recover the Pre-Petition Obligations or otherwise take enforcement action against the Debtors based solely on any Event of Default which occurred prior to the entry of this Interim Order (collectively, the *"Existing Defaults"*); *provided* that, (a) subject to the provisions of paragraph 11 hereof, such forbearance shall terminate upon the Post-Petition Termination Date (as defined in paragraph 6 hereof), and (b) except as otherwise expressly set forth herein, the automatic stay shall continue to apply with respect to all assets of the Debtors' estates.

5. *Interest, Fees, Costs and Expenses.* All DIP Loans shall bear interest at the rate of ten percent (10%) per annum (computed on the basis of a year of 360 days for the actual number

1308428v11

of days elapsed), *provided* that during the existence of any default under the Post-Petition Financing that such interest shall be increased by an additional four percent (4%). The Lender shall be entitled to recover all of its reasonable out-of-pocket expenses, including audit expenses, plus any additional out-of-pocket expenses, and including reasonable consultants', attorneys' and paralegals' fees, costs and expenses incurred in connection with the Obligations to the extent provided in the Pre-Petition Loan Documents, provided however, that the foregoing are not Approved Budget Expenses and shall not be paid from Cash Collateral or proceeds of the Post-Petition Financing. In consideration for providing the Post-Petition Financing, the Lender will be entitled to receive a commitment fee of $20,000, which fee shall be fully earned and payable upon the entry of this Interim Order.

6.     *Termination of Post-Petition Credit.*   (a) The Lender's willingness to make loans hereunder and the Lender's consent to the Debtors' use of Cash Collateral shall be subject to termination (the "*Post-Petition Termination Date*") and all Obligations shall be immediately due and payable in cash (except as the Lender may otherwise agree in writing in its sole discretion) upon the occurrence of any of the following events (the "*Post-Petition Defaults*"), in each case subject to the "*DIP Cure Period*" defined below:

(b)     (i)       Any Debtor fails to pay any amount payable under the DIP Credit Agreement when due and payable, and such failure to pay continues for period of three (3) business days thereafter following the receipt of written notice from the Lender (the "*DIP Cure Period*");

(ii)       (A) Any Debtors fail or neglect to perform, keep, or observe any of the provisions of <u>Sections 1, 4 or 5</u> of the DIP Credit Agreement, (B) an "Event of Default" occurs under any other DIP Loan Documents; or (C) any Debtor fails or neglects to perform, keep, or observe any of the provisions or obligations required under the Financing Orders;

(iii)       Any representation or warranty herein, in any other DIP Loan Documents, or in any written statement, report, financial statement or certificate made or delivered to Lender contemporaneously herewith is untrue or incorrect in any material respect as of

1308428v11

the date when made or deemed made (other than any representation or warranty qualified as to a Material Adverse Effect, which such representation or warranty must be true and correct in all respects as of the date when made or deemed made).

(iv)     The DIP Credit Agreement, any other DIP Loan Documents, or Financing Order shall, for any reason, cease to create a valid Lien on the Collateral purported to be covered thereby or such Lien shall cease to be a perfected priming first-priority Lien (except as expressly provided in any Financing Order) pursuant to Section 364 of the Bankruptcy Code or Debtor shall so allege in any pleading filed in any court.

(v)     A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases.

(vi)     Entry of an order by the Bankruptcy Court converting one or more of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or dismissing one or more of the Chapter 11 Cases.

(vii)     Application by any Debtor (or any other party with the support of a Debtor) to the Bankruptcy Court in the Chapter 11 Cases or any other court of competent jurisdiction for an order authorizing the granting of any liens or claims *pari passu* or senior to Lender's Lien and the Super-Priority Indebtedness.

(viii)     Filing by any Debtor of any plan or reorganization other than one providing for the indefeasible payment in full in cash, on or prior to the maturity date of the DIP Loan;

(ix)     The Financing Orders are amended, stayed, vacated, or modified without Lender's prior written consent.

(x)     Filing of any challenge by any Debtor to the validity, priority, or extent of any Liens in favor of Lender.

(xi)     The entry by the Bankruptcy Court of an order terminating any Debtor's right to use Cash Collateral;

(xii)     The Debtors' bankruptcy estates become administratively insolvent, with such determination being made by comparing the value of the Debtors' assets, taken as a whole, to the amount of Debtors' post-petition administrative expense liabilities without regard to current cash flows.

(xiii)    Any Debtor shall use cash collateral or any proceeds of the DIP Loan, for any item other than those set forth in, and in accordance with, the Approved Budgets and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by the Bankruptcy Court and Lender; or

(xv)    Unless replaced by a Person acceptable to Lender in its sole discretion and confirmed by the Bankruptcy Court within thirty (30) days, the Debtors fail for any reason to maintain Kevin Cleary of Fort Dearborn Partners as the chief restructuring officer of the Debtors (or other Person having functionally equivalent authority, duties and responsibilities consistent with the position of a chief restructuring officer acceptable to Lender in its sole discretion.

(xvi)    The Debtors shall fail to comply with the Milestones set forth in Section 4.10 of the DIP Credit Agreement, subject in all respects to the "*Milestone Cure Period*" as therein defined.

7.    *Security for Indebtedness.*  (a) The Lender is hereby granted as security for the DIP Obligations, pursuant to sections 363, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a valid and perfected first lien (the "*DIP Liens*") on the DIP Collateral, as that term is defined on Annex A to the DIP Credit Agreement. The DIP Liens shall be junior in priority to any valid, perfected and unavoidable liens to the extent that such liens are senior to the Pre-Petition Liens under applicable law as of the Petition Date, but solely upon an adjudication that such alleged lien is valid, and including any liens that are properly perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code.  The Lender at its option may release at any time from its liens and security interests any assets determined by the Lender to have a risk of environmental liabilities which the Lender in its sole discretion deems unacceptable.   The interest of the Debtors' estates in any property for which a security interest or lien is avoided or otherwise preserved for the benefit of Debtors' estates under section 551, or any other provision of the Bankruptcy Code, shall be subordinate to the DIP Liens. The DIP Liens expressly exclude

any and all claims or rights of action arising under chapter 5 of the Bankruptcy Code (collectively, the "*Avoidance Actions*").

(b)     For all DIP Obligations arising under this Interim Order, the Lender is granted an allowed super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia,* sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "*Superpriority Claim*"), *provided, however*, that the Superpriority Claim shall be subject to the payment of the Carve-Out and the Approved Budget Expenses incurred, accrued, unpaid or otherwise payable prior to the Post-Petition Termination Date in accordance with this Interim Order. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtors, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors, subject to the limitations provided herein.  Notwithstanding anything herein to the contrary, the Superpriority Claim shall not be recoverable from the Avoidance Actions.

(c)     All Cash Collateral arising from Pre-Petition Collateral (including as provided and set forth under section 552(b) of the Bankruptcy Code) (the "*Pre-Petition Cash Collateral*") subject to the liens granted by the Debtors shall be deemed to be collateral for the Pre-Petition Obligations, as well as for the DIP Loans. All Cash Collateral arising from the DIP Collateral (the "*Post-Petition Cash Collateral*") subject to the liens granted by the Debtors shall be deemed

17

to be collateral for the DIP Obligations and the Adequate Protection Claims, as defined and in the manner set forth under paragraph 8.

8.    *Adequate Protection for Use of Cash Collateral.* As adequate protection for the Lender's consent to the use of Cash Collateral, the Lender is hereby granted valid, binding, continuing, enforceable fully perfected, first-priority replacement liens on and senior security interest in and to all of the DIP Collateral (the "*Adequate Protection Liens*"), subject only to the Carve-Out, the Approved Budget Expenses and the DIP Liens, for any diminution in the value of the Lender's interest in the Pre-Petition Collateral including the Pre-Petition Cash Collateral resulting from the sale, lease or use of the Pre-Petition Collateral from and after the Petition Date, other than the priming of the Pre-Petition Collateral by the DIP Collateral (the "*Adequate Protection Claim*").

9.    *Perfection of New Liens.* All liens and security interests on or in the DIP Collateral and the Adequate Protection Liens granted to the Lender by this Interim Order and the Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; *provided, however,* that notwithstanding the provisions of section 362 of the Bankruptcy Code, (i) the Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the Lender may require, and (ii) the Lender may require the Debtors to deliver to the Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtors is directed to cooperate and comply therewith. If the Lender, in its

sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if the Lender, in accordance with the DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents, or taking possession, shall be deemed to have been filed or recorded, or taken, in the Chapter 11 Cases, as of the entry of this Interim Order but with the priorities as set forth herein. The Lender may (in its discretion) but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have any real or personal property and such filing or recording shall constitute further evidence of perfection of the Lender's interests in the DIP Collateral.

10. *Waiver.* The Debtors and the estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right, (a) without the Lender's prior written consent (which may be withheld in its sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Obligations in this Interim Order and, subject to the entry of a Final Order, the Obligations: (i) to grant or impose, or request that the Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Collateral, which are *pari passu* with or superior to the Lender's liens on and security interests in such DIP Collateral, other than the Carve-Out; (ii) to return goods pursuant to section 546(c) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise, unless otherwise directed by Court order; or (iii) to modify or affect any of the rights of the Lender under this Interim Order or any DIP Loan Documents by

any order entered in the Chapter 11 Cases or any subsequent or superseding case, including any conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto (collectively, a *"Successor Case"*).

11. *Modification of Automatic Stay; Other Remedies.* (a) Except as set forth in subparagraph (b) of this paragraph, which governs any action by the Lender to foreclose on its liens on any DIP Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated as to the Lender to permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Interim Order and the other DIP Loan Documents without further application or motion to, or order from, the Court. Except as set forth in subparagraph (b) of this paragraph, the Lender is hereby granted leave, among other things, to (i) receive and apply payments of the DIP Obligations and collections on and proceeds of the Pre-Petition Collateral and the DIP Collateral to the DIP Obligations in the manner specified in this Interim Order and the DIP Loan Documents, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iii) charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Interim Order as provided therein, (iv) give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order, and (v) cease making loans or other extensions of credit and/or suspend or terminate any obligation of the Lender to make loans or other extensions of credit under the DIP Loan Documents or this Interim Order solely from and after the Post-Petition Termination Date.

(b) Upon the occurrence of the Post-Petition Termination Date, the Debtors' ability to use Cash Collateral and proceeds of the Post-Petition Financing shall terminate without notice.

The Lender shall thereafter be entitled to deliver written notice of its intention to exercise its remedies under the DIP Loan Documents and following the expiration of seven (7) calendar days, the Lender will be entitled to exercise the remedies provided and set forth in Section 7 of the DIP Credit Agreement. Unless the Bankruptcy Court orders otherwise, (x) the automatic stay, as to the Lender, shall be automatically terminated at the end of such notice period, without further notice, hearing, or order, and (y) the Debtors shall cooperate with the Lender, to effect an orderly liquidation of the DIP Collateral on terms and conditions acceptable to the Lender. The Debtors shall immediately provide notice to the Lender (with a copy to counsel to the Committee) of the occurrence of any Post-Petition Default. Notwithstanding anything herein to the contrary, the rights of the Lender upon the occurrence of the Post-Petition Termination Date shall be expressly subject to the payment of, and funding made available from the Lender or any proceeds of sale: (i) for all fees and expenses incurred, accrued, unpaid or otherwise payable under the Carve-Out, including the Supplemental Fees and Expenses (as defined in paragraph 13 hereof); and (ii) for all incurred, accrued, unpaid or otherwise payable Approved Budget Expenses.

12.     *Priority Claims.*  Subject to the Carve-Out and the Approved Budget Expenses, the DIP Obligations shall have the highest administrative priority under section 364(c)(l) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise, whether incurred in the Chapter 11 Case or any Successor Case, and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Case or any Successor Case.  Nothing in this Interim Order or the Approved Budget(s) or any other budget shall constitute the consent by the Lender to the imposition of any costs or expense of

1308428v11

administration or other charge, lien, assessment or claim (including any amounts set forth in the Approved Budget or any other budget) against the Lender, its claims or its collateral under section 506(c) of the Bankruptcy Code or otherwise.

13. *Carve-Out.* (a) The Lender's liens on and security interests in the DIP Collateral or the Pre-Petition Collateral and its administrative expense claims under sections 364(c)(1) or 507(b) of the Bankruptcy Code, the liens securing the Subordinated Debt (as such term is defined in the Subordination Agreements), and any section 507(b) claims granted pursuant to this Interim Order or the Final Order shall be subject only to the following (the "*Carve-Out*"): (i) all expenses set forth in the Approved Budgets; (ii) all fees required to be paid to the clerk of the Bankruptcy Court, any agent thereof and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (iii) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iv) to the extent allowed by the Bankruptcy Court, all claims for unpaid fees, costs and expenses (the "*Professional Fees*") incurred by persons or firms retained by the Debtors or any Committee whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (collectively, the "*Professional Persons*") that are: (A) based upon services rendered at any time prior to the occurrence of an Event of Default unless such Event of Default is waived or cured as provided in this Agreement, or (B) following the Post-Petition Termination Date, if any, in an aggregate amount not to exceed $150,000 for Professional Fees of the Debtors, $50,000 for Professional Fees of a Committee (if appointed) and $25,000 for Professional Fees of a subsequently appointed chapter 7 or chapter 11 bankruptcy trustee (collectively, the "*Supplemental Fees and Expenses*"). As long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay all fees, expenses, compensation and reimbursement of expenses allowed and payable, including under

any order entered in the Chapter 11 Cases establishing procedures for interim monthly compensation and reimbursement of Professional Fees, or sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out. In the event the Carve-Out is reduced by any amount during an Event of Default, upon the effectiveness of a cure of such Event of Default, the Carve-Out shall be increased by such amount. Nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii) or (iii) above, on any grounds.

(b)     Notwithstanding anything to the contrary in this Interim Order or the Loan Documents, no proceeds of the Carve-Out, the Obligations, Cash Collateral (including any pre-petition retainer funded by the Lender pursuant to the Pre-Petition Loan Documents), Pre-Petition Collateral or DIP Collateral may be used to pay any claims for services rendered by any of the Debtors Professionals, the Committee Professionals or any other person in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens and security interests of the Lender in the Pre-Petition Collateral or the DIP Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the Pre-Petition Loan Documents, this Interim Order and/or the DIP Loan Documents or the Lender's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Collateral; *provided*, *however*, that the Committee Professionals may expend up to $25,000 for fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to,

the stipulations and admissions of the Debtors contained in this Interim Order. The Lender shall retain its rights as a party in interest to object to any claims of any of the Debtors Professionals and the Committee Professionals.

14. *Cash Collection Procedures.* From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time, shall be deposited in the same bank account(s) into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition Credit Agreement (or in such other accounts as are designated or, in the case of the Carve-Out and the Approved Budget Expenses, consented to by the Lender from time to time). Except as otherwise set forth herein, all Cash Collateral in the possession or control of the Debtors as of the Petition Date and as otherwise set forth in section 552(b) of the Bankruptcy Code, constitutes proceeds of the Pre-Petition Collateral. All Cash Collateral shall only be utilized in conformance with an Approved Budgets. If applicable, all financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of the Lender to turnover to the Lender all funds therein without offset or deduction of any kind.

15. *Budget; Use of Loan and DIP Collateral Proceeds.* Attached as <u>Exhibit B</u> hereto and incorporated herein by reference is a budget (which has been approved by the Lender) setting forth by line item all projected cash receipts and cash disbursements for the time period from the Petition Date through the week ending June 30, 2024 (the *"Approved Budget"*). The Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the Lender and the Debtors agree in writing in its respective sole discretion (each such

additional budget, a *"Supplemental Approved Budget"*) (the Approved Budget and any and all Supplemental Approved Budgets shall constitute *"Approved Budget(s)."*) *(The aggregate of all expenses approved under the Approved Budgets, together with the Permitted Variances as set forth in Section 5.8 of the DIP Credit Agreement, shall be collectively referred to as the "Approved Budget Expenses").* Except as otherwise provided herein, the proceeds of DIP Loans or other extensions of credit made by the Lender to Debtors pursuant to this Interim Order and the DIP Loan Documents, all proceeds of DIP Collateral and all Post-Petition Cash Collateral shall be used only as follows: (a) prior to the Post-Petition Termination Date, *first,* to the payment of the Approved Budget Expenses (subject to the limitations and exceptions set forth in this ordering paragraph), and the Carve-Out, *second*, to the payment of the DIP Loan, and *third*, to any Adequate Protection Claims; and (b) on or after the Post-Petition Termination Date, *first*, to the payment of any Approved Budget Expenses and the Carve-Out that were incurred, accrued, unpaid or otherwise payable prior to the Post-Petition Termination Date, in amounts not to exceed the line items set forth for in the Approved Budgets through the Post-Petition Termination Date, *second*, to the payment of the Supplemental Fees and Expenses, and *third*, to the DIP Loan. The Lender shall have no obligation with respect to the Debtors' use of the proceeds of the Post-Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with any Approved Budgets or to pay (directly or indirectly from its DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget(s). Funds borrowed under this Interim Order and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with this Interim Order. The Lender's consent to any Approved Budget(s) shall not be construed as consent to the use of any Cash Collateral or a commitment to continue to provide Post-Petition Financing after the occurrence of a Post-Petition Termination Date, regardless of whether the

aggregate funds shown on the Approved Budget(s) have been expended. To induce the Lender to permit the Debtors to use Cash Collateral and borrow additional funds, the Debtors have agreed, and this Court hereby orders, that as long as any of the Obligations are outstanding, the Debtors shall not seek, assert, argue for, encourage or support the use of Cash Collateral of the Lender by the Debtors except as expressly permitted and consented to by the Lender pursuant to the terms of this Interim Order.

16.     *Covenants.*  The Debtors shall timely comply with all of the covenants set forth in this Interim Order and the DIP Loan Documents, subject in all respects to the DIP Cure Period.

17.     *Application of Pre-Petition Collateral Proceeds.*  (a) Subject to paragraph 15 hereof and the prior payment of Approved Budget Expenses, the Carve-Out and the Supplemental Fees and Expenses, all proceeds of Pre-Petition Collateral including Pre-Petition Cash Collateral, shall thereafter be applied (i) *first*, to the payment of the DIP Loan; (ii) *second*, to the payment of the Adequate Protection Claims; and (iii) *third*, to the payment of the Pre-Petition Obligations.

(b) In the event that there is ambiguity as to whether particular collateral is Pre-Petition Collateral or DIP Collateral, or whether proceeds are proceeds of Pre-Petition Collateral or DIP Collateral, such collateral shall be deemed to be Pre-Petition Collateral and such proceeds shall be deemed to be proceeds of Pre-Petition Collateral and applied accordingly in accordance with the provisions of this paragraph.  The Debtors shall not have the right to direct the manner of application of any payments to the Lender or any other receipts by the Lender of proceeds of any of the Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this paragraph.

18.     *Non-Ordinary Course Dispositions.*  No sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any auction or other similar sales) may be done without the Lender's written consent.

1308428v11

19.     *Books and Records.*   The Debtors shall permit the Lender and any authorized representatives designated by the Lender (including its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the Debtors, including the Debtors' respective financial and accounting records, and to request copies and take extracts therefrom, and to discuss Debtors' affairs, finances and business with Debtors' officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the Debtors shall promptly provide to the Lender and the Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants in the DIP Loan Documents and this Interim Order.

20.     *The Lender's Reservation of Rights; No Waiver.*   The Lender does not waive, and expressly reserves, any and all claims, defenses, rights, and remedies it has pursuant to any or all of the Pre-Petition Loan Documents, the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent, or other representative of the Debtors.   In addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the Lender arising under this Interim Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors, in its pre-petition capacity, under the Pre-Petition Loan Documents.

21.     *Order Binding on Successors.*   The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of Debtors' estates or of any estate in any Successor Case) and the Professional Persons.   Except as otherwise explicitly set forth in this Interim Order, no third parties other than the Professional

Persons are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

22. *Effect of Dismissal, Conversion or Substantive Consolidation.* If the Chapter 11 Cases are dismissed, converted, otherwise superseded or substantively consolidated, the Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, superseded, or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supercission or substantive consolidation, all of the terms and conditions of this Interim Order, including the liens and the priorities granted hereunder, shall remain in full force and effect.

23. *Releases and Validation of Pre-Petition Obligations and Liens; Allowance of Secured Claim.* The releases, discharges, waivers, and agreements set forth in Recital C and in this paragraph will be subject to the rights of the Committee and any other party in interest to object on the terms and conditions set forth in paragraph 25. The Debtors and their estates, hereby: (a) release and discharge the Lender, together with its affiliates, agents, attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between the Lender and the Debtors, or any other acts or omissions by the Lender in connection with any of the Pre-Petition Loan Documents or its pre-petition relationship with the Debtors; (b) waive any and all defenses (including offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability (under sections 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Obligations and the security interests in and liens on the Pre-Petition Collateral in favor of the Lender; and (c) agree, without further Court order, to the allowance of the pre-petition claims of the Lender pursuant to sections 502 and 506 of the

1308428v11

Bankruptcy Code on account of the Pre-Petition Obligations as fully secured claims according to the Lender's books and records, the principal amount of which is not less than $14,215,000.00 as of the Petition Date, plus accrued pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Pre-Petition Loan Documents.

24.     *The Lender's Relationship with Debtors.*  In making decisions to advance any loans or other extensions of credit to the Debtors, in administering any loans or other extensions of credit, or in taking any other actions reasonably related to this Interim Order or the DIP Obligations or the DIP Loan Documents (including the exercise of its approval rights with respect to any budget), the Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Lender and the Debtors.

25.     *Objections by Parties in Interest.*  (a) The stipulations, admissions and releases contained in this Interim Order shall be binding on the Debtors and all parties in interest, including any Committee, unless such Committee, other committee or any other party in interest (other than the Debtors) (i) obtains the authority to commence and commences, or, if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case commences, on or before the date that is the later of (A) 75 days after the entry of this Interim Order, (B) in the case of such action by the Committee, 60 days after the appointment of the Committee, or (C) such later date

as has been agreed to, in writing, by the Lender, if any (such time period shall be referred to as the *"Challenge Period,"* and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the *"Challenge Period Termination Date"*), (x) files prior to the Challenge Period Termination Date, a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Interim Order, or (y) files prior to the Challenge Period Termination Date, a contested matter or adversary proceeding against the Lender in connection with or related to the Pre-Petition Obligations, the Pre-Petition Loan Documents, the validity, enforceability, priority or extent of the Lender's liens on the Pre-Petition Collateral, or the actions or inactions of the Lender arising out of or related to the Pre-Petition Obligations, or otherwise, including any claim against the Lender in the nature of a "*lender liability*" claim, or any other causes of action, setoff, counterclaim or defense to the Pre-Petition Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the *"Claims and Defenses"*) and (ii) obtains a judgment from this Court in any such timely and properly commenced contested matter or adversary proceeding asserting the Claims and Defenses.

(b) If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then the admissions, stipulations, findings and releases included in this Interim Order, including the release provisions herein, shall be binding on all parties in interest, including any Committee, and (i) the Pre-Petition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Case and any subsequent chapter 7 case, (ii) the Lender's liens on the Pre-Petition Liens shall be deemed legal, valid, binding, enforceable

and properly perfected, not subject to recharacterization, subordination, avoidance or reduction and (iii) the Pre-Petition Obligations, the Pre-Petition Liens, the conduct of the Lender, and the Lender itself shall not be subject to any other or further challenge by any party in interest, and any such party shall be enjoined and forever barred from seeking to exercise the rights of the Debtors' estates regarding any such challenge, including any successor thereto, or from asserting any Claims and Defenses against the Lender, or its respective agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys or advisors (solely in its capacities as such). If any such adversary proceeding or contested matter is timely filed prior to the Challenge Period Termination Date, the stipulations and admissions and provisions contained in this Interim Order or the Final Order shall nonetheless remain binding and preclusive on the Committee, the Debtors and the Debtors' estates and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter by such party. The Challenge Period may be extended for the benefit of any one or more parties by written agreement of the Lender in its sole discretion without further order of the Court. Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any cause of action belonging to any of the Debtors or their estates, including any claim and defense or other claim against the Lender. If a chapter 7 trustee is appointed prior to the expiration of the Challenge Period, such trustee shall have until the later of (a) the termination of the Challenge Period or (b) twenty-one (21) days following such trustee's appointment, to commence a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Interim Order, or to seek an extension of the Challenge Period.

1308428v11

26.     *Effect of Modification of Order.*   The Debtors shall not, without the Lender's prior written consent, seek to modify, vacate, or amend this Interim Order or any DIP Loan Documents.   If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any DIP Obligations outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such DIP Obligations. Notwithstanding any such stay, modification or vacatur, any DIP Obligations outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all the rights, privileges and benefits, including the security interests and priorities granted herein, with respect to all such DIP Obligations.

27.     *Safe Harbor.*   The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and the Lender have agreed.   Thus, each of such terms and conditions constitutes a part of the authorization under section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code.

28.     *Subsequent Hearing; Procedure for Objections and Entry of Final Order.*   The Motion is set for a Final Hearing before this Court at 11:00 a.m. on May 1, 2024 (such date or such later date to which the Final Hearing is adjourned or continued with the Lender's consent, the *"Final Hearing Date"*), at which time any party in interest may present any timely filed objections to the entry of a Final Order, in form and substance acceptable to the Lender in its sole discretion.   The Debtors shall, within five (5) days from the entry of this Interim Order,

1308428v11

serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by regular mail upon (i) the Noticed Parties, and (ii) any other party which theretofore has filed in the Chapter 11 Cases a request for special notice with this Court and served such request upon the Debtors' counsel. The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of Illinois no later than April 29, 2024, which objections shall be served so that the same are received on or before 5:00 p.m. (prevailing Central time) of such date by (i) Howard L. Adelman, Adam P. Silverman and Adelman & Gettleman, Ltd., proposed counsel to the Debtors, (ii) Eric S. Rein, Kilpatrick Townsend & Stockton LLP, counsel to the Lender, (iii) U.S. Department of Justice, and (iv) the U.S. Trustee. Any objections by creditors or other parties in interest to any of the provisions of this Interim Order shall be deemed waived unless filed and served in accordance with this paragraph.

29. *No Marshalling.* Subject to entry of the Final Order, the Lender shall not be under any obligation to marshal any assets in favor of the Debtors or any other party or against or in payment of any or all of the Obligations.

30. *Shortened Notice.* Notice of the Motion on a shortened and expedited basis is allowed and approved.

31. *Objections Overruled or Withdrawn.* All objections to the entry of this Interim Order have been withdrawn or overruled.

32. *Controlling Effect of Order.* To the extent any provisions in this Interim Order conflict with any provisions of the Motion, any Pre-Petition Loan Documents or any DIP Loan Documents, the provisions of this Interim Order shall control.

1308428v11

33.    *Order Effective.*  This Interim Order shall be effective as of the date of signature by

the Court.

Dated: April 18, 2024
      Chicago, Illinois

                      HONORABLE DAVID D. CLEARY
                      UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**DIP AGREEMENT**

# EXHIBIT B

# BUDGET

# Exhibit A

# DIP Agreement

**SECURED SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT**

dated as of April 18, 2024

among

**THE OBERWEIS GROUP, INC.,**
**OBERWEIS DAIRY, INC.,**
**NORTH AURORA ICE CREAM LLC,**
**TOGI BRANDS, LLC,**
**TOGI RE I, LLC, and**
**THIRD MILLENNIUM REAL ESTATE L.L.C.**

as Debtors,

and

**CIBC BANK USA**

as Lender

**ANNEXES**

ANNEX A DEFINITIONS
ANNEX B CLOSING CHECKLIST
ANNEX C REPORTING
ANNEX D NOTICE ADDRESSES

**SCHEDULES**

SCHEDULE 1.3 BUDGET
SCHEDULE 3.8 INSURANCE POLICIES
SCHEDULE 3.9 THIRD PARTY LIENS
SCHEDULE 3.10 SUMMARY OF PRE-PETITION OBLIGATIONS
SCHEDULE 3.13 MATERIAL LEASES

**EXHIBITS**

EXHIBIT A FORM OF PROPOSED NOTICE OF BORROWING
EXHIBIT B FORM OF INTERIM FINANCING ORDER
EXHIBIT C FORM OF FINAL FINANCING ORDER

This SECURED SUPER-PRIORITY POST-PETITION CREDIT AGREEMENT (this "Agreement"), dated as of April 18, 2024, among THE OBERWEIS GROUP, INC., a Delaware corporation ("Holdings"), OBERWEIS DAIRY, INC., an Illinois corporation ("Dairy"), NORTH AURORA ICE CREAM LLC, an Illinois limited liability company ("NAIC"), TOGI BRANDS, LLC, an Illinois limited liability company ("Brands"), TOGI RE I, LLC, an Illinois limited liability company ("TOGI REI"), THIRD MILLENNIUM REAL ESTATE L.L.C., an Illinois limited liability company ("TMRE" and together with Holdings, Dairy, NAIC, Brands, TOGI RE, collectively on a joint and several basis, the "Debtors") and CIBC BANK USA, an Illinois state chartered bank (the "Lender").

## RECITALS

WHEREAS, on April 12, 2024 (the "Petition Dates"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Illinois, Eastern Division, Case No. 24-05385; Case No. 24-05388; Case No. 24-05389; Case No. 24-05391; Case No. 24-05392; and Case No. 24-05393 (the "Bankruptcy Cases").

WHEREAS, the Lender heretofore extended the CIBC Loans to the Debtors pursuant to the Pre-Petition Loan Documents.

WHEREAS, Lender is willing to make available to Debtors the DIP Loan upon the terms and subject to the conditions set forth herein and in the Financing Orders;

WHEREAS, the funding hereunder will facilitate the sale of the assets of the Debtors as a going concern, pursuant to Section 363 of the Bankruptcy Code (the "Section 363 Sale")

WHEREAS, each Debtor has agreed to secure the obligations to Lender hereunder with, *inter alia,* security interests in, and liens on, substantially all of Debtors' personal property and assets, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them herein and in Annex A. All annexes, schedules, exhibits and other attachments hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

### 1.1 Credit Facility.

(i)     Multiple Delayed Draw Term Loan Credit Facility.

(A)     Subject to the terms and conditions hereof, Lender agrees to make the DIP Loan available to the Debtors in the form of a multiple delayed draw term loan with advances in an aggregate amount not to exceed One Million and 00/100 Dollars ($1,000,000) (the "Available Loan Amount").

(B)     Subject to the terms and conditions hereof, Lender agrees to make available to the Debtors, upon entry of the Interim Financing Order, the initial advance of the Available Loan Amount in an aggregate amount not to exceed (i) Four Hundred Thousand Dollars ($400,000) or (ii) such lesser sum as approved by the Bankruptcy Court (the "Initial Advance").  For the avoidance of doubt, the availability under the DIP Loan shall be reduced accordingly upon the funding of the Initial Advance.

(C)     Following the Initial Advance and subject to the terms and conditions hereof, each subsequent advance shall be made upon not less than one (1) business day prior written notice to Lender and each in amount not less than the lesser of (i) the remaining Available Loan Amount and (ii) Twenty-Five Thousand Dollars ($25,000); provided that, notwithstanding anything to the contrary contained in any Loan Agreement, the aggregate disbursements under this Agreement shall in no event exceed $1,000,000.

(D)     During the DIP Term, the Debtors shall be entitled to borrow and prepay the DIP Loan in accordance with the terms and conditions of this Agreement; provided, however, that (i) the Debtors may not borrow any amounts hereunder should an Event of Default have occurred and be continuing; and (ii) the Debtors may not re-borrow any amount of the DIP Loan that has been repaid or otherwise paid.  Lender shall have no obligation to make advances of the DIP Loan hereunder (i) upon the date which Lender has made advances of the DIP Loan in an aggregate amount equal to the Available Loan Amount or (ii) on or after the last day of the DIP Term.

(E)     Subject to the foregoing and the other terms and conditions of this Agreement, the Debtors, in order to request an advance of the DIP Loan hereunder, shall deliver a notice of borrowing substantially in the form attached hereto as **Exhibit A** (a "*Notice of Borrowing*") one (1) business day before disbursement of the DIP Loan shall be made, except for the Initial Advance sought under the Loan, which may be requested within one (1) business day of the entry of the Interim Financing Order substantially in the form attached hereto as **Exhibit B**. Each Notice of Borrowing shall specify the principal amount of the advance requested to be made. On the date of the proposed borrowing (which shall be the first business day following the delivery of the Notice of Borrowing) or as soon as reasonably practicable thereafter, Lender shall, subject to the satisfaction of all applicable conditions precedent and all other terms and conditions set forth herein, wire the requested advance in immediately available funds to a Controlled Account designated by the Debtors and confirmed in the applicable Notice of Borrowing. Lender is not required to keep any external or internal notations in respect of the advances under the DIP Loan and the failure to make such notations or keep any

such records shall not limit or affect the Debtors' joint and several obligations to pay all amounts owing hereunder as and when due; <u>provided</u>, <u>however</u> that to the extent Lender prepares or maintains any such notations or records, the notations and records of Lender shall be deemed conclusive absent manifest error.

(F)　　All Obligations including, without limitation, the entire unpaid disbursed balance of the DIP Loan and all accrued and unpaid interest, fees, and any other non-contingent obligations shall be immediately due and payable in full by the Debtors, on a joint and several basis, to Lender in immediately available funds on the Maturity Date, which is defined in section 6.1 hereof.

(G)　　All proceeds of the DIP Loan shall constitute and are hereinafter referred to as the "<u>Super-Priority Indebtedness</u>."

1.2　　<u>Repayments</u>.

(i)　　<u>Voluntary Repayment.</u>　The Debtors may at any time without premium or penalty repay the DIP Loan, <u>provided</u>, <u>that</u> (i) the Debtors shall give Lender notice of each prepayment by 12:00 noon Chicago time at least two (2) business days' prior to the date of any such prepayment of the DIP Loan and (ii) all prepayments of the DIP Loan shall be in a minimum amount equal to the lesser of $25,000 or the balance of the unpaid DIP Loan.

(ii)　　<u>Mandatory Prepayments</u>.

(A)　　If at any time the aggregate outstanding principal amount of the DIP Loan exceeds the Available Loan Amount, or, prior to the entry of the Final Financing Order, the amount permissible pursuant to the Interim Financing Order, the Debtors, on a joint and several basis, shall immediately repay the aggregate outstanding DIP Loan to the extent required to eliminate such excess.

(B)　　Within five (5) calendar days of receipt by any Debtor of cash proceeds of any Collateral, including as a result of the Section 363 Sale, the Debtors shall, on a joint and several basis, prepay the Available Loan Amount in an amount equal to one hundred percent (100%) of such cash proceeds, net of (A) reasonable commissions and other reasonable and customary transaction costs, fees (including attorneys' fees incurred by counsel to the Debtors and the Committee attributable to the subject transaction) and expenses properly attributable to such transaction and payable by the Debtors in connection therewith (in each case of any commissions or fees, paid to non-affiliates), (B) income, transfer, sales, or other taxes paid or payable by the Debtors in connection with such asset disposition, and (C) cash escrows (until released from escrow), (collectively, the "<u>Agreed Deducts</u>").　Any such prepayment shall be applied in accordance with Section 1.2(iii).

(C)　　Within five (5) calendar days of receipt by any Debtor of any Extraordinary Receipts received in cash, the Debtors shall, on a joint and several basis, prepay the DIP Loan in an amount equal to one hundred percent (100%) of

such cash Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts, including the Agreed Deducts. Any such prepayment shall be applied in accordance with Section 1.2(iii).

(iii)     Application of Payments. Any repayments or prepayments, as the case may be made by the Debtors shall be applied as follows: first, to any fees and expenses of Lender then due and payable pursuant to any of the DIP Loan Documents (including, without limitation, reasonable fees and disbursements of counsel to Lender incurred in connection with (i) the preparation, execution and delivery of the DIP Loan Documents and the administration thereof and (ii) the Chapter 11 Cases); second, to interest then due and payable on the DIP Loan; third, to the principal balance of DIP Loan outstanding until the same has been paid in full; and fourth, in the case of proceeds of Prepetition Collateral, to the balance of the Obligations.

(iv)     Generally. All payments hereunder shall be made in lawful money of the United States and in immediately available funds. Any extension of time for the payment of any DIP Loan resulting from the due date falling on a non-business day shall be included in the computation of interest. The date, amount, and the interest rate with respect to the DIP Loan, and all payments of any Obligations with respect thereto, may be recorded by Lender on its books and, at the discretion of Lender prior to any transfer of this Agreement at any other time, may be endorsed by Lender on a schedule or other notation. Any such endorsement shall be conclusive absent manifest error. Each Debtor waives presentment, notice of dishonor, protest, and any other notice or formality with respect to this Agreement.

1.3     Use of Proceeds. No Debtor will directly or indirectly use the proceeds of the DIP Loan for any purpose other than those set forth in the Schedule 1.3 (the "Budget") subject to, in each case, any Permitted Budget Variance. Payments made pursuant to the Budget or otherwise permitted hereunder may, at the sole and absolute discretion of Lender, be funded directly from the proceeds of the DIP Loan by Lender and, for the avoidance of doubt, such amounts shall be charged at Lender's discretion to the Debtors on a joint and several basis, through a corresponding reduction in the Available Loan Amount. Notwithstanding anything to the contrary herein, except as provided in the Financing Orders, no proceeds of the DIP Loan may be used or otherwise made available for any fees or expenses incurred by any Person or entity in connection with: (i) the investigation, initiation or prosecution of any claims (including for the avoidance of liens or security interests) against Lender or any of its affiliates, or preventing, hindering, or delaying the assertion of enforcement of any lien, claim, right or security interest or realization upon any collateral that secures any loan, including the DIP Loan, made to the Debtors by Lender; (ii) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior consent of Lender; (iii) a request, without the prior consent of Lender, for authorization to obtain debtor-in-possession financing or other financial accommodations without the prior written consent of Lender, unless such financing would pay Lender in full; or (iv) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of Lender, or which results in the occurrence of an Event of Default under the DIP Loan Documents, unless otherwise agreed by Lender. Notwithstanding anything contained herein to the contrary, the Committee may utilize up to 25,000 of the DIP Loan solely for investigatory purposes relative to the pre-petition conduct of the Lender (the "Investigatory Carve-Out").

1.4    Interest.

(i)    Interest shall accrue on the unpaid principal amount of the DIP Loan from the date made through the date of the repayment thereof at a rate equal to ten percent (10%) per annum. The Debtors, on a joint and several basis, shall pay interest to Lender on the outstanding amount of the DIP Loan at the time of the payments required pursuant to Section 1.2(ii) hereof.

(ii)    If any payment on the DIP Loan becomes due and payable on a day other than a business day, the maturity thereof will be extended to the next succeeding business day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(iii)    All computations of interest (including, without limitation, interest accruing following the occurrence and during the continuance of an Event of Default) shall be made by Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(iv)    So long as an Event of Default (as defined and described in Section 7.1) has occurred and is continuing, at the election of Lender, confirmed by written notice from Lender to the Debtors, the interest rates applicable to the DIP Loan shall be increased by four percentage points (4%) per annum above the rates of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding obligations under the Loan shall bear interest at the Default Rate applicable to such outstanding obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

1.5    Fees. The Debtors shall, on a joint and several basis, pay to Lender a commitment fee of Twenty Thousand Dollars ($20,000) upon the approval of the Interim Financing Order by the Bankruptcy Court (the "Commitment Fee"). The Commitment Fee shall be payable in U.S. dollars in immediately available funds, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and liabilities with respect thereto (with appropriate gross-up for withholding taxes) and shall not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute any Debtors may have.

2.    **CONDITIONS PRECEDENT**

2.1    The effectiveness of this Agreement and the obligation of the Lender to make the Initial Advance or to fulfill, or perform any other action in respect thereof is subject to the satisfaction of the following conditions precedent in form and substance satisfactory to Lender in its sole and absolute discretion on or before the date of the Initial Advance unless otherwise waived by Lender in writing in its sole and absolute discretion (such date, the "Closing Date"):

(i)    Credit Agreement.    This Agreement (including, without limitation, completed annexes, exhibits and schedules) together with any other DIP Loan Documents required by Lender to be executed as of the Closing Date or counterparts thereof shall have been duly

executed by, and delivered to all parties hereto in form and substance reasonably satisfactory to Lender.

(ii)     <u>Interim Financing Order</u>. The entry by the Bankruptcy Court in the Bankruptcy Cases of the Interim Financing Order substantially in the form attached hereto as **Exhibit B**, and, if such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending such appeal.

(iii)     <u>No Reversal</u>.  The Interim Financing Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lender and shall not be subject to a stay.

(iv)     <u>DIP Loan Documents</u>.  DIP Loan Documents or counterparts thereof shall have been duly executed by, and delivered to all parties hereto; and Lender shall have received such other DIP Loan Documents and instruments, contemplated by this Agreement including all those listed in the Closing Checklist attached hereto as <u>Annex B</u>, each in form and substance mutually acceptable to Lender and Debtors.

2.2     The obligation of Lender to make any advance of the DIP Loan subsequent to the Initial Advance or to fulfill, or perform any other action in respect thereof is subject to the satisfaction of the following conditions precedent in form and substance satisfactory to Lender in its sole and absolute discretion on or before the date of the first advance subsequent to the Initial Advance unless otherwise waived by Lender in writing in its sole and absolute discretion:

(i)     <u>Final Financing Order</u>. The entry by the Bankruptcy Court in the Bankruptcy Cases of the Final Financing Order substantially in the form attached hereto as **Exhibit C** and, if such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending such appeal.

(ii)     <u>No Reversal</u>. The Final Financing Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lender and shall not be subject to a stay.

2.3     The obligation of Lender to honor any request for an advance of the DIP Loan (including, without limitation, the Initial Advance, and each subsequent advance) is subject to the following conditions precedent, each of which must be satisfied in a manner satisfactory to Lender in its sole discretion:

(i)     Both before and after giving effect to the incurrence of any advance of the DIP Loan hereunder, the following statements shall be true and correct:

(A)     The representations and warranties of the Debtors in this Agreement and the other DIP Loan Documents shall be true and correct in all material respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date);

(B)    No Event of Default shall exist or be continuing either prior to or after giving effect to the making such advance of the Loan;

(C)    No Material Adverse Effect shall have occurred;

(D)    The making of such advance of the DIP Loan (and the use of the proceeds therefrom) shall not be enjoined, temporarily, preliminarily, or permanently;

(E)    Lender shall have approved the Budget;

(F)    the Bankruptcy Cases shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(G)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Bankruptcy Cases; and

(H)    The Debtors maintain a Permitted CRO (as defined below).

(ii)    Lender shall have received such other documents, approvals, and items as required herein and as Lender may request in its reasonable discretion.

## 3. REPRESENTATIONS AND WARRANTIES

Each Debtor, jointly and severally, makes the following representations and warranties to Lender as of the Closing Date and as of the date of each advance of the DIP Loan hereunder, each and all of which shall survive the execution and delivery of this Agreement:

3.1    <u>Enforceability</u>. Upon the approval of the Financing Orders by the Bankruptcy Court, the DIP Loan Documents will constitute the legal, valid, and binding obligations of each Debtor, enforceable against such Debtor in accordance with their terms, subject in all respects to the applicable provisions of the Bankruptcy Code.

3.2    <u>Authority and Ownership</u>. Each Debtor, subject to the entry of the Financing Orders, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise bind such Debtor and encumber the property of the estate in the Bankruptcy Cases pursuant to the terms of this Agreement and such Debtor owns all right, title and interest in, to and under all of the Collateral.

3.3    <u>Due Organization and Qualification</u>. Each Debtor is a corporation or limited liability company duly existing under the laws of its state of organization and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified.

3.4    <u>Due Authorization; No Conflict</u>. Subject to the entry of the Financing Orders and the terms hereof, the execution, delivery, and performance of the DIP Loan Documents, have been

duly authorized, and will not (i) conflict with nor constitute a breach of any provision contained in such Debtors' organizational documents, (ii) result in the imposition of any lien, charge or encumbrance against any assets of or properties of such Debtor (other than the liens, security interests and encumbrances in favor of Lender) or (ii) to the Debtors' knowledge, violate any provision of applicable law (including, without limitation, Regulation U of the Federal Reserve Board), order writ, judgment, injunction, decree, determination or aware presently in effect having applicability to such Debtor or any of its assets or properties. Except as provided in the Bankruptcy Code, to the Debtors' knowledge, no consent, approval, or authorization of, or registration, declaration or filing with any governmental authority or Person is required as a condition to or in connection with the due and valid execution, delivery, and performance by any Debtor of any DIP Loan Documents.

3.5    Litigation. Except for the Bankruptcy Cases and except for any other litigation disclosed to and approved by Lender in writing, there are no actions, suits, investigations, or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) any Debtor that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or properties of any Debtor or any part of the DIP Collateral under any DIP Loan Documents; or (iii) any of the transactions contemplated in the DIP Loan Documents. There are currently no material judgments entered against any Debtor, other than as disclosed to and approved by Lender in writing, and no Debtor is in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

3.6    Environmental Condition. None of Debtors' properties or assets has ever been used by any Debtor or, to the best of each Debtor's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of each Debtor's knowledge, none of any Debtor's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any Environmental Laws; no lien arising under any Environmental Law has attached to any revenues or to any real or personal property owned by any Debtor; and no Debtor has received a summons, citation, notice, or directive from any federal, state or other governmental agency concerning any action or omission by any Debtor resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

3.7    Government Regulation. No Debtor is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, or any other federal or state statute that restricts or limits its ability to incur indebtedness or to perform its obligations hereunder.

3.8    Insurance. Schedule 3.8 lists all insurance policies of the Debtors' currently in effect.

3.9    Liens. Schedule 3.9 lists all existing liens in favor of third parties.

3.10    Prepetition Secured Indebtedness. The amount of the Obligations is listed accurately and fully on Schedule 3.10 attached hereto.

3.11    Use of Proceeds. The proceeds from the DIP Loan will be used only to make only those payments set forth in Section 1.3 hereof and the Budget.

3.12    Controlled Accounts. Following the establishment of the Controlled Accounts, all deposits, securities, investment, and other accounts of the Debtor are Controlled Accounts.

3.13    Material Leases.  Schedule 3.13 sets forth all real property leases to which Dairy is currently a party.


4.  **AFFIRMATIVE COVENANTS**

Each Debtor, on a joint and several basis, agrees that from and after the date hereof and until the indefeasible payment in full of the all Obligations:

4.1    Reporting.

(i)    Each Debtor shall provide to Lender: (i) copies of the monthly operating reports filed in the Bankruptcy Cases simultaneously with their filing, which reports will be timely filed by the Debtors in accordance with the applicable United States Trustee guidelines and regulations; (ii) every seven (7) days after the Closing Date, an updated thirteen (13) week cash flow forecast, in each case, in form and substance reasonably satisfactory to Lender in its sole and absolute discretion (each such forecast approved by Lender, in accordance with the provisions hereof, an "Approved Budget," and together with the Budget, the "Approved Budgets") for the subsequent thirteen (13) week period, consistent with the form of the initial Budget; (iii) beginning on the first Tuesday that is at least seven (7) days following the Closing Date and on Tuesday of each week thereafter, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Debtors for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to the initial Budget or the most recently Approved Budget delivered prior to such Variance Report (as applicable) on a weekly and cumulative basis, and each such Variance Report shall include explanations for all material variances. Lender shall have ten (10) days from the date of receipt of the Debtors' cash-flow forecast to object to the forecast by providing written notice to the Debtors specifying the objection; if no objection is made within ten (10) days, then the thirteen (13) week cash flow forecast shall become an Approved Budget without further notice.

(ii)    Each Debtor will use commercially reasonable efforts to cause its accountants, financial advisors, consultants, and parties providing management services to such Debtor to cooperate, consult with, and provide to Lender all such information as may be reasonably requested by Lender with respect to the businesses, results of operations, and financial condition of such Debtor.  Promptly following receipt, each Debtor shall provide to Lender copies of any notices (including notices of default or acceleration) received from any holder or trustee of, under or with respect to any Subordinated Indebtedness.  Promptly following the occurrence thereof, each Debtor shall notify Lender of any amendment, modification, breach, rescission or termination

of any Material Contract or the existence of any Material Contract entered into following the Closing Date.

(iii)     The Debtors shall timely deliver to Lender all items set forth on <u>Annex C</u>.

4.2     <u>Payment of Charges</u>.

(i)     Except as non-payment is permitted or payment is prohibited by the Bankruptcy Code or the Bankruptcy Court in the Bankruptcy Cases, each Debtor shall pay and discharge or cause to be paid and discharged promptly all Charges which could give rise to a Lien against the Collateral.

(ii)     Each Debtor may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, taxes or claims described in <u>Section 4.2(i)</u>; <u>provided</u>, that (i) adequate reserves with respect to such contest are maintained on its books; (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing the DIP Loan and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges; (iii) none of the DIP Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) it shall promptly pay or discharge such contested Charges, taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Debtor or the conditions set forth in this <u>Section 4.1(ii)</u> are no longer met and (v) Lender has not advised the Debtors in writing that Lender reasonably believes that nonpayment or nondischarge thereof could have or result in a material breach in Lender's good faith judgment.

4.3     <u>Books Records and Inspections</u>.   Each Debtor shall keep adequate books and records with respect to such Debtor's business activities in which proper entries, reflecting all financial transactions; permit Lender or any representative thereof to inspect the properties and operations of such Debtor; and permit, at any reasonable time and with reasonable notice (or at any time without notice if an Event of Default exists), Lender or any representative thereof to visit any or all of its offices, to discuss its financial matters with its officers and its independent auditors (and each Debtor hereby authorizes such independent auditors to discuss such financial matters with any Lender or any representative thereof), and to examine (and, at the expense of the Lender), any of its books or other records; and permit Lender and its representatives to inspect all tangible assets of each Debtor including all real property assets, and to inspect, audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to inventory, accounts and any other DIP Collateral.

4.4     <u>Insurance.</u>   Each Debtor shall, at the sole cost and expense of the estate, maintain the policies of insurance described on <u>Schedule 3.8</u> as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Lender. The Debtors shall deliver to Lender, in form and substance reasonably satisfactory to Lender, endorsements to (i) all "All Risk" and business interruption insurance and (ii) all general liability and other liability policies.

4.5     Service of Documents.  Lender and Lender's counsel shall receive all material pleadings, motions and other documents filed on behalf of the Debtors with the Bankruptcy Court in the Bankruptcy Cases.

4.6     Fundamental Changes. Each Debtor will preserve its corporate and legal existence and will not make any material changes to the nature or manner of their respective businesses and business activities. Each Debtor shall maintain executive personnel and management at a level of experience and ability equivalent to the present executive personnel and management.

4.7     Controlled Accounts. Each Debtor shall deposit and maintain all cash and cash receipts in the Controlled Accounts, until such time as such Debtor is authorized to disburse such cash in accordance with a Budget.

4.8     Further Assurances. Each Debtor, upon the reasonable request of Lender, will duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be reasonably necessary or proper to carry out more effectively the provisions and purposes of this Agreement or to grant, preserve, protect or perfect the Liens created by this Agreement, the Financing Orders or the other DIP Loan Documents or the validity or priority of any such Lien.

4.9     Periodic Meetings with Permitted CRO. The Debtors shall arrange for the Permitted CRO to provide the Lender with periodic updates regarding the Debtors' financial condition, operations, sale process and other matters requested by Lender with such updates to be provided telephonically and occur no less than weekly.

4.10    Milestones. The Debtors shall satisfy the following milestones as set forth below (each individually, a "Milestone" and collectively, the "Milestones"):

(i)     By no later than April 12, 2024, the Debtors will file the Bankruptcy Cases;

(ii)    By no later than April 19, 2024, the Debtors shall obtain Bankruptcy Court approval of the Interim Financing Order;

(iii)   By no later than May 1, 2024, the Debtors shall have obtained the entry of final and non-appealable order approving an agreed sale process acceptable to Lender which may incorporate the conducting of an auction in conjunction with the solicitation and receipt of competitive bids through an orderly marketing process (the "Agreed Sale Procedures"), and which sets a hearing to consider the approval of the Section 363 Sale (the "Sale Hearing");

(iv)    By no later than May 24, 2024 – Qualified Bid Deadline;

(v)     By May 29, 2024, the Debtors will have completed the sale process pursuant to the Agreed Sale Procedures;

(vi)    By June 5, 2024, the Bankruptcy Court shall conduct the Sale Hearing and enter a final and non-appealable order approving Section 363 Sale; (the "Sale Approval Order"); and

(vii)    By June 12, 2024, the Debtors shall have closed on the purchase or purchases authorized under the Sale Approval Order.

Each of the Milestones shall be subject to an automatic five (5) business day cure period, and to such extensions of time as may be warranted or required as a result of the availability of the Bankruptcy Court and the setting of hearing dates and times by the Bankruptcy Court which may interfere with or violate the within deadlines (collectively, the "Milestone Cure Period").

## 5.    NEGATIVE COVENANTS

Each Debtor agrees, on a joint and several basis, from and after the date hereof and until the indefeasible payment in full of the Obligations:

5.1    Indebtedness.  No Debtor shall create, incur, assume, or permit to exist any Indebtedness (defined in Annex A), except (i) Indebtedness outstanding on the date of disbursement and described on Schedule 3.9 to the creditors set forth thereon (the "Existing Creditors"), (ii) the DIP Loan, and (iii) any Indebtedness that pays in full the DIP Loan.

5.2    Liens.  No Debtor shall create, incur, assume or permit to exist any Lien on or with respect to any property of the estate (whether now owned or hereafter acquired) except for (a) Permitted Encumbrances; (b) Liens in existence on the date hereof and summarized on Schedule 3.9, securing the Indebtedness; extensions and renewals thereof, including extensions or renewals of any such Liens; provided that the principal amount of the Indebtedness so secured is not increased and the Lien does not attach to any other property; and (c) Liens arising from loans that pay off the DIP Loan.

5.3    Hazardous Materials.  No Debtor shall cause or permit a release of any Hazardous Material on, at, in, under, above, to, from or about any of the real property of any Debtor where such release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of the Collateral.

5.4    Chapter 11 Claims. No Debtor shall incur, create, assume, suffer to exist, or permit any administrative expense, unsecured claim, or other super-priority claim or lien that is *pari passu* with or senior to the DIP Loan as Super-Priority Indebtedness, or apply to the Bankruptcy Court in the Bankruptcy Case for authority to do so.

5.5    The Orders. No Debtor will, directly or indirectly (i) seek, support, consent to, or suffer to exist any modification, stay, vacation, or amendment of the Financing Orders, except for any modifications and amendments agreed to in writing by Lender in its sole and absolute discretion, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of Lender) or (iii) seek authorization for, or permit the existence of, any claims other than that of Lender entitled to a superpriority under Sections 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the Super-Priority Indebtedness.

5.6     Use of Proceeds. Each Debtor shall use the proceeds of the DIP Loan in accordance with the Budget (subject to any Permitted Budget Variance, as defined below) and the Financing Orders.

5.7     Except as provided in the Financing Orders, and subject to the Investigatory Carve-Out, no Collateral or proceeds of the DIP Loan may be used directly or indirectly by any Debtor, any committee, any trustee, or other estate representative appointed in the Bankruptcy Case (or any successor case) or any other Person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of Lender or the Super-Priority Indebtedness (except to the extent expressly permitted by this Agreement); (b) to prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of Lender, solely in its capacity as Lender, its controlling Persons, affiliates, or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) Chapter Five Actions, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to the Obligations, the Super-Priority Indebtedness, the DIP Loan Documents, and any Liens in favor of Lender, (D) any action seeking to invalidate, modify, set aside, avoid, or subordinate, in whole or in part, the Obligations, the DIP Loan Documents, any Liens in favor of Lender, or any payments made with respect to any of the foregoing (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to Lender in the Financing Orders or under any of the DIP Loan Documents (including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay Lender's assertions, enforcements, realizations, or remedies on or against the Collateral in accordance with the applicable DIP Loan Documents and the Financing Orders), or (F) objecting to, contesting, or interfering with, in any way, Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred, (c) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by Lender or (d) make any payment (as adequate protection or otherwise) on account of any claim or debt arising prior to the Petition Dates other than payments authorized by the Bankruptcy Court and in compliance with a Budget.

5.8     Budget Compliance and Variances.

(i)     Each Debtor will use the proceeds of the DIP Loan solely to make disbursements for expenditures provided for in accordance with Section 1.3 and this Section 5.8. No Debtor shall pay any expenses (other than de minimis amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Budget.

(ii)     Beginning on the Petition Date, no Debtor shall cause or permit expenses to vary from the applicable Budget by more than fifteen percent (15%) in excess of the budgeted amount for cash disbursements on a cumulative rolling four (4) week basis (the "Permitted Budget

Variances"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by the Debtors). In the event that actual amounts for total cash receipts and cash disbursements from operations line items and/or Professional Fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances, and it being further agreed that any amounts for Professional Fees in excess of the Budget shall not be paid by the Debtors until all amounts owing to Lender hereunder are paid in full.

(iii)     If the Budget is updated, modified, or supplemented by the Debtors, each such updated, modified, or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, Lender and no such updated, modified, or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget. Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by Lender.

5.9     Controlled Accounts.  No Debtor shall establish or maintain a Deposit Account that is not a Controlled Account, and no Debtor shall deposit proceeds in a Deposit Account that is not a Controlled Account.

5.10     Alternative Financing.  If any Debtor obtains any financing other than the DIP Loan for any reason whatsoever, the proceeds of such alternative financing must be used to first repay the DIP Loan together with any fees, costs, and expenses due to Lender under the DIP Loan Documents.

5. 11     Additional Restrictions.  No Debtor shall make or commit to make payments to critical vendors (other than those critical vendors that are approved in writing by Lender or by order of the Bankruptcy Court) in respect of prepetition amounts in excess of the amount included in the Budget. No Debtor shall make any payments in respect of Subordinated Indebtedness or any other indebtedness (except to Lender) except as expressly permitted in writing by Lender. No Debtor shall permit any amendment, modification or waive any of its rights under the Subordinated Indebtedness or any other indebtedness without the prior written consent of Lender.

5.12     Dispositions. Other than the Section 363 Sale, or a sale of assets consistent with a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that proposes to indefeasibly repay the Obligations in full in cash, no Debtor shall, without the express prior written consent of Lender, or until the indefeasible payment in full of the Obligations, sell, transfer, assign or otherwise dispose of (i) any personal property assets outside of the ordinary course of business or (ii) any real property assets.

## 6. TERM

6.1     <u>Maturity</u>.  Unless terminated sooner by reason of acceleration or otherwise, payment of the DIP Loan shall be due upon the financing arrangements contemplated hereby shall be in effect until the earliest of (i) the sixtieth (60th) calendar day from the date of entry of the Interim Financing Order, (ii) the closing of a sale of all or substantially all of the assets of the Debtors' bankruptcy estate pursuant to the Section 363 Sale, (iii) confirmation and consummation of a plan of reorganization or a plan of liquidation, or (iv) an Event of Default (the "<u>Maturity Date</u>").

6.2     <u>Survival of Obligations</u>.  Except as otherwise expressly provided for in this Agreement, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Debtors or the rights of Lender relating to any unpaid portion of the DIP Loan, due or not due, liquidated, contingent or unliquidated, or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Maturity Date.  Except as otherwise expressly provided herein, all undertakings, agreements, covenants, warranties, and representations of or binding upon the Debtors, and all rights of Lender shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the repayment in full of the DIP Loan.

## 7. EVENTS OF DEFAULT; RIGHTS AND REMEDIES

7.1     <u>Events of Default</u>.  The occurrence of any one or more of the following events and the expiration of the "DIP Cure Period" (defined below) shall constitute an "<u>Event of Default</u>" hereunder:

(i)     Any Debtor fails to pay any amount payable under this Agreement when due and payable, including interest payments, and such failure to pay continues for period of three (3) business days thereafter following the receipt of written notice from the Lender (the "<u>DIP Cure Period</u>");

(ii)     (A) Any Debtors fail or neglect to perform, keep, or observe any of the provisions of <u>Sections 1, 4 or 5</u> hereof, (B) an "Event of Default" occurs under any other DIP Loan Documents; or (C) any Debtors fail or neglect to perform, keep, or observe any of the provisions or obligations required under any Financing Order;

(iii)     Any representation or warranty herein, in any other DIP Loan Documents, or in any written statement, report, financial statement or certificate made or delivered to Lender contemporaneously herewith is untrue or incorrect in any material respect as of the date when made or deemed made (other than any representation or warranty qualified as to a Material Adverse Effect, which such representation or warranty must be true and correct in all respects as of the date when made or deemed made).

(iv)     This Agreement, any other DIP Loan Documents, or Financing Order shall, for any reason, cease to create a valid Lien on the DIP Collateral purported to be covered thereby or such Lien shall cease to be a perfected priming first-priority Lien (except as expressly provided

in any Financing Order) pursuant to Section 364 of the Bankruptcy Code or Debtor shall so allege in any pleading filed in any court.

(v)     A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Bankruptcy Cases.

(vi)     Entry of an order by the Bankruptcy Court in the Bankruptcy Case converting one or more of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case.

(vii)     Application by any Debtor (or any other party with the support of a Debtor) to the Bankruptcy Court in the Bankruptcy Cases or any other court of competent jurisdiction for an order authorizing the granting of any liens or claims *pari passu* or senior to Lender's Lien and the Super-Priority Indebtedness.

(viii)     Filing by any Debtor of any plan or reorganization other than one providing for the indefeasible payment in full in cash, on or prior to the Maturity Date, of all Obligations;

(ix)     The Financing Orders are amended, stayed, vacated, or modified without Lender's prior written consent.

(x)     Filing of any challenge by any Debtor to the validity, priority, or extent of any Liens in favor of Lender.

(xi)     The entry by the Bankruptcy Court of an order terminating any Debtor's right to use cash collateral;

(xii)     The Debtors' bankruptcy estate becomes administratively insolvent, with such determination being made by comparing the value of the Debtors' assets, taken as a whole, to the amount of Debtors' post-petition administrative expense liabilities without regard to current cash flows.

(xiii)     Any Debtor shall use cash collateral or any proceeds of the DIP Loan, for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by the Bankruptcy Court and Lender; or

(xiv)     Unless replaced by a Person acceptable to Lender in its sole discretion and confirmed by the Bankruptcy Court within thirty (30) days, the Debtors fail for any reason to maintain Kevin Cleary of Fort Dearborn Partners as the chief restructuring officer of the Debtors (or other Person having functionally equivalent authority, duties and responsibilities consistent with the position of a chief restructuring officer) acceptable to Lender in its sole discretion (a "Permitted CRO").

7.2    Remedies.

If any Event of Default has occurred and is continuing, then, in Lender's sole and absolute discretion, the stay provided by Section 362(a) of the Bankruptcy Code, or any other applicable stay or injunction shall be automatically vacated and modified as set forth herein and in the Financing Orders or other orders from the Bankruptcy Court. Lender may deliver written notice to the Bankruptcy Court that the automatic stay provisions of Section 362 of the Bankruptcy Code or any other stay have been vacated and modified to the extent necessary to permit Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and after seven (7) calendar days after such notice, to take, subject to the provisions of the interim or final Financing Order, whichever is applicable, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)    increase the rate of interest applicable to the DIP Loan to the Default Rate;

(b)    declare any obligation to provide advances of the DIP Loan terminated whereupon such obligation of Lender shall be immediately terminated;

(c)    declare the unpaid principal of and any accrued interest in respect of the DIP Loan and any and all other Obligations to be due, whereupon the same shall be immediately due and payable in cash without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Debtor;

(d)    enforce any and all rights against the Collateral.

(e)    take any other actions or exercise any other rights or remedies permitted under the Financing Orders, the DIP Loan Documents, or applicable law to effectuate the repayment of the Obligations.

Each Debtor shall cooperate fully with Lender in its exercise of rights and remedies, whether against the DIP Collateral or otherwise. Each Debtor hereby waives any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of Lender set forth in the Financing Orders and in the DIP Loan Documents, except as otherwise expressly provided herein.  Notwithstanding anything herein to the contrary, the Debtors reserve all rights, and any and all resulting claims or defenses in their favor, arising as a result of the Event of Default declared by Lender being invalid *ab initio*.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Documents shall have been breached by any Debtor, and not cured within the DIP Cure Period, then Lender may proceed to protect and enforce Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Documents.

7.3    Except to the extent provided otherwise in the Financing Orders, subject to the Carve-Out and the expenses in the Budget, and expressly excluding the Chapter Five Actions, each Debtor hereby agrees that the DIP Loan shall constitute senior Super-Priority Indebtedness over all administrative expense claims and unsecured claims against Debtor now existing or hereafter

arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provisions of the Bankruptcy Code and any and all administrative expense claims granted to any other Person, the establishment of which super-priority in favor of Lender shall have been approved and authorized by the Bankruptcy Court.

7.4     In the event of a conflict between, or inconsistency among, the Financing Orders, on the one hand, and any other DIP Loan Documents, on the other hand, the Final Financing Order shall control, and in its absence, the Interim Financing Order shall control.

7.5     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     Pursuant to the Financing Orders and this Agreement, Lender shall not be required to prepare, file, register, or publish any financing statements, mortgages, deeds of trust, hypothecations, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the senior priming Liens in, to and under the Collateral granted by or pursuant to this Agreement, the Financing Orders or any other DIP Loan Documents. If Lender shall, in its sole discretion, from time to time elect to prepare, file, register, or publish any such financing statements, mortgages, hypothecations, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable, or perfect all or any portion of Lender's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published, or recorded or taken at the time and on the date that the interim Financing Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of Lender on the Collateral.

(ii)     Except as otherwise agreed to by Lender, the Liens, lien priorities, Super-Priority Indebtedness, and other rights and remedies granted to Lender pursuant to this Agreement, the Financing Orders, or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Super-Priority Indebtedness provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Bankruptcy Case, or by any other act or omission whatsoever.

7.6     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act, or omission:

(i)     other than as provided in the Financing Orders or the DIP Loan Documents, Lender's Liens on the DIP Collateral shall constitute valid, enforceable and perfected senior priming Liens, and shall be prior to all other Liens of every kind and nature, now existing or hereafter arising, in favor of any other creditor or other Person including the liens of the Existing Creditors (by way of voluntary subordination for consensual liens and priming for nonconsensual liens by court order); and

(ii)     Lender's senior priming Liens on the DIP Collateral shall continue to be valid, enforceable, and perfected without the need for Lender to prepare, file, register or publish any financing statements, mortgages, deeds of trust, hypothecations, account control agreements, notices of Lien or similar instruments or to otherwise perfect Lender's Liens under applicable non-bankruptcy law.

7.7     No portion of the DIP Loan shall be used to make payments to the Existing Creditors for any purpose, unless agreed to in writing by Lender.

7.8     In connection with any sale of all or any portion of the Collateral, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including the Section 363 Sale or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, in accordance with applicable law, Lender shall have the absolute right to "credit bid" up to the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral or the Pre-Petition Collateral. In connection with the foregoing, Lender shall have the right to assign its right to purchase all or any portion of Debtor's assets in connection with any such "credit bid" to a newly-formed acquisition vehicle that is an affiliate of Lender; provided, however, that any such assignee of Lender shall not have any shareholder, member, officer, director, or any Insider (as defined in Bankruptcy Code Section 101(31)) of any of the foregoing in common with any of the management, member, officer, director or shareholders of any Debtor or any Insider of any of the foregoing.

## 8.     GRANT OF SECURITY.

8.1     To secure the Loan, effective immediately upon entry of the Interim Financing Order, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first position and priority priming post-petition security interests in and Liens on all DIP Collateral.

8.2     To the extent permitted by applicable law, each Debtor hereby irrevocably authorizes Lender and its affiliates, counsel, and other representatives, at any time and from time to time, to file in the name of such Debtor or otherwise and without separate authorization or authentication of such Debtor appearing thereon, such UCC financing statements or continuation statements as Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of Lender under this Agreement, and such financing statements and amendments may describe the DIP Collateral covered thereby "all of Debtor's personal property and assets" or words to similar effect, whether now owned or hereafter acquired, notwithstanding that such description may be broader in scope than the DIP Collateral described in this Agreement. Each Debtor hereby also authorizes Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as Lender may reasonably request to evidence the Lien of Lender in any patent, trademark, copyright or other intellectual property, including without limitation the goodwill or accounts and general intangibles of each Debtor relating thereto or represented thereby. Each Debtor agrees that, except to the extent that any filing office requires

otherwise, a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. Each Debtor shall, on a joint and several basis, pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the DIP Collateral.

8.3     Debtor will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by Lender in order to perfect Lender's Lien in the Collateral, all at the reasonable cost and expense of the Debtors on a joint and several basis.

**9.     FEES AND EXPENSES.  EACH DEBTOR, ON A JOINT AND SEVERAL BASIS, AGREES TO PAY OR REIMBURSE, AS APPLICABLE, LENDER FOR ALL REASONABLE FEES AND COSTS, EXPENSES, AND CHARGES OF LENDER (INCLUDING, WITHOUT LIMITATION, REASONABLE FEES AND CHARGES OF COUNSEL) IN CONNECTION WITH THE PREPARATION AND PROCUREMENT OF THE ENTRY OF ANY FINANCING ORDER, PERFORMANCE OR ENFORCEMENT OF THE DIP LOAN DOCUMENTS, OR THE DEFENSE OR PROSECUTION OF ANY RIGHTS OF LENDER PURSUANT TO ANY DIP LOAN DOCUMENTS.  THE FEES PAYMENTS REQUIRED PURSUANT TO <u>SECTION 1.5</u> OF THIS AGREEMENT MAY, AT THE SOLE AND ABSOLUTE DISCRETION OF LENDER, BE PAID OR FUNDED DIRECTLY TO LENDER FROM THE DIP LOAN PROCEEDS BY LENDER (AND, AS APPLICABLE, TAKE THE FORM OF ORIGINAL ISSUE DISCOUNT), ON BEHALF OF DEBTOR, AND, FOR THE AVOIDANCE OF DOUBT, SUCH AMOUNTS, AT THE OPTION OF LENDER, SHALL BE ADDED TO THE PRINCIPAL PORTION OF THE DIP LOAN AND ACCRUE INTEREST ON THE TERMS AND CONDITIONS SET FORTH HEREIN.**

**10.     SUCCESSORS AND ASSIGNS**

10.1     <u>Successors and Assigns</u>.  This Agreement shall be binding on and shall inure to the benefit of each Debtor and Lender and their respective successors and assigns (including, in the case of any Debtor, the reorganized debtor), except as otherwise provided herein or therein.  No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations, or duties hereunder without the prior express written consent of Lender.  Any such purported assignment, transfer, hypothecation, or other conveyance by any Debtor without the prior express written consent of Lender shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of any Debtor and Lender with respect to the transactions contemplated hereby and no Person shall be a third-party beneficiary of any of the terms and provisions of this Agreement.

**11.     MISCELLANEOUS**

11.1     <u>Complete Agreement; Modification of Agreement</u>.  This Agreement constitutes the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered, or amended except as set forth in <u>Section 11.2</u>.

11.2     Amendments and Waivers.  Except for actions expressly permitted to be taken by Lender no amendment, modification, termination, or waiver of any provision of this Agreement, or any consent to any departure by any Debtor therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and the Debtors.

11.3     Waiver of Jury Trial.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIPLOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11.4     No Waiver by Lender.

Lender's failure, at any time or times, to require strict performance by each Debtor of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance herewith or therewith.  Any suspension or waiver of an Event of Default shall not suspend, waive, or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type.  Subject to the provisions of Section 11.2, none of the undertakings, agreements, warranties, covenants and representations of each Debtor contained in this Agreement and no Event of Default by any Debtor shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender and directed to any Debtor specifying such suspension or waiver.

11.5     Remedies.  Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that Lender may have, by operation of law or otherwise.  Recourse to the Collateral shall not be required.

**12.     SEVERABILITY.  WHEREVER POSSIBLE, EACH PROVISION OF THIS AGREEMENT SHALL BE INTERPRETED IN SUCH A MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW, BUT IF ANY PROVISION OF THIS AGREEMENT SHALL BE PROHIBITED BY OR INVALID UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS AGREEMENT.**

12.1     Governing Law.  Except as otherwise expressly provided in this agreement, in all respects, including all matters of construction, validity and performance, this agreement and the

Indebtedness shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Illinois applicable to contracts made and performed in that state and any applicable laws of the United States of America. Each Debtor and Lender hereby consent and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes pertaining to this agreement or to any matter arising out of or relating to this agreement.

12.2    Notices.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered: (a) upon the earlier of actual receipt and three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 12.2); (c) one (1) business day after deposit with a reputable overnight courier with all charges prepaid or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in Annex D or to such other address (or facsimile number) as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.  Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration, or other communication to any Person (other than the Debtors or Lender) designated in Annex D to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration, or other communication.

12.3    Section Titles.  The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

12.4    Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement. Signatures received via email shall be deemed to be and shall constitute original signatures for all purposes and in all respects.

12.5    Reinstatement.  This Agreement shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Loan, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Loan, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored, or returned, the DIP Loan shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored, or returned.

12.6    Advice of Counsel.  Each of the parties represents to each other party hereto that it has been represented by counsel of its choosing in connection with the preparation and negotiation of this Agreement.

12.7    No Strict Construction.    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

12.8    Savings Clause. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Loans, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate. Notwithstanding the foregoing, it is the intention of Lender and Debtors to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the advances made hereunder or be refunded to the Debtors.

## 13.    **JOINT AND SEVERAL LIABILITY.**

13.1    Each Debtor is accepting joint and several liability hereunder and under the DIP Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Debtor and in consideration of the undertakings of each Debtor to accept joint and several liability for the obligations of each of them.    Each Debtor jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other Debtor, with respect to the payment and performance of all of the obligations arising under this Agreement and the other DIP Loan Documents, it being the intention of the parties hereto that all of the obligations shall be the joint and several obligations of every Debtor without preferences or distinction among them.    Each Debtor jointly and severally hereby agrees that any one Debtor is authorized to execute and deliver any and all documents requested or required by Lender in connection with the DIP Loan, and that said documents shall be enforceable against all Debtors.    In addition, each Debtor jointly and severally hereby agrees that any one Debtor is authorized to deliver or receive notices under the DIP Loan Documents on behalf of each other Debtor, and that receipt of any such notice by one Debtor shall be deemed received by each other Debtor.    Each Debtor further irrevocably appoints each other Debtor as its agent for any service of process.

13.2    If and to the extent that any Debtor shall fail to make any payment with respect to any of the obligations hereunder or any other DIP Loan Documents as and when due or to perform any of such obligations in accordance with the terms thereof, then in each such event the other Debtors will make such payment with respect to, or perform, such obligation.    The obligations of each Debtor hereunder constitute full recourse obligations of such Debtor enforceable against it to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

13.3 Except as otherwise expressly provided herein, each Debtor hereby waives notice of acceptance of its joint and several liability and any and all defenses to such joint and several liability or suretyship generally, in each case, arising from notice of any and all advances, notice of occurrence of any Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the obligations hereunder, any requirement of diligence or otherwise and, generally, all demands, notices and other formalities of every kind in connection with this Agreement. Each Debtor hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the obligations hereunder, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any Event of Default by any Debtor in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the obligations hereunder, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such obligations or the addition, substitution or release, in whole or in part, of any Debtor. Without limiting the generality of the foregoing, each Debtor assents to any other action or delay in acting or failure to act on the part of Lender including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section, afford grounds for terminating, discharging or relieving such Debtor, in whole or in part, from any of its obligations hereunder, it being the intention of each Debtor that, so long as any of the obligations hereunder remain unsatisfied, the obligations of such Debtor hereunder shall not be discharged except by performance and then only to the extent of such performance. The obligations of each Debtor hereunder shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction, or similar proceeding with respect to any Debtor or Lender. The joint and several liability of each Debtor hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation, or any other change whatsoever in the name, membership, constitution, or place of formation of any Debtor or Lender.

13.4 The provisions of this Section may be enforced by Lender, its successors and assigns, in accordance with the terms of this Agreement from time to time against any Debtor as often as occasion therefor may arise and without requirement on the part of Lender first to marshal any of its claims or to exercise any of its rights against the other Debtor or to exhaust any remedies available to it against the other Debtor or to resort to any other source or means of obtaining payment of any of the obligations hereunder or to elect any other remedy. The provisions of this Section shall remain in effect until all the obligations hereunder shall have been paid in full or otherwise fully satisfied (other than contingent indemnity obligations which by their terms survive the termination of this Agreement). If at any time, any payment, or any part thereof, made in respect of any of the obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, or reorganization of any Debtor, or otherwise, the provisions of this Section will forthwith be reinstated in effect, as though such payment had not been made.

**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, this Credit Agreement has been duly executed as of the date first written above.

DEBTOR:

**THE OBERWEIS GROUP, INC.**

By: _____
Name: [__]
Title: [__]

DEBTOR:

**OBERWEIS DAIRY, INC.**

By: _____
Name: [__]
Title: [__]

DEBTOR:

**NORTH AURORA ICE CREAM LLC**

By: _____
Name: [__]
Title: [__]

DEBTOR:

**TOGI BRANDS, LLC**

By: _____
Name: [__]
Title: [__]

DEBTOR:

**TOGI RE I, LLC**

By: _____
Name: [__]
Title: [__]

DEBTOR:

**THIRD MILLENNIUM REAL ESTATE L.L.C.**

By: _____
Name: [__]
Title: [__]

**LENDER:**

**CIBC BANK USA**

By: _____
Name: [__]
Title: [__]

# ANNEX A
## to
## CREDIT AGREEMENT

## DEFINITIONS

Capitalized terms used in this Credit Agreement shall have (unless otherwise provided elsewhere in the DIP Loan Documents) the following respective meanings, and all references to Sections, Exhibits, Schedules, or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules, or Annexes of or to the Agreement:

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the Court presiding over the Bankruptcy Cases.

"Carve-Out" means: (i) all expenses set forth in the Approved Budgets; (ii) all fees required to be paid to the clerk of the Bankruptcy Court, any agent thereof and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (iii) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iv) to the extent allowed by the Bankruptcy Court, all claims for unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or any Committee whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (collectively, the "Professional Persons") that are: (A) based upon services rendered at any time prior to the occurrence of an Event of Default unless such Event of Default is waived or cured as provided in this Agreement, or (B) after the occurrence and during the continuation of an Event of Default, if any, in an aggregate amount not to exceed $150,000 for Professional Fees of the Debtors, $50,000 for Professional Fees of a Committee (if appointed) and $25,000 for Professional Fees of a subsequently appointed chapter 7 or chapter 11 bankruptcy trustee. As long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay all fees, expenses, compensation and reimbursement of expenses allowed and payable, including under any order entered in the Bankruptcy Case establishing procedures for interim monthly compensation and reimbursement of Professional Fees, or sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out. In the event the Carve-Out is reduced by any amount during an Event of Default, upon the effectiveness of a cure of such Event of Default, the Carve-Out shall be increased by such amount. Nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii) or (iii) above, on any grounds. The Carve-Out further includes the Supplemental Fees and Expenses.

"Charges" means all federal, state, county, city, municipal, local, foreign, or other governmental taxes, levies, assessments, charges, liens, claims, or encumbrances upon or relating to (a) the Collateral or (b) the obligations.

"CIBC Loans" shall have the meaning set forth in Section C(i) *et seq* of the Interim Financing Order.

"Closing Checklist" means the Schedule attached hereto as Annex B.

"Collateral" means collectively, the DIP Collateral and the Pre-Petition Collateral.

"Committee" means an official committee of unsecured creditors or committee of equity security holders appointed in the Bankruptcy Case by the U.S. Trustee.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, "Controlling" or "Controlled" have meanings correlative thereto.

"Controlled Account" means collectively, the Deposit Accounts of the Debtors maintained with Lender.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization other than an account evidenced by a negotiable certificate of a deposit.

"DIP Collateral" shall mean all property and assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, each Debtor (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, such Debtor, and regardless of where located, including, without limitation: (a) cash and cash equivalents; (b) all funds and other items of value in any account of such Debtor including, without limitation, all securities accounts and deposit accounts; (c) all accounts and other receivables; (d) contract rights; (e) instruments, documents and chattel paper; (f) securities (whether or not marketable); (g) equipment, inventory, fixtures, artifacts and goods; (h) franchise rights; (i) patents, tradenames, trademarks, copyrights, and all other intellectual property; (j) general intangibles; (k) capital stock; (l) investment property; (m) supporting obligations; (n) letter of credit rights; (o) all commercial tort claims and all other claims and causes of action; (p) the proceeds of all claims or causes of action; (q) vehicles; and (r) to the extent not covered by the foregoing, all other assets or property of such Debtor, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided, however, that claims arising under sections 544, 545, 547, 548 of the Bankruptcy Code and under similar state laws are excepted from Lender's Collateral and do not secure the DIP Loan or the Obligations (the "Chapter 5 Actions"). For avoidance of doubt, the Chapter Five Actions and any resulting recoveries shall be expressly excluded from any Super-Priority Claims or Liens

of the Lender under the Bankruptcy Code, including under Section 364(d) or Section 507(b) of the Bankruptcy Code, and shall not be used to repay the DIP Loan.

"<u>DIP Loan</u>" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Debtor to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, or other instrument, arising under this Agreement.

"<u>DIP Loan Documents</u>" means, collectively, this Agreement, the Note and all other documents set forth on the Closing Checklist, along with and any other document, instrument or agreement entered into contemporaneously herewith, each as may be amended, restated, supplemented, or otherwise modified from time to time.

"<u>DIP Term</u>" shall mean the period from the Closing Date to, but excluding, the Maturity Date.

"<u>Environmental Laws</u>" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 <u>et seq.</u>) ("<u>CERCLA</u>"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 <u>et seq.</u>); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 <u>et seq.</u>); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 <u>et seq.</u>); the Toxic Substance Control Act (15 U.S.C. §§ 2601 <u>et seq.</u>); the Clean Air Act (42 U.S.C. §§ 7401 <u>et seq.</u>); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 <u>et seq.</u>); the Occupational Safety and Health Act (29 U.S.C. §§ 651 <u>et seq.</u>); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) <u>et seq.</u>), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"<u>Environmental Liabilities</u>" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any release or threatened release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals, or registrations required by any governmental authority under any Environmental Laws.

"Extraordinary Receipts" means any cash received by any Debtor from the disposition of Collateral not in the ordinary course of business, including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not a Debtor or is used for repairs or remediation), (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not a Debtor), and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Final Financing Order" means the final order of the Bankruptcy Court approving the DIP Loan (as the same may be amended, supplemented, or modified from time to time after entry thereof) substantially in the form attached hereto as **Exhibit C**.

"Financing Orders" means the Interim Financing Order and the Final Financing Order (as the same may be amended, supplemented, or modified from time to time after entry thereof).

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means (a) all indebtedness of a Debtor for borrowed money or for the deferred purchase price of property and (b) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by a Debtor.

"Interim Financing Order" means an interim order of the Bankruptcy Court approving the DIP Loan (as the same may be amended, supplemented, or modified from time to time after entry thereof) substantially in the form attached hereto as **Exhibit B**.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same

economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the UCC, as defined herein in <u>Annex A</u> or comparable law of any jurisdiction).

"<u>Material Adverse Effect</u>" shall mean, with respect to any material event, act, condition, or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on: (i) the business, results of operations, financial condition, assets, liabilities or prospects of a Debtor taken as a whole (other than the commencement of the Bankruptcy Case and the continuation of the Bankruptcy Case), (ii) the ability of any Debtor to perform any of its respective obligations under the DIP Loan Documents, (iii) the rights and remedies of Lender under any of the DIP Loan Documents, (iv) the legality, validity or enforceability of any of the DIP Loan Documents, (v) the value of the Collateral, or (vi) the perfection or priority of the Liens granted pursuant to the DIP Loan Documents. Notwithstanding the foregoing, Lender agrees that, (i) the filing the Bankruptcy Case shall not constitute a Material Adverse Effect; and (ii) so long as the Debtors remain in compliance with the Milestones, Lender will not assert the existence of a Material Adverse Effect.

"<u>Material Contract</u>" means any contract or other arrangement to which any Debtor is a party or by which any of its assets or properties are bound, in each case, for which the breach of default or nonperformance under, cancellation or termination of or the failure to renew could reasonably be expected to result in a Material Adverse Effect.

"<u>Note</u>" means that certain Secured Super-Priority Post-Petition Loan Note, dated as of the date hereof, made, and executed by the Debtors in favor of Lender, as may be amended, restated, supplemented, or otherwise modified from time to time.

"<u>Obligations</u>" shall mean all amounts owing by any Debtor to Lender pursuant to or in connection with this Agreement, any other DIP Loan Documents or the Pre-Petition Loan Documents, including the Pre-Petition Obligations. Obligations expressly include all principal, interest, fees, expenses, indemnification, and reimbursement payments, costs, and expenses (including all reasonable fees and expenses of counsel to Lender incurred pursuant to this Agreement or any other DIP Loan Documents or in connection with the Bankruptcy Cases), whether direct or indirect, absolute, or contingent, liquidated, or unliquidated, now existing or hereafter arising hereunder or thereunder.

"<u>Permitted Encumbrances</u>" means the following encumbrances: (a) Liens for taxes or assessments or other governmental Charges not yet due and payable or which are being contested in accordance with <u>Section 4.2(ii)</u>; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation; (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Debtor is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Debtor is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of the real property or other minor irregularities in title

(including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such real property; (g) presently existing or hereafter created Liens in favor of Lender; and (h) the liens set forth in Schedule 3.9 hereof.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity, or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body, or department thereof).

"Pre-Petition Collateral" shall have the meaning set forth in Footnote 7 of the Interim Financing Order.

"Pre-Petition Obligations" shall have the meaning set forth in Footnote 7 of the Interim Financing Order.

"Supplemental Fees and Expenses" shall have the meaning set forth in Section 13(a) of the Interim Financing Order.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the States of Illinois and Delaware; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the Lender in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Illinois and Delaware, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC, have the respective meanings provided in the UCC including, without limitation: (i) as-extracted collateral; (ii) certificated security; (iii) chattel paper; (iv) documents; (v) electronic chattel paper; (vi) financial assets; (vii) goods, (viii) instruments; (ix) inventory; (x) investment property; (xi) payment intangibles; (xii) proceeds; (xiii) securities account; (xiv) securities intermediary; (xv) security; (xvi) security certificate; (xvii) security entitlements; (xviii) uncertificated security; (xix) accounts; (xxx) commercial tort claims; (xxxi) account debtor; (xxxii) equipment; (xxxiii) letter-of-credit rights, (xxxiv) supporting obligations and (xxxv) tangible chattel paper.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Agreement) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.  Whenever any provision in the Agreement refers to the knowledge (or an analogous phrase) of a Debtor, such words are intended to signify that he or it has actual knowledge or

awareness of a particular fact or circumstance or, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**ANNEX B**
**to**
**CREDIT AGREEMENT**

**CLOSING CHECKLIST**.

In addition to, and not in limitation of, the conditions described in <u>Section 2.1</u> of the Agreement, the following items must be received by Lender in form and substance satisfactory to Lender on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in <u>Annex A</u> to the Agreement), unless such requirement is waived in writing by Lender:

      A.     <u>Appendices</u>.  All Appendices to the Agreement, in form and substance satisfactory to Lender.

      B.     <u>Insurance</u>.  Satisfactory evidence that the insurance policies listed on Schedule 3.8 are in full force and effect, and all required endorsements have been delivered to Lender.

      C.     <u>Authority Documents</u>.  Copies of certificates of formation and good standing certificates for each Debtor.

      D.     Secured Super-Priority Post-Petition Loan Note.

**ANNEX C**
**to**
**CREDIT AGREEMENT**

## REPORTING

Each Debtor shall deliver or cause to be delivered to Lender, as indicated, the following

        (a)    <u>Default Notices</u>.  As soon as practicable, and in any event within one (1) calendar day after any Debtor has actual knowledge of the existence of any Event of Default or other event that has had a Material Adverse Effect, telephonic or telecopied notice specifying the nature of such Event of Default or other event, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next business day.

        (b)    <u>Insurance Notices</u>.  As soon as practicable and, in any event within five (5) days of receipt, disclosure of losses or casualties received by the Debtors from Debtors' insurers.

        (c)    <u>Financial Information</u>.  On a bi-weekly basis, a report of any variances to the Budget and, no later than the fifth business day after the end of each calendar month, a present roll-forward of the 13-week cashflow.

        (d)    <u>Other Documents</u>.  Such other financial and other information respecting Debtors' business or financial condition as Lender shall from time- to-time reasonably request.

**ANNEX D**
**CREDIT AGREEMENT**

**<u>NOTICE ADDRESSES</u>**

If to Lender:

    CIBC Bank USA
    120 S. LaSalle Street
    Chicago, IL 60603
    Attn: Hugh Wilder, Managing Director of Loan Administration, Credit Rick Management

With copy to:

    Kilpatrick Townsend & Stockton LLP
    500 W. Madison Street, Suite 3700
    Chicago, IL 60661
    Attn: Eric S. Rein, Esq.

If to Debtors:

    The Oberweis Group Inc.
    951 Ice Cream Drive
    Aurora, IL 60542
    Attn: Adam Kraber, President
        Kevin Cleary, CRO

With copy to:

    Adelman & Gettleman, Ltd.
    53 W. Jackson Boulevard, Suite 1050
    Chicago, IL 60604
    Attn: Howard L. Adelman, Esq.

**Schedule 1.3**
**to**
**CREDIT AGREEMENT**

**<u>BUDGET</u>**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Thereafter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| | Sunday | 4/7/2024 | 4/14/2024 | 4/21/2024 | 4/28/2024 | 5/5/2024 | 5/12/2024 | 5/19/2024 | 5/26/2024 | 6/2/2024 | 6/9/2024 | 6/16/2024 | |
| Week ending | Saturday | 4/13/2024 | 4/20/2024 | 4/27/2024 | 5/4/2024 | 5/11/2024 | 5/18/2024 | 5/25/2024 | 6/1/2024 | 6/8/2024 | 6/15/2024 | 6/22/2024 | 7/1/2024 |
| | **CASH FLOW** | | | | | | | | | | | | |
| | **CASH RECEIPTS** | | | | | | | | | | | | |
| 1 | **TOTAL OPERATING CASH RECEIPTS** | 1,398,387 | 1,350,200 | 1,359,900 | 1,510,000 | 1,569,797 | 1,585,200 | 1,565,200 | 1,564,900 | 1,579,497 | 1,594,900 | 300,000 | - |
| 2 | | | | | | | | | | | | | |
| 3 | **OPERATING DISBURSEMENTS** | | | | | | | | | | | | |
| 4 | **Key Vendor Payments** | | | | | | | | | | | | |
| 5 | Foremost | - | (195,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | - | - |
| 6 | Organic Valley | - | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | - | - |
| 7 | Meadowvale | (46,571) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (35,000) | (35,000) | - | - |
| 8 | Resale products | - | (249,752) | (133,770) | (143,410) | (140,120) | (140,770) | (142,752) | (143,410) | (100,000) | (75,000) | - | - |
| 9 | 1836 Farms | (240) | | | | | | | | | | | |
| 10 | Transportation | - | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | - | - |
| 11 | Greco & Tocco Greco | - | (75,000) | (75,000) | (90,000) | (90,000) | (90,000) | (90,000) | (75,000) | (90,000) | (75,000) | - | - |
| 12 | Stanpac / Darfill | (27,630) | (20,000) | (20,000) | (20,000) | - | (20,000) | - | (20,000) | - | - | - | - |
| 13 | Fuel | (24,499) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | - | - |
| 14 | Other distributors | - | (200,000) | (100,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | - | - |
| 15 | Ingredients & Packaging | (121,141) | (181,000) | (123,366) | (149,236) | (100,000) | (86,309) | (32,847) | (94,933) | (50,000) | (50,000) | - | - |
| 16 | **Total Key Vendor Pmts** | (220,081) | (1,085,752) | (712,136) | (687,646) | (615,120) | (622,079) | (550,599) | (618,343) | (490,000) | (450,000) | - | - |
| 17 | **Payroll Expense** | | | | | | | | | | | | |
| 18 | Payroll | (818,383) | (50,000) | (860,000) | (50,000) | (875,000) | (50,000) | (875,000) | (50,000) | (850,000) | (450,000) | (850,000) | - |
| 19 | Benefits | (28,798) | (85,750) | (750) | (20,750) | (750) | (85,750) | (750) | (20,750) | (750) | (85,750) | - | - |
| 20 | Health insurance | (132,965) | - | - | - | (120,000) | - | - | - | - | (120,000) | - | - |
| 21 | Payroll fees | - | (500) | - | - | (500) | - | - | - | - | - | - | - |
| 22 | **Total Payroll Expense** | (980,147) | (135,750) | (861,250) | (70,750) | (995,750) | (136,250) | (875,750) | (70,750) | (850,750) | (655,750) | (850,000) | - |
| 23 | **Other Operating Expenses** | | | | | | | | | | | | |
| 24 | Insurance | (50,659) | (60,000) | - | (106,000) | - | (60,000) | - | (62,000) | - | - | - | - |
| 25 | D&O Insurance Tail | - | - | - | - | - | - | - | (45,000) | - | - | - | - |
| 26 | Rent (Inside) | - | - | - | (116,023) | - | - | - | (116,023) | - | - | - | - |
| 27 | Rent (Outside) | - | - | - | (207,848) | - | - | - | (207,848) | - | - | - | - |
| 28 | Sales taxes | (4,571) | (137,200) | (54,600) | (40,000) | (29,000) | (25,600) | (137,200) | (35,000) | (4,600) | (54,600) | - | - |
| 29 | Real estate taxes | (85,500) | - | - | - | - | - | - | - | - | - | - | - |
| 30 | Utility Order | - | (100,000) | (60,770) | (12,862) | (9,021) | (19,137) | (45,000) | (45,000) | (45,000) | (45,000) | - | - |
| 31 | Credit card payments | - | - | (200,000) | - | - | - | (200,000) | - | - | - | - | - |
| 32 | Other check disbursements | (28,789) | (150,000) | (100,000) | (103,638) | (90,979) | (50,000) | (55,000) | (71,500) | (55,000) | (100,000) | - | - |
| 33 | Other ACH disbursements | (94,501) | (65,000) | (65,000) | (55,000) | (65,000) | (65,000) | (65,000) | (55,000) | (65,000) | (65,000) | - | - |
| 34 | Miscellaneous | (5,412) | (1,000) | (1,000) | (6,700) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (6,700) | - | - |
| 35 | **Total Other Operating Expenses** | (269,431) | (513,200) | (481,370) | (648,071) | (195,000) | (220,737) | (503,200) | (638,371) | (176,300) | (265,600) | - | - |
| 36 | **Debt Service Disbursements** | | | | | | | | | | | | |
| 37 | Bank fees | (5,907) | (20,000) | | | | | | | | | | |
| 38 | Interest expense | - | | | | | | | | | (25,000) | | |
| 39 | **Total Debt Service Disbursements** | (5,907) | (20,000) | - | - | - | - | - | - | - | (25,000) | - | - |
| 40 | | | | | | | | | | | | | |
| 41 | **TOTAL OPERATING DISBURSEMENTS** | (1,475,565) | (1,754,702) | (2,054,756) | (1,406,467) | (1,805,870) | (979,066) | (1,929,549) | (1,327,464) | (1,517,050) | (1,396,350) | (850,000) | - |
| 42 | | | | | | | | | | | | | |
| 43 | **TOTAL OPERATING CASH FLOW** | (77,178) | (404,502) | (694,856) | 103,533 | (236,073) | 606,134 | (364,349) | 237,436 | 62,447 | 198,550 | (550,000) | - |
| 44 | | | | | | | | | | | | | |
| 45 | **NON-OPERATING CASH ACTIVITY** | | | | | | | | | | | | |
| 46 | **Cash Receipts** | | | | | | | | | | | | |
| 47 | *Proceeds from Sale of the Company* | - | - | - | - | - | - | - | - | - | 13,750,000 | - | - |
| 48 | *Trucks* | - | - | - | - | - | - | - | - | - | 200,000 | - | - |
| 49 | *Real Estate (Plant & Equipment)* | - | - | - | - | - | - | - | - | - | 6,000,000 | - | - |
| 50 | *Asset disposal proceeds (Total)* [1] | - | - | - | - | - | - | - | - | - | 19,950,000 | - | - |
| 51 | *Dip Financing* | - | 200,000 | 200,000 | 200,000 | - | 200,000 | - | 200,000 | - | - | - | - |
| 52 | **Cash Disbursements** | | | | | | | | | | | | |
| 53 | *Fort Dearborn Partners* | (50,000) | - | - | - | - | (100,000) | - | - | - | (100,000) | - | - |
| 54 | *Adelman & Gettleman* | (50,000) | - | - | - | - | (100,000) | - | - | - | (100,000) | - | - |
| 55 | *Livingstone* | - | - | (25,000) | - | - | (25,000) | - | - | - | (525,000) | - | - |
| 56 | *Creditor's Committee Fees* | - | - | (25,000) | - | - | (25,000) | - | - | - | (25,000) | - | - |
| 57 | *401k Audit* | - | - | - | - | - | - | - | - | - | (25,000) | - | (25,000) |
| 58 | *Tax Return Preparation* | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| 59 | *Noticing Agent* | - | (20,000) | - | - | - | (20,000) | - | - | - | - | (25,000) | - |
| 60 | *Professional Fees (Total)* | (100,000) | (35,000) | (25,000) | - | - | (270,000) | - | - | - | (750,000) | (25,000) | (75,000) |
| 61 | *US Trustee Fees* | - | - | - | (45,000) | - | - | - | - | - | - | - | (230,000) |
| 62 | *Ombudsman* | - | (25,000) | - | - | - | - | - | - | - | - | - | - |
| 63 | **(Cure Costs)** | | | | | | | | | | | | |
| 64 | *Cure Costs - Rent* | - | - | - | - | - | - | - | - | - | (335,028) | - | - |
| 65 | *Cure Costs - Real Estate Taxes* | - | - | - | - | - | - | - | - | - | (1,102,899) | - | - |
| 66 | **(Super Priority)** | | | | | | | | | | | | |
| 67 | *Payments on DIP Financing* | - | - | - | - | - | - | - | - | - | (1,000,000) | - | - |
| 68 | **(Sr. Secured)** | | | | | | | | | | | | |
| 69 | *CIBC paydown* | - | - | - | - | - | - | - | - | - | (13,923,356) | - | - |
| 70 | *Paydown of other Finance Companies and Bank Debt* | - | - | - | - | - | - | - | - | - | (2,000,000) | - | - |
| 71 | **(Administrative Claims)** | | | | | | | | | | | | |
| 72 | *503b(9) Claims* | - | - | - | - | - | - | - | - | - | (800,000) | - | - |
| 73 | *Carve-out for estate* | - | - | - | - | - | - | - | - | - | (200,000) | - | - |
| 74 | **Total Non-Operating Cash Flows** | (100,000) | 165,000 | 150,000 | 155,000 | - | (70,000) | - | 200,000 | - | (161,283) | (255,000) | (75,000) |
| 75 | | | | | | | | | | | | | |
| 76 | **CASH FLOW** | (177,178) | (239,502) | (544,856) | 258,533 | (236,073) | 536,134 | (364,349) | 437,436 | 62,447 | 37,267 | (805,000) | (75,000) |
| 77 | *Cumulative Cash Flow* | (177,178) | (416,680) | (961,536) | (703,003) | (939,076) | (402,942) | (767,292) | (329,855) | (267,409) | (230,142) | (1,035,142) | (1,110,142) |
| 78 | | | | | | | | | | | | | |
| 79 | **LIQUIDITY** | | | | | | | | | | | | |
| 80 | | | | | | | | | | | | | |
| 81 | **Cash On-Hand** | | | | | | | | | | | | |
| 82 | Beginning Balance | 1,110,142 | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 |
| 83 | Increase/(Decrease) Operations | (177,178) | (239,502) | (544,856) | 258,533 | (236,073) | 536,134 | (364,349) | 437,436 | 62,447 | 37,267 | (805,000) | (75,000) |
| 84 | Ending Bank Balance | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 | 0 |
| 85 | Checks O/S | | | | | | | | | | | | |
| 86 | **Ending Book Balance** | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 | 0 |

(1) The amount set forth in this budget for proceeds from the disposition of substantially all assets of the Debtors is an estimated amount based upon current discussions with a prospective purchaser. As of the filing hereof, an asset purchase agreement has not yet been executed. The parties continue their ongoing discussions on documentation.

**Schedule 3.8**
**to**
**CREDIT AGREEMENT**

## <u>INSURANCE POLICIES</u>

| Type of Coverage | Carrier | Policy No. | Exp. Date |
|---|---|---|---|
| Automobile Liability | Travelers Property Casualty Company of America | TC2J-CAP-0R536371-TIL-23 | 07/01/2024 |
| Automobile Physical Damage | Travelers Property Casualty Company of America | TJ-BAP-0R536383-TIL-23 | 07/01/2024 |
| Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Crime Coverage | Travelers Casualty and Surety Company of America | 106270172 | 07/01/2024 |
| Excess Umbrella Liability | Great American Insurance Company | TUE 3455374-03 | 07/01/2024 |
| General Liability | North Pointe Insurance Company | 171000584 | 07/01/2024 |
| Other States Workers Compensation, Employers Liability | The Travelers Indemnity Company of Connecticut | UB-0R659383-23-51-K | 07/01/2024 |
| Product Recall | Allied World Surplus Lines Insurance Company | 0313-9015 | 07/01/2024 |
| Commercial Property | QBE North America | QCI1352392 | 07/01/2024 |
| Commercial Storage Tank Liability | Crum & Foster Specialty Insurance Company | STP-422533 | 07/01/2024 |
| Umbrella Liability | Travelers Property Casualty Company of America | CUP-3S633138-23-NF | 07/01/2024 |
| Workers Compensation, Employers Liability | Travelers Property Casualty Company of America | UB-0R659230-22-51-R | 07/01/2024 |
| Workplace Violence Expense | Federal Insurance Company | 8251-2407 | 07/01/2024 |

**Schedule 3.9**
**to**
**CREDIT AGREEMENT**

**<u>EXISTING LIENS</u>**

| Lienholder | Indebtedness (approx. as of 04/9/2024) |
|---|---|
| Lender | $14,214,166.76 |
| Associated Material Handling Industries Inc. | $366,000.00 |
| DariFill, Inc. | $120,000.00 |
| Wells Fargo Equipment Finance, Inc. | $72,000.00 |
| Banc of America Leasing & Capital, LLC | $1,213,000.00 |
| TSC Equipment Finance LLC | $236,000.00 |
| Daimler Truck Financial Services USA LLC | $898,000.00 |
| BMO Harris Bank N.A. | $828,000.00 |
| First Commonwealth Equipment Finance | $319,000.00 |
| GM Financial | $45,000.00 |

**Schedule 3.10**
**to**
**CREDIT AGREEMENT**

## SUMMARY OF PRE-PETITION OBLIGATIONS

| Operative Document(s) | Indebtedness (approx.; as of 4/9/24) |
|---|---|
| Revolving Loan Note dated February 21, 2022 | $456,900 |
| Master Letter of Credit Agreements dated March 9, 2009 | $1,508,000 |
| Term Loan Note dated February 24, 2022 | $7,361,400 |
| 2022 DDT Loan Note dated February 24, 2022 | $2,972,800 |
| Promissory Note dated May 2, 2012 | $1,915,066.76 |
| **TOTAL** | **$14,214,166.76** |

# Schedule 3.13
## to
## CREDIT AGREEMENT

## <u>MATERIAL LEASES</u>

| Lessor | Description |
|---|---|
| 3158 W 95th Street LLC | Evergreen Park, IL dairy store |
| Associated Material Handling | North aurora, IL warehouse equipment |
| Bailey Lee and Susan Lum Trust | St. Peters, MO dairy store |
| Bartlett Ice Cream, LLC | Bartlett, IL dairy store |
| Bartlett Ice Cream, LLC | St. Charles, IL dairy store |
| BCFT, LLC | Schererville, IN dairy store |
| Brookwood Center, LLC | Bolingbrook, IL dairy store |
| Brown and Sons' Foodliner, Inc. | Kirkwood, MO dairy store |
| Caswell Town Center, LLC | Troy, MI dairy store |
| DariFill, Inc. | North Aurora, IL production equipment |
| David Gregory | Plainfield, IL dairy store |
| EMO Properties, LLC | Bloomingdale, IL dairy store |
| Fidelity Advisors LLLP | Ballwin, MO dairy store |
| Geneva Ice Cream LLC | Geneva, IL dairy store |
| Greco/Reggi Development, LLC | Naperville (South), IL dairy store |
| GSP Park Fletcher, LLC | Indianapolis, IN transfer center |
| Harris Properties, LLC | Chicago (lakeview) IL dairy store |
| Investment Partners, LLC | Bloomington, IL transfer center |
| IRC Downers Grove Marketplace, LLC | Downers Grove, IL dairy store |
| James D Oberweis Living Trust | Bloomington, IL dairy store |
| James D Oberweis Living Trust | Champaign, IL dairy store |
| James D Oberweis Living Trust | Schaumburg, IL dairy store |
| James D Oberweis Living Trust | North Aurora, IL truck barn |
| Lexington Square, LLC | Elmhurst, IL dairy store |
| LGF Capital, LLC | Oswego, IL dairy store |
| Micromont Holdings 8, LLC | Elgin, IL dairy store |
| Midcounty Realty, LLC | St, Louis, MO transfer center |
| Naperville Associates, LLC | Naperville (North), IL dairy store |
| Oakville Ice Cream LLC | Oakville, MO dairy store |
| O'Fallon Ice Cream, LLC | O'Fallon, MO dairy store |
| Orland Park Ice Cream, LLC | Orland Park, IL dairy store |
| Park Ridge Plaza LLC | Park Ridge, IL dairy store |
| Plymouth Industrial Center, Inc. | Detroit, MI transfer center |
| Riveroaks Properties, LLC | Mokena, IL dairy store |
| Rolling Meadows Ice Cream LLC | Rolling Meadows, IL dairy store |
| St. John Properties, LLC | Oak Creek, WI transfer center |
| The Fidelity Group, LP | Lake Zurich, IL dairy store |
| VEK Investments, LLC | Gurnee, IL dairy store |
| Wheaton Retail Wheaton, II LLC | Wheaton, IL dairy store |
| Woodward Samoset Associates LLC | Royal Oak, MI dairy store |

**EXHIBIT A**
**to**
**CREDIT AGREEMENT**

## NOTICE OF BORROWING

**<u>NOTICE OF BORROWING</u>**

   Reference is made to that certain Secured Super-Priority Post-Petition Credit Agreement, dated as of April __, 2024, by and among the undersigned (**"Debtors"**), and the Lender, CIBC Bank USA (the **"Credit Agreement"**). Capitalized terms used herein without definition are so used as defined in the Credit Agreement.

   The undersigned hereby gives irrevocable notice as Debtors, pursuant to <u>section 1.1(i)(E)</u> of the Credit Agreement, of its request for an advance to be made on [_____, 2024] (the "**Borrowing Date**") in the amount of [$_____], pursuant to the terms of the Credit Agreement.

   Debtors hereby represent and warrant that (a) all of the conditions contained in <u>section 1.1</u> of the Credit Agreement have been satisfied on and as of the date hereof, and will continue to be satisfied on and as of the date of the advance(s) requested hereby, before and after giving effect thereto and to the application of the proceeds therefrom; (b) all of the representations and warranties contained in section 3 of the Credit Agreement are true on and as of the date of this Notice of Borrowing and will be true in all material respects on and as of the applicable Borrowing Date within the same effect as if such representations and warranties had been made on and as of the date of this Notice of Borrowing or on and as of the applicable Borrowing Date, as the case may be, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true as of such earlier date; (c) no Event of Default has occurred and is continuing on the date of this Notice of Borrowing or will have occurred and be continuing on the applicable Borrowing Date, or will result from the advance(s) requested in this Notice of Borrowing; and (d) no event or circumstance having a Material Adverse Effect has occurred since the Interim Financing Order.

**IN WITNESS WHEREOF**, Debtors have caused this Notice of Borrowing to be executed and delivered by their duly authorized officer as of the date first set forth above.

**THE OBERWEIS GROUP, INC.**

By: _____
Name: _____
Title: _____

**OBERWEIS DAIRY, INC.**

By: _____
Name: _____
Title: _____

**NORTH AURORA ICE CREAM, LLC**

By: _____
Name: _____
Title: _____

**TOGI BRANDS, LLC**

By: _____
Name: _____
Title: _____

**TOGI RE 1, LLC**

By: _____
Name: _____
Title: _____

**THIRD MILLENNIUM REAL ESTATE, L.L.C.**

By: _____
Name: _____
Title: _____

**EXHIBIT B**
**to**
**CREDIT AGREEMENT**

**<u>INTERIM FINANCING ORDER</u>**


**INTENTIONALLY LEFT BLANK / SEE FOOTNOTE 7 IN THE INTERIM FINANCING ORDER**

**EXHIBIT C**
**to**
**CREDIT AGREEMENT**

## FINAL FINANCING ORDER

(WITHOUT EXHIBITS)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 24-05385 |
| Oberweis Dairy, Inc., *et al.*,[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Honorable David D. Cleary |
| Debtors. | ) | |
| | ) | |
| | ) | |

**FINAL ORDER AUTHORIZING (A) SECURED POST-PETITION
FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364,
(B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND
(C) GRANT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364**

Upon the motion (the *"Motion"*) dated April 15, 2024, of Oberweis Dairy, Inc., *et al.*, (the *"Debtors"*) in the above-captioned case (a) seeking this Court's authorization pursuant to section**s** 105, 361, 363(c), 363(e), 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the *"Bankruptcy Code"*) and Rules 2002, 4001(c), 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), and Rules 4001-2 and 5005-3(D) of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the *"Local Rules"*) for the Debtors, *inter alia,* (i) to obtain post-petition financing (the *"Post-Petition Financing"*), up to an aggregate principal amount not to exceed $1,000,000.00 at any time outstanding, plus accrued interest on the aggregate principal amount from CIBC Bank USA, an Illinois state chartered bank (the *"Lender"*); (ii) to grant the Lender first priority liens and security interests in all of the Debtors' currently owned and after acquired property to secure the Debtors' obligations under the Post-Petition Financing and (iii) to accord the Lender a super

---

[1] The Debtors in this case, and the last four digits of their respective federal employer identification numbers, are Oberweis Dairy, Inc. ('7516); The Oberweis Group, Inc. ('1378); North Aurora Ice Cream, LLC ('8506); TOGI RE I, LLC ('5952); TOGI Brands, LLC ('7072); and Third Millennium Real Estate L.L.C. ('1589).

priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the Post-Petition Financing with priority in payment for such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below and specifically excepting and subject and subordinate to the Carve-Out (as defined below in paragraph 13 hereof) and the Approved Budget Expenses (as those terms are defined below in paragraph 15 hereof); (b) seeking this Court's authorization to use the Lender's cash collateral within the meaning of Bankruptcy Code § 363(a)(the *"Cash Collateral"*), pursuant to Bankruptcy Code § 363(c), and to provide adequate protection pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d) to the Lender; (c) seeking a preliminary hearing on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (the *"Interim Order"*) authorizing the Debtors to borrow from the Lender under the Post-Petition Financing up to an aggregate of $1,000,000 at any time outstanding on an interim basis upon entry of the Interim Order, plus accrued interest on the aggregate principal amount, upon the terms and conditions set forth in the Interim Order, pending the Final Hearing referred to below; (d) after an interim hearing on the Post-Petition Financing held on April __, 2024 (the "*Interim Hearing*"), requesting that a final hearing (the *"Final Hearing"*) be scheduled by this Court to consider entry of a final order (*"Final Order"*), authorizing upon entry of a Final Order on a final basis the Post-Petition Financing in the total aggregate amount of $1,000,000 at any time outstanding; and (e) requesting that notice of the Motion be shortened under the circumstances, together with all other rights and remedies requested in the Motion.

It appearing that due and appropriate notice of the Motion, the relief requested therein, the Interim Order and the Final Hearing was served by the Debtors on: (i) the Lender and its counsel, (ii) all other parties with liens of record on assets of the Debtors as of the Petition Date, (iii) the Office of the United States Trustee of the Northern District of Illinois (the "*U.S. Trustee*"), (iv) the

United States Trustee for Region II, (v) the twenty (20) largest unsecured creditors of the estate and (vi) any other party that has requested notice pursuant to Bankruptcy Rule 2002, all as more fully set forth in, and evidenced by, the Certificates of Service on file herein [Docket Nos. __, __].

The Court having held the Interim Hearing and entered the Interim Order [Docket No. __] on April __, 2024; the Court having held the Final Hearing on _____; due and sufficient notice of the Motion, the Interim Order and the Final Hearing under the circumstances having been given; the Court having reviewed the Motion and any responses and objections thereto, the *Declaration of Adam Kraber in Support of Chapter 11 Petitions and First-Day Motions* and the other filings and pleadings made by the Debtors; and upon the entire record made at the Interim Hearing and the Final Hearing, including the evidence and testimony presented; and this Court having found good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]:**

A.    On April 12, 2024 (the *"Petition Date"*), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are in possession of their property, and operating and managing their businesses, as Debtors-in-Possession pursuant to Bankruptcy Code §§ 1107 and 1108 (the "*Chapter 11 Cases*").

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Consideration of the Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (D), (K), (M) and (O), and the Debtors confirm their consent to the entry of a final order or judgment by the Court with respect to the Motion if it is determined that

---

[2] Findings of Fact shall be construed as Conclusions of Law and Conclusions of Law shall be construed as Findings of Fact, pursuant to Bankruptcy Rule 7052.

the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

C.    Subject only to the rights of parties in interest that are specifically set forth in paragraph 25, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)    The Debtors have previously entered into two separate lending arrangements with the Lender (the "*CIBC Loans*").  The CIBC Loans are broken down into the "Dairy Loan" and the "TMRE Loan" as those terms are further defined and described below.

(ii)    **Dairy Loan**

a.    Parties.  Lender; ODI; TOGI, NAIC, TRI and Brands (collectively, the "*Dairy Borrowers*").

b.    Operative Documents.

i.    Second Amended and Restated Loan and Security Agreement dated as of February 24, 2022 (the "*Dairy LSA*");

ii.    First Amendment to the Dairy LSA dated as of November 4, 2022;

iii.    Second Amendment to the Dairy LSA dated as of December 21, 2022;

iv.    Third Amendment  to the Dairy LSA dated as of March 20, 2023;

v.    Revolving Loan Note dated February 24, 2022 ("*Dairy Revolving Note*");

vi.    Term Loan Note dated February 24, 2022 ("*Dairy Term Note*");

vii.    2020 CAPEX LOAN NOTE dated February 24, 2022 ("*Dairy Cap-Ex Note*");

viii.        2022 DDT Loan Note dated February 24, 2022 ("*Dairy DDT Note*");

ix.        Master Letter of Credit Agreement dated March 9, 2009 ("*Dairy MLCA*");

x.        Trademark Security Agreement dated March 9, 2009;

xi.        Mortgage dated March 29, 2016 and recorded April 16, 2016, as amended, for the property commonly known as 929 Burlington, Western Springs, Illinois ("*Burlington Mortgage*");

xii.        Mortgage dated March 9, 2002 and recorded March 11, 2009, as amended, for the property commonly known as 951 Ice Cream Drive, North Aurora, Illinois (the "*Ice Cream Drive Mortgage*");

xiii.        Mortgage dated October 29, 2012 and recorded November 5, 2012, as amended, for the property commonly known as 4811 Dempster, Skokie, Illinois (the "*Dempster Mortgage*");

xiv.        Mortgage dated March 1, 2022 and recorded March 1, 2022, as amended, for the property commonly known as 860 E. Boughton, Bolingbrook, Illinois (the "*Boughton Mortgage*");

xv.        Mortgage dated February 24, 2022 and recorded March 1, 2022, as amended, for the property commonly known as 515 Roosevelt, Glen Ellyn (the "*Roosevelt Mortgage*");

xvi.        Mortgage dated May 2, 2012 and recorded May 10, 2012, as amended, for the property commonly known as 9 E. Dundee Rd., Arlington Heights, Illinois dated May 2, 2012 (the "*Dundee Mortgage*");

xvii.        Mortgage dated May 2, 2012 and recorded May 10, 2012, as amended, for the property commonly known as 967 Waukegan Rd, Glenview, Illinois dated May 2, 2012 (the "*Waukegan Mortgage*");

xviii.        Mortgage dated October 27, 2021 and recorded October 27, 2021, as amended, for the property known as 6469 and 6485 N. Lincoln Ave, Lincolnwood, Illinois (the "*Lincoln Mortgages*");

(The Burlington Mortgage, the Ice Cream Drive Mortgage, the Dempster Mortgage, the Boughton Mortgage, the Roosevelt Mortgage, the Dundee Mortgage, the Waukegan Mortgage and the Lincoln Mortgages shall be referred to collectively, as the "*Dairy Mortgages*.").

xix.        Forbearance Agreement dated as of August 31, 2023 (the "*Original Forbearance Agreement*");

xx. First Amended Forbearance Agreement dated as of October 31, 2023 (the "*First Amended Forbearance Agreement*");

xxi. Second Amended Forbearance Agreement dated December 15, 2023 (the "*Second Amended Forbearance Agreement*");

xxii. Third Amended Forbearance Agreement dated as of January 12, 2024 but effective as of January 5, 2024 (the "*Third Amended Forbearance Agreement*");

xxiii. Fourth Amended Forbearance Agreement dated February 28, 2024 but effective as of February 9, 2024 (the "*Fourth Amended Forbearance Agreement*");

(the Original Forbearance Agreement, the First Amended Forbearance Agreement, the Second Amended Forbearance Agreement, the Third Amended Forbearance Agreement and the Fourth Amended Forbearance Agreement shall be referred to collectively as the "*Forbearance Agreements*").

xxiv. Collateral Access Agreement dated as of February 22, 2023;

xxv. Letter from the Lender to TOGI, ODI, NAIC, Brands, and TRI dated August 1, 2023;

xxvi. UCC-1 Financing Statement filed with the Delaware Secretary of State on March 9, 2009 as Filing No. 0735883, as amended and continued from time to time;

xxvii. UCC-1 Financing Statement filed with the Illinois Secretary of State on March 10, 2009 as Filing No. 14103597, as amended and continued from time to time;

xxviii. UCC-1 Financing Statement filed with the Illinois Secretary of State on May 1, 2014 as Filing No. 19234126, as amended and continued from time to time;

xxix. UCC-1 Financing Statement filed with the Illinois Secretary of State on July 31, 2020 as Filing No. 26216478, as amended and continued from time to time; and

xxx. UCC-1 Financing Statement filed with the Illinois Secretary of State on April 28, 2017 as Filing No. 22332767, as amended and continued from time to time

(collectively, the "*Dairy Loan Documents*").

c.      Loan Status. The outstanding balances under the Dairy Loans as of April 4, 2024 were are as follows:

    i.      Dairy Revolving Note - $456,900.00;

    ii.     Dairy Term Note - $7,361,400.00;

    iii.    Dairy Cap-Ex Note – $0.00;

    iv.     Dairy DDT Note - $2,972,800.00; and

    v.      Dairy MLCA – $1,508,000.00

(collectively, the "*Dairy Loan Balances*").

d.      Collateral.

    i.      Blanket lien on all or substantially all of the tangible and intangible personal property assets of the Dairy Borrowers;[3]

    ii.     Separate liens on specified trademarks of the Dairy Borrowers; and

---

[3] Under Section 6.1 of the Dairy LSA, each of the Borrowers granted a lien and security interest in favor of the Lender in and to the following described assets:

(a)     Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on <u>Schedule 6.9,</u> Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities;

(b)     All Software and computer programs;

(c)     All books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of the Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

(d)     All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

iii.    Dairy Mortgages.

(collectively, the "*Dairy Collateral*")

(iii)    <u>TMRE Loan</u>

a.    Parties:  Lender; TMRE[4];

b.    Operative Documents:

i.    Promissory Note dated May 2, 2012, in the original principal amount of $4,184,000 (the "*TMRE Note*");

ii.    Loan and Security Agreement dated May 2, 2012 (the "*TMRE LSA*");

iii.    First Amendment to TMRE LSA, dated April 28, 2017;

iv.    Second Amendment to TMRE LSA dated October 27, 2021;

v.    Third Amendment to TMRE LSA, dated December 21, 2022;

vi.    Guaranty dated as of May 2, 2012;

vii.    Amended and Restated Guaranty dated April 28, 2017; and

viii.    Second Amended and Restated Guaranty dated October 27, 2021;

ix.    The Forbearance Agreements; and

x.    UCC-1 Financing Statement filed with the Illinois Secretary of State on May 3, 2012 as Filing No. 17254804, as amended and continued from time to time

(collectively, the "*TMRE Loan Documents*")

c.    <u>Loan Status</u> – The outstanding balances under the TMRE Loans as of April 4, 2024 was $1,915,066.76 (the "*TMRE Loan Balance*").

d.    <u>Collateral</u>

---

[4] Presently the guarantors of the TMRE Loan include TOGI, ODI, NAIC, Brands and TRI.

i. Blanket Lien on all or substantially all of the tangible and intangible personal property assets of TMRE;[5] and

ii. The Dundee Mortgage; the Lincoln Mortgages, and the Waukegan Mortgage.

(collectively, the "*TMRE Collateral*")[6]

(ii) In accordance with the terms of the Pre-Petition Loan Documents, the Debtors are truly and justly indebted to the Lender, without defense, counterclaim or offset of any kind. As of the Petition Date the Pre-Petition Obligations totaled not less than $14,215,000, exclusive of all accrued and unpaid interest, costs, expenses, and fees owed to the Lender pre-petition. Subject in all respects to the rights of third parties in paragraph 25 hereof, the Debtors further acknowledge, agree and stipulate that (a) the Pre-Petition Liens (1) are valid, binding,

---

[5] Under Section 6.1 of the TMRE LSA, TMRE granted a lien and security interest in favor of the Lender in and to the following described assets:

(e) Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on <u>Schedule 6.9</u>, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities;

(f) All Software and computer programs;

(g) All books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of the Borrower's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

(h) All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

[6] The Dairy Loan Documents and the TMRE Loan Documents shall be referred to collectively as the "*Pre-Petition Loan Documents*"; the Dairy Loan Balances and the TMRE Loan Balance shall be referred to collectively as the "*Pre-Petition Obligations*"; the Dairy Collateral and the TMRE Collateral shall be referred to collectively as the "*Pre-Petition Collateral*"; and the liens of the Lender against the Pre-Petition Collateral shall be referred to collectively as the "*Pre-Petition Liens*."

enforceable and perfected liens in the Pre-Petition Collateral, (2) were granted to the Lender pre-petition for fair consideration and reasonably equivalent value, and (3) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b)(1) all of the Pre-Petition Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Loan Documents, (2) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition Obligations exist in favor of the Debtors, and (3) no portion of the Pre-Petition Obligations or any payments made to or for the benefit of the Lender pre-petition are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii) By reason of the Pre-Petition Loan Documents, the Pre-Petition Obligations are secured by the Pre-Petition Liens against the Pre-Petition Collateral.

D. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Post-Petition Financing and the use of the Cash Collateral. The Debtors urgently require financing and access to the Cash Collateral to (a) fund the Chapter 11 Cases, and (b) sell their businesses as going concerns. The Debtors' need for financing is critical. In the absence of the Post-Petition Financing and such use of the Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.

E. Given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain sufficient unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise available without: (i) the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and (ii) securing such indebtedness and obligations with the security

interests in and the first liens upon the property described below. The Lender objects to the priming of its prepetition liens and security interests pursuant to Bankruptcy Code § 364(d) and the terms of this Final Order. The Debtors do not have the resources to secure such funding over the objection of the Lender, and the Lender has indicated it will not consent to such financing.

F.     Based on the record presented to this Court by the Debtors, it appears (and the Debtors and the Lender have stipulated) that the Post-Petition Financing has been negotiated in good faith and at arm's length between the Debtors and the Lender, and any credit extended and loans made to the Debtors pursuant to this Final Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.     Based on the record before this Court, it appears (and the Debtors and the Lender have stipulated) that the terms of this Final Order, including the terms of the Post-Petition Financing, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.     This Court concludes that entry of this Final Order is in the best interests of the Debtors' estates and creditors as its immediate entry will, among other things, allow for the Debtors' business to continue to operate and facilitate the sale of Debtors' businesses as going concern.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Interim Hearing and the Final Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.     *Motion Granted.*  The Motion is granted as set forth herein.

2. *Authorization.* The Debtors are expressly authorized and empowered to borrow money, use Cash Collateral, and perform their obligations pursuant to the provisions of this Final Order and that certain *Secured Super-Priority Post-Petition Credit Agreement (the "DIP Credit Agreement")* attached hereto as <u>Exhibit A</u>, together with the documents listed on Annex B of the DIP Credit Agreement, and any other documents, instruments or agreements entered into contemporaneously with the DIP Credit Agreement, as may be amended, restated, supplemented or otherwise modified from time to time, shall be referred to collectively as the "*DIP Loan Documents*"). The aggregate Post-Petition Financing under the DIP Credit Agreement is $1,000,000. To the extent there is a conflict between the terms of the DIP Credit Agreement and this Final Order, the terms of this Final Order shall control in all respects. All post-petition loans and all other indebtedness and obligations incurred on or after the Petition Date by the Debtors to the Lender pursuant to this Final Order and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are subsequently referred to herein as the *"DIP Obligations,"* and, together with the Pre-Petition Obligations, as the *"Obligations."* The Debtors are jointly and severally liable to the Lender for the DIP Obligations.

3. *Borrowings; Use of Cash Collateral.* Subject to the terms and conditions of this Final Order and the DIP Loan Documents, (a) the Lender hereby consents to the Debtors' use of the Cash Collateral in accordance with the terms hereof and (b) the Lender will make post-petition loans (the "DIP Loans") to the Debtors in accordance with the Approved Budget(s), as defined in and in accordance with the provisions of paragraph 15 hereof.

4. *Events of Default.* Nothing herein or in any of the DIP Loan Documents shall constitute or be deemed to constitute a waiver by the Lender of any existing or future events of default under the Pre-Petition Loan Documents or the DIP Loan Documents ("*Events of Default*"). Without prejudice to, or waiver of, the Lender's rights and remedies against the Debtors in respect

of any Post-Petition Defaults (defined below) hereafter arising pursuant to paragraph 6 hereof, the Lender agrees to forbear from foreclosing its liens on any Pre-Petition Collateral, to seek to recover the Pre-Petition Obligations or otherwise take enforcement action against the Debtors based solely on any Event of Default which occurred prior to the entry of this Final Order (collectively, the *"Existing Defaults"*); *provided* that, (a) subject to the provisions of paragraph 11 hereof, such forbearance shall terminate upon the Post-Petition Termination Date (as defined in paragraph 6 hereof), and (b) except as otherwise expressly set forth herein, the automatic stay shall continue to apply with respect to all assets of the Debtors' estates.

5.    *Interest, Fees, Costs and Expenses.*  All DIP Loans shall bear interest at the rate of ten percent (10%) per annum (computed on the basis of a year of 360 days for the actual number of days elapsed), *provided* that during the existence of any default under the Post-Petition Financing that such interest shall be increased by an additional four percent (4%). The Lender shall be entitled to recover all of its reasonable out-of-pocket expenses, including audit expenses, plus any additional out-of-pocket expenses, and including reasonable consultants', attorneys' and paralegals' fees, costs and expenses incurred in connection with the Obligations to the extent provided in the Pre-Petition Loan Documents, provided however, that the foregoing are not Approved Budget Expenses and shall not be paid from Cash Collateral or proceeds of the Post-Petition Financing. In consideration for providing the Post-Petition Financing, the Lender was entitled to receive a commitment fee in the amount of $20,000 upon the entry of the Interim Order.

6.    *Termination of Post-Petition Credit.*  (a) The Lender's willingness to make loans hereunder and the Lender's consent to the Debtors' use of Cash Collateral shall be subject to termination (the "*Post-Petition Termination Date*") and all Obligations shall be immediately due and payable in cash (except as the Lender may otherwise agree in writing in its sole discretion)

upon the occurrence of any of the following events (the "*Post-Petition Defaults*"), in each case subject to the "*DIP Cure Period*" defined below:

(b)   (i)   Any Debtor fails to pay any amount payable under the DIP Credit Agreement when due and payable, and such failure to pay continues for period of three (3) business days thereafter following the receipt of written notice from the Lender (the "*DIP Cure Period*");

(ii)   (A) Any Debtors fail or neglect to perform, keep, or observe any of the provisions of Sections 1, 4 or 5 of the DIP Credit Agreement, (B) an "Event of Default" occurs under any other DIP Loan Documents; or (C) any Debtor fails or neglects to perform, keep, or observe any of the provisions or obligations required under the Financing Orders;

(iii)   Any representation or warranty herein, in any other DIP Loan Documents, or in any written statement, report, financial statement or certificate made or delivered to Lender contemporaneously herewith is untrue or incorrect in any material respect as of the date when made or deemed made (other than any representation or warranty qualified as to a Material Adverse Effect, which such representation or warranty must be true and correct in all respects as of the date when made or deemed made).

(iv)   The DIP Credit Agreement, any other DIP Loan Documents, or Financing Order shall, for any reason, cease to create a valid Lien on the Collateral purported to be covered thereby or such Lien shall cease to be a perfected priming first-priority Lien (except as expressly provided in any Financing Order) pursuant to Section 364 of the Bankruptcy Code or Debtor shall so allege in any pleading filed in any court.

(v)   A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases.

(vi)   Entry of an order by the Bankruptcy Court converting one or more of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or dismissing one or more of the Chapter 11 Cases.

(vii)   Application by any Debtor (or any other party with the support of a Debtor) to the Bankruptcy Court in the Chapter 11 Cases or any other court of competent jurisdiction for an order authorizing the granting of any liens or claims *pari passu* or senior to Lender's Lien and the Super-Priority Indebtedness.

(viii)     Filing by any Debtor of any plan or reorganization other than one providing for the indefeasible payment in full in cash, on or prior to the maturity date of the DIP Loan;

(ix)     The Financing Orders are amended, stayed, vacated, or modified without Lender's prior written consent.

(x)     Filing of any challenge by any Debtor to the validity, priority, or extent of any Liens in favor of Lender.

(xi)     The entry by the Bankruptcy Court of an order terminating any Debtor's right to use Cash Collateral;

(xii)     The Debtors' bankruptcy estates become administratively insolvent, with such determination being made by comparing the value of the Debtors' assets, taken as a whole, to the amount of Debtors' post-petition administrative expense liabilities without regard to current cash flows.

(xiii)     Any Debtor shall use cash collateral or any proceeds of the DIP Loan, for any item other than those set forth in, and in accordance with, the Approved Budgets and as approved by the Bankruptcy Court or prepays any pre-petition debt except as approved by the Bankruptcy Court and Lender; or

(xv)     Unless replaced by a Person acceptable to Lender in its sole discretion and confirmed by the Bankruptcy Court within thirty (30) days, the Debtors fail for any reason to maintain Kevin Cleary of Fort Dearborn Partners as the chief restructuring officer of the Debtors (or other Person having functionally equivalent authority, duties and responsibilities consistent with the position of a chief restructuring officer acceptable to Lender in its sole discretion.

(xvi)     The Debtors shall fail to comply with the Milestones set forth in Section 4.10 of the DIP Credit Agreement, subject in all respects to the "*Milestone Cure Period*" as therein defined.

7.     *Security for Indebtedness.*  (a) The Lender is hereby granted as security for the DIP Obligations, pursuant to sections 363, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a valid and perfected first lien (the "*DIP Liens*") on the DIP Collateral, as that term is defined on Annex A to the DIP Credit Agreement. The DIP Liens shall be junior in priority to any valid, perfected and unavoidable liens to the extent that such liens are senior to the Pre-Petition Liens

under applicable law as of the Petition Date, but solely upon an adjudication that such alleged lien is valid, and including any liens that are properly perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code. The Lender at its option may release at any time from its liens and security interests any assets determined by the Lender to have a risk of environmental liabilities which the Lender in its sole discretion deems unacceptable. The interest of the Debtors' estates in any property for which a security interest or lien is avoided or otherwise preserved for the benefit of Debtors' estates under section 551, or any other provision of the Bankruptcy Code, shall be subordinate to the DIP Liens. The DIP Liens expressly exclude any and all claims or rights of action arising under chapter 5 of the Bankruptcy Code (collectively, the "*Avoidance Actions*").

(b)     For all DIP Obligations arising under this Final Order, the Lender is granted an allowed super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia,* sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "*Superpriority Claim*"), *provided, however*, that the Superpriority Claim shall be subject to the payment of the Carve-Out and the Approved Budget Expenses incurred, accrued, unpaid or otherwise payable prior to the Post-Petition Termination Date in accordance with this Final Order. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtors, and shall be payable from and have recourse to all pre-petition and post-petition property

of the Debtors, subject to the limitations provided herein. Notwithstanding anything herein to the contrary, the Superpriority Claim shall not be recoverable from the Avoidance Actions.

(c)     All Cash Collateral arising from Pre-Petition Collateral (including as provided and set forth under section 552(b) of the Bankruptcy Code) (the "*Pre-Petition Cash Collateral*") subject to the liens granted by the Debtors shall be deemed to be collateral for the Pre-Petition Obligations, as well as for the DIP Loans. All Cash Collateral arising from the DIP Collateral (the "*Post-Petition Cash Collateral*") subject to the liens granted by the Debtors shall be deemed to be collateral for the DIP Obligations and the Adequate Protection Claims, as defined and in the manner set forth under paragraph 8.

8.     *Adequate Protection for Use of Cash Collateral.* As adequate protection for the Lender's consent to the use of Cash Collateral, the Lender is hereby granted valid, binding, continuing, enforceable fully perfected, first-priority replacement liens on and senior security interest in and to all of the DIP Collateral (the "*Adequate Protection Liens*"), subject only to the Carve-Out, the Approved Budget Expenses and the DIP Liens, for any diminution in the value of the Lender's interest in the Pre-Petition Collateral including the Pre-Petition Cash Collateral resulting from the sale, lease or use of the Pre-Petition Collateral from and after the Petition Date, other than the priming of the Pre-Petition Collateral by the DIP Collateral (the "*Adequate Protection Claim*").

9.     *Perfection of New Liens.* All liens and security interests on or in the DIP Collateral and the Adequate Protection Liens granted to the Lender by this Final Order and the Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; *provided, however,* that notwithstanding the

provisions of section 362 of the Bankruptcy Code, (i) the Lender may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the Lender may require, and (ii) the Lender may require the Debtors to deliver to the Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtors is directed to cooperate and comply therewith. If the Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if the Lender, in accordance with the DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents, or taking possession, shall be deemed to have been filed or recorded, or taken, in the Chapter 11 Cases, as of the entry of this Final Order but with the priorities as set forth herein. The Lender may (in its discretion) but shall not be required to, file a certified copy of this Final Order in any filing or recording office in any county or other jurisdiction in which the Debtors have any real or personal property and such filing or recording shall constitute further evidence of perfection of the Lender's interests in the DIP Collateral.

10. *Waiver.* The Debtors and the estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right, (a) without the Lender's prior written consent (which may be withheld in its sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash of the DIP Obligations in this Final Order and the Obligations: (i) to grant or impose, or request that the Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens on or security interests in

any DIP Collateral, which are *pari passu* with or superior to the Lender's liens on and security interests in such DIP Collateral, other than the Carve-Out; (ii) to return goods pursuant to section 546(c) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise, unless otherwise directed by Court order; or (iii) to modify or affect any of the rights of the Lender under this Final Order or any DIP Loan Documents by any order entered in the Chapter 11 Cases or any subsequent or superseding case, including any conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto (collectively, a *"Successor Case"*).

11. *Modification of Automatic Stay; Other Remedies.* (a) Except as set forth in subparagraph (b) of this paragraph, which governs any action by the Lender to foreclose on its liens on any DIP Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated as to the Lender to permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Final Order and the other DIP Loan Documents without further application or motion to, or order from, the Court. Except as set forth in subparagraph (b) of this paragraph, the Lender is hereby granted leave, among other things, to (i) receive and apply payments of the DIP Obligations and collections on and proceeds of the Pre-Petition Collateral and the DIP Collateral to the DIP Obligations in the manner specified in this Final Order and the DIP Loan Documents, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iii) charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Final Order as

provided therein, (iv) give the Debtors any notice provided for in any of the DIP Loan Documents or this Final Order, and (v) cease making loans or other extensions of credit and/or suspend or terminate any obligation of the Lender to make loans or other extensions of credit under the DIP Loan Documents or this Final Order solely from and after the Post-Petition Termination Date.

(b)     Upon the occurrence of the Post-Petition Termination Date, the Debtors' ability to use Cash Collateral and proceeds of the Post-Petition Financing shall terminate without notice. The Lender shall thereafter be entitled to deliver written notice of its intention to exercise its remedies under the DIP Loan Documents and following the expiration of seven (7) calendar days, the Lender will be entitled to exercise the remedies provided and set forth in Section 7 of the DIP Credit Agreement. Unless the Bankruptcy Court orders otherwise, (x) the automatic stay, as to the Lender, shall be automatically terminated at the end of such notice period, without further notice, hearing, or order, and (y) the Debtors shall cooperate with the Lender, to effect an orderly liquidation of the DIP Collateral on terms and conditions acceptable to the Lender.  The Debtors shall immediately provide notice to the Lender (with a copy to counsel to the Committee) of the occurrence of any Post-Petition Default.  Notwithstanding anything herein to the contrary, the rights of the Lender upon the occurrence of the Post-Petition Termination Date shall be expressly subject to the payment of, and funding made available from the Lender or any proceeds of sale: (i) for all fees and expenses incurred, accrued, unpaid or otherwise payable under the Carve-Out, including the Supplemental Fees and Expenses (as defined in paragraph 13 hereof); and (ii) for all incurred, accrued, unpaid or otherwise payable Approved Budget Expenses.

12.     *Priority Claims.*  Subject to the Carve-Out and the Approved Budget Expenses, the DIP Obligations shall have the highest administrative priority under section 364(c)(l) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b),

507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise, whether incurred in the Chapter 11 Case or any Successor Case, and shall at all times be senior to the rights of the Debtors, any successor trustee or estate representative in the Chapter 11 Case or any Successor Case. Nothing in this Final Order or the Approved Budget(s) or any other budget shall constitute the consent by the Lender to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including any amounts set forth in the Approved Budget or any other budget) against the Lender, its claims or its collateral under section 506(c) of the Bankruptcy Code or otherwise.

13. *Carve-Out.* (a) The Lender's liens on and security interests in the DIP Collateral or the Pre-Petition Collateral and its administrative expense claims under sections 364(c)(1) or 507(b) of the Bankruptcy Code, the liens securing the Subordinated Debt (as such term is defined in the Subordination Agreements), and any section 507(b) claims granted pursuant to this Final Order or the Final Order shall be subject only to the following (the "*Carve-Out*"): (i) all expenses set forth in the Approved Budgets; (ii) all fees required to be paid to the clerk of the Bankruptcy Court, any agent thereof and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (iii) fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iv) to the extent allowed by the Bankruptcy Court, all claims for unpaid fees, costs and expenses (the "*Professional Fees*") incurred by persons or firms retained by the Debtors or any Committee whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (collectively, the "*Professional Persons*") that are: (A) based upon services rendered at any time prior to the occurrence of an Event of Default unless such Event of Default is waived or cured as provided in this Agreement, or (B) following the Post-Petition Termination Date, if any, in an aggregate amount not to exceed $150,000 for Professional Fees of the Debtors, $50,000 for

Professional Fees of a Committee (if appointed) and $25,000 for Professional Fees of a subsequently appointed chapter 7 or chapter 11 bankruptcy trustee (collectively, the "*Supplemental Fees and Expenses*"). As long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay all fees, expenses, compensation and reimbursement of expenses allowed and payable, including under any order entered in the Chapter 11 Cases establishing procedures for interim monthly compensation and reimbursement of Professional Fees, or sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and the same shall not reduce the Carve-Out. In the event the Carve-Out is reduced by any amount during an Event of Default, upon the effectiveness of a cure of such Event of Default, the Carve-Out shall be increased by such amount. Nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii) or (iii) above, on any grounds.

(b) Notwithstanding anything to the contrary in this Final Order or the Loan Documents, no proceeds of the Carve-Out, the Obligations, Cash Collateral (including any pre-petition retainer funded by the Lender pursuant to the Pre-Petition Loan Documents), Pre-Petition Collateral or DIP Collateral may be used to pay any claims for services rendered by any of the Debtors Professionals, the Committee Professionals or any other person in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens and security interests of the Lender in the Pre-Petition Collateral or the DIP Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the Pre-Petition Loan Documents, this Final Order and/or the DIP

Loan Documents or the Lender's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP Collateral; *provided*, *however*, that the Committee Professionals may expend up to $25,000 for fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions of the Debtors contained in this Final Order. The Lender shall retain its rights as a party in interest to object to any claims of any of the Debtors Professionals and the Committee Professionals.

14. *Cash Collection Procedures.* From and after the date of the entry of this Final Order, all collections and proceeds of any DIP Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time, shall be deposited in the same bank account(s) into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition Credit Agreement (or in such other accounts as are designated or, in the case of the Carve-Out and the Approved Budget Expenses, consented to by the Lender from time to time). Except as otherwise set forth herein, all Cash Collateral in the possession or control of the Debtors as of the Petition Date and as otherwise set forth in section 552(b) of the Bankruptcy Code, constitutes proceeds of the Pre-Petition Collateral. All Cash Collateral shall only be utilized in conformance with an Approved Budgets. If applicable, all financial institutions in which any lockboxes, blocked accounts or other accounts of the Debtors are located are hereby authorized and directed to comply with any request of the Lender to turnover to the Lender all funds therein without offset or deduction of any kind.

15. *Budget; Use of Loan and DIP Collateral Proceeds.* Attached as <u>Exhibit B</u> hereto and incorporated herein by reference is a budget (which has been approved by the Lender) setting forth by line item all projected cash receipts and cash disbursements for the time period from the Petition Date through the week ending June 30, 2024 (the *"Approved Budget"*). The Approved Budget

may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the Lender and the Debtors agree in writing in its respective sole discretion (each such additional budget, a *"Supplemental Approved Budget"*) (the Approved Budget and any and all Supplemental Approved Budgets shall constitute *"Approved Budget(s).")* *(The aggregate of all expenses approved under the Approved Budgets, together with the Permitted Variances as set forth in Section 5.8 of the DIP Credit Agreement, shall be collectively referred to as the "Approved Budget Expenses").* Except as otherwise provided herein, the proceeds of DIP Loans or other extensions of credit made by the Lender to Debtors pursuant to this Final Order and the DIP Loan Documents, all proceeds of DIP Collateral and all Post-Petition Cash Collateral shall be used only as follows: (a) prior to the Post-Petition Termination Date, *first,* to the payment of the Approved Budget Expenses (subject to the limitations and exceptions set forth in this ordering paragraph), and the Carve-Out, *second*, to the payment of the DIP Loan, and *third*, to any Adequate Protection Claims; and (b) on or after the Post-Petition Termination Date, *first*, to the payment of any Approved Budget Expenses and the Carve-Out that were incurred, accrued, unpaid or otherwise payable prior to the Post-Petition Termination Date, in amounts not to exceed the line items set forth for in the Approved Budgets through the Post-Petition Termination Date, *second*, to the payment of the Supplemental Fees and Expenses, and *third*, to the DIP Loan. The Lender shall have no obligation with respect to the Debtors' use of the proceeds of the Post-Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with any Approved Budgets or to pay (directly or indirectly from its DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget(s). Funds borrowed under this Final Order and Cash Collateral used under this Final Order shall be used by the Debtors in accordance with this Final Order. The Lender's consent to any Approved Budget(s) shall not be construed as

consent to the use of any Cash Collateral or a commitment to continue to provide Post-Petition Financing after the occurrence of a Post-Petition Termination Date, regardless of whether the aggregate funds shown on the Approved Budget(s) have been expended. To induce the Lender to permit the Debtors to use Cash Collateral and borrow additional funds, the Debtors have agreed, and this Court hereby orders, that as long as any of the Obligations are outstanding, the Debtors shall not seek, assert, argue for, encourage or support the use of Cash Collateral of the Lender by the Debtors except as expressly permitted and consented to by the Lender pursuant to the terms of this Final Order.

16.     *Covenants.*  The Debtors shall timely comply with all of the covenants set forth in this Final Order and the DIP Loan Documents, subject in all respects to the DIP Cure Period.

17.     *Application of Pre-Petition Collateral Proceeds.*  (a) Subject to paragraph 15 hereof and the prior payment of Approved Budget Expenses, the Carve-Out and the Supplemental Fees and Expenses, all proceeds of Pre-Petition Collateral including Pre-Petition Cash Collateral, shall thereafter be applied (i) *first*, to the payment of the DIP Loan; (ii) *second*, to the payment of the Adequate Protection Claims; and (iii) *third*, to the payment of the Pre-Petition Obligations.

(b) In the event that there is ambiguity as to whether particular collateral is Pre-Petition Collateral or DIP Collateral, or whether proceeds are proceeds of Pre-Petition Collateral or DIP Collateral, such collateral shall be deemed to be Pre-Petition Collateral and such proceeds shall be deemed to be proceeds of Pre-Petition Collateral and applied accordingly in accordance with the provisions of this paragraph.  The Debtors shall not have the right to direct the manner of application of any payments to the Lender or any other receipts by the Lender of proceeds of any of the Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this paragraph.

18.     *Non-Ordinary Course Dispositions.*  No sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any auction or other similar sales) may be done without the Lender's written consent.

19.     *Books and Records.*  The Debtors shall permit the Lender and any authorized representatives designated by the Lender (including its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the Debtors, including the Debtors' respective financial and accounting records, and to request copies and take extracts therefrom, and to discuss Debtors' affairs, finances and business with Debtors' officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the Debtors shall promptly provide to the Lender and the Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants in the DIP Loan Documents and this Final Order.

20.     *The Lender's Reservation of Rights; No Waiver.*  The Lender does not waive, and expressly reserves, any and all claims, defenses, rights, and remedies it has pursuant to any or all of the Pre-Petition Loan Documents, the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against the Debtors and any officer, director, employee, agent, or other representative of the Debtors.  In addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the Lender arising under this Final Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors, in its pre-petition capacity, under the Pre-Petition Loan Documents.

21.     *Order Binding on Successors.*  The provisions of this Final Order shall be binding upon and inure to the benefit of the Lender, the Debtors, and their respective successors and assigns

(including any trustee or other estate representative appointed as a representative of Debtors' estates or of any estate in any Successor Case) and the Professional Persons. Except as otherwise explicitly set forth in this Final Order, no third parties other than the Professional Persons are intended to be or shall be deemed to be third party beneficiaries of this Final Order or the DIP Loan Documents.

22.    *Effect of Dismissal, Conversion or Substantive Consolidation.*  If the Chapter 11 Cases are dismissed, converted, otherwise superseded or substantively consolidated, the Lender's rights and remedies under this Final Order and the DIP Loan Documents shall be and remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, superseded, or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supercission or substantive consolidation, all of the terms and conditions of this Final Order, including the liens and the priorities granted hereunder, shall remain in full force and effect.

23.    *Releases and Validation of Pre-Petition Obligations and Liens; Allowance of Secured Claim.*  The releases, discharges, waivers, and agreements set forth in Recital C and in this paragraph will be subject to the rights of the Committee and any other party in interest to object on the terms and conditions set forth in paragraph 25.  The Debtors and their estates, hereby: (a) release and discharge the Lender, together with its affiliates, agents, attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between the Lender and the Debtors, or any other acts or omissions by the Lender in connection with any of the Pre-Petition Loan Documents or its pre-petition relationship with the Debtors; (b) waive any and all defenses (including offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability (under sections 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of

the Pre-Petition Obligations and the security interests in and liens on the Pre-Petition Collateral in favor of the Lender; and (c) agree, without further Court order, to the allowance of the pre-petition claims of the Lender pursuant to sections 502 and 506 of the Bankruptcy Code on account of the Pre-Petition Obligations as fully secured claims according to the Lender's books and records, the principal amount of which is not less than $14,215,000.00 as of the Petition Date, plus accrued pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Pre-Petition Loan Documents.

24. *The Lender's Relationship with Debtors.* In making decisions to advance any loans or other extensions of credit to the Debtors, in administering any loans or other extensions of credit, or in taking any other actions reasonably related to this Final Order or the DIP Obligations or the DIP Loan Documents (including the exercise of its approval rights with respect to any budget), the Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Lender and the Debtors.

25. *Objections by Parties in Interest.* (a) The stipulations, admissions and releases contained in this Final Order shall be binding on the Debtors and all parties in interest, including any Committee, unless such Committee, other committee or any other party in interest (other than the Debtors) (i) obtains the authority to commence and commences, or, if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case commences, on or before the date that is the

later of (A) 75 days after the entry of the Interim Order, (B) in the case of such an action by the Committee, 60 days after the appointment of the Committee, or (C) such later date as has been agreed to, in writing, by the Lender, if any (such time period shall be referred to as the *"Challenge Period,"* and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the *"Challenge Period Termination Date"*), (x) files prior to the Challenge Period Termination Date, a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Final Order, or (y) files prior to the Challenge Period Termination Date, a contested matter or adversary proceeding against the Lender in connection with or related to the Pre-Petition Obligations, the Pre-Petition Loan Documents, the validity, enforceability, priority or extent of the Lender's liens on the Pre-Petition Collateral, or the actions or inactions of the Lender arising out of or related to the Pre-Petition Obligations, or otherwise, including any claim against the Lender in the nature of a "*lender liability*" claim, or any other causes of action, setoff, counterclaim or defense to the Pre-Petition Obligations (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the *"Claims and Defenses"*) and (ii) obtains a judgment from this Court in any such timely and properly commenced contested matter or adversary proceeding asserting the Claims and Defenses.

(b) If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then the admissions, stipulations, findings and releases included in this Final Order, including the release provisions herein, shall be binding on all parties in interest, including any Committee, and (i) the Pre-Petition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, subordination, recharacterization, defense

or avoidance, for all purposes in the Chapter 11 Case and any subsequent chapter 7 case, (ii) the Lender's liens on the Pre-Petition Liens shall be deemed legal, valid, binding, enforceable and properly perfected, not subject to recharacterization, subordination, avoidance or reduction and (iii) the Pre-Petition Obligations, the Pre-Petition Liens, the conduct of the Lender, and the Lender itself shall not be subject to any other or further challenge by any party in interest, and any such party shall be enjoined and forever barred from seeking to exercise the rights of the Debtors' estates regarding any such challenge, including any successor thereto, or from asserting any Claims and Defenses against the Lender, or its respective agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys or advisors (solely in its capacities as such). If any such adversary proceeding or contested matter is timely filed prior to the Challenge Period Termination Date, the stipulations and admissions and provisions contained in the Interim Order or this Final Order shall nonetheless remain binding and preclusive on the Committee, the Debtors and the Debtors' estates and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter by such party. The Challenge Period may be extended for the benefit of any one or more parties by written agreement of the Lender in its sole discretion without further order of the Court. Nothing in this Final Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any cause of action belonging to any of the Debtors or their estates, including any claim and defense or other claim against the Lender. If a chapter 7 trustee is appointed prior to the expiration of the Challenge Period, such trustee shall have until the later of (a) the termination of the Challenge Period or (b) twenty-one (21) days following such trustee's appointment, to commence a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, or releases included in this Final Order, or to seek an extension of the Challenge Period.

26.     *Effect of Modification of Order.*   The Debtors shall not, without the Lender's prior written consent, seek to modify, vacate, or amend this Final Order or any DIP Loan Documents. If any of the provisions of this Final Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any DIP Obligations outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such DIP Obligations.   Notwithstanding any such stay, modification or vacatur, any DIP Obligations outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Final Order, and the Lender shall be entitled to all the rights, privileges and benefits, including the security interests and priorities granted herein, with respect to all such DIP Obligations.

27.     *Safe Harbor.*   The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and the Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code.

28.     *No Marshalling.*   The Lender shall not be under any obligation to marshal any assets in favor of the Debtors or any other party or against or in payment of any or all of the Obligations.

29.     *Shortened Notice*.   Notice of the Motion on a shortened and expedited basis is allowed and approved.

30.     *Objections Overruled or Withdrawn.*   All objections to the entry of this Final Order have been withdrawn or overruled.

31.     *Controlling Effect of Order.*   To the extent any provisions in this Final Order conflict with any provisions of the Motion, the Interim Order, any Pre-Petition Loan Documents or any DIP Loan Documents, the provisions of this Final Order shall control.

32.     *Order Effective.*   This Final Order shall be effective as of the date of signature by the Court.

Dated:

Chicago, Illinois

_____

HONORABLE DAVID D. CLEARY
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**DIP AGREEMENT**

# EXHIBIT B

# BUDGET

# Exhibit B

# Budget

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Thereafter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| Sunday | | 4/7/2024 | 4/14/2024 | 4/21/2024 | 4/28/2024 | 5/5/2024 | 5/12/2024 | 5/19/2024 | 5/26/2024 | 6/2/2024 | 6/9/2024 | 6/16/2024 | |
| Week ending Saturday | | 4/13/2024 | 4/20/2024 | 4/27/2024 | 5/4/2024 | 5/11/2024 | 5/18/2024 | 5/25/2024 | 6/1/2024 | 6/8/2024 | 6/15/2024 | 6/22/2024 | 7/1/2024 |
| | **CASH FLOW** | | | | | | | | | | | | |
| | **CASH RECEIPTS** | | | | | | | | | | | | |
| 1 | **TOTAL OPERATING CASH RECEIPTS** | 1,398,387 | 1,350,200 | 1,359,900 | 1,510,000 | 1,569,797 | 1,585,200 | 1,565,200 | 1,564,900 | 1,579,497 | 1,594,900 | 300,000 | - |
| 2 | | | | | | | | | | | | | |
| 3 | **OPERATING DISBURSEMENTS** | | | | | | | | | | | | |
| 4 | **Key Vendor Payments** | | | | | | | | | | | | |
| 5 | Foremost | - | (195,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | | |
| 6 | Organic Valley | - | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | | |
| 7 | Meadowvale | (46,571) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (70,000) | (35,000) | (35,000) | | |
| 8 | Resale products | - | (249,752) | (133,770) | (143,410) | (140,120) | (140,770) | (142,752) | (143,410) | (100,000) | (75,000) | | |
| 9 | 1836 Farms | (240) | | | | | | | | | | | |
| 10 | Transportation | - | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | | |
| 11 | Greco & Tocco Greco | - | (75,000) | (75,000) | (90,000) | (90,000) | (90,000) | (90,000) | (75,000) | (90,000) | (75,000) | | |
| 12 | Stanpac / Darfill | (27,630) | (20,000) | (20,000) | (20,000) | - | (20,000) | - | (20,000) | - | - | | |
| 13 | Fuel | (24,499) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | | |
| 14 | Other distributors | - | (200,000) | (100,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | | |
| 15 | Ingredients & Packaging | (121,141) | (181,000) | (123,366) | (149,236) | (100,000) | (86,309) | (32,847) | (94,933) | (50,000) | (50,000) | | |
| 16 | **Total Key Vendor Pmts** | (220,081) | (1,085,752) | (712,136) | (687,646) | (615,120) | (622,079) | (550,599) | (618,343) | (490,000) | (450,000) | - | - |
| 17 | **Payroll Expense** | | | | | | | | | | | | |
| 18 | Payroll | (818,383) | (50,000) | (860,000) | (50,000) | (875,000) | (50,000) | (875,000) | (50,000) | (850,000) | (450,000) | (850,000) | |
| 19 | Benefits | (28,798) | (85,750) | (750) | (20,750) | (750) | (85,750) | (750) | (20,750) | (750) | (85,750) | | |
| 20 | Health insurance | (132,965) | | | | (120,000) | | | | | (120,000) | | |
| 21 | Payroll fees | - | (500) | | | (500) | | | | | | | |
| 22 | **Total Payroll Expense** | (980,147) | (135,750) | (861,250) | (70,750) | (995,750) | (136,250) | (875,750) | (70,750) | (850,750) | (655,750) | (850,000) | - |
| 23 | **Other Operating Expenses** | | | | | | | | | | | | |
| 24 | Insurance | (50,659) | (60,000) | | (106,000) | | (60,000) | | (62,000) | | | | |
| 25 | D&O Insurance Tail | | | | | | | | (45,000) | | | | |
| 26 | Rent (Inside) | | | | (116,023) | | | | (116,023) | | | | |
| 27 | Rent (Outside) | | | | (207,848) | | | | (207,848) | | | | |
| 28 | Sales taxes | (4,571) | (137,200) | (54,600) | (40,000) | (29,000) | (25,600) | (137,200) | (35,000) | (4,600) | (54,600) | | |
| 29 | Real estate taxes | (85,500) | | | | | | | | | | | |
| 30 | Utility Order | - | (100,000) | (60,770) | (12,862) | (9,021) | (19,137) | (45,000) | (45,000) | (45,000) | (45,000) | | |
| 31 | Credit card payments | - | | (200,000) | | | | (200,000) | | | | | |
| 32 | Other check disbursements | (28,789) | (150,000) | (100,000) | (103,638) | (90,979) | (50,000) | (55,000) | (71,500) | (55,000) | (100,000) | | |
| 33 | Other ACH disbursements | (94,501) | (65,000) | (65,000) | (55,000) | (65,000) | (65,000) | (55,000) | (55,000) | (65,000) | (65,000) | | |
| 34 | Miscellaneous | (5,412) | (1,000) | (1,000) | (6,700) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (6,700) | | |
| 35 | **Total Other Operating Expenses** | (269,431) | (513,200) | (481,370) | (648,071) | (195,000) | (220,737) | (503,200) | (638,371) | (176,300) | (265,600) | - | - |
| 36 | **Debt Service Disbursements** | | | | | | | | | | | | |
| 37 | Bank fees | (5,907) | (20,000) | | | | | | | | | | |
| 38 | Interest expense | | | | | | | | | | (25,000) | | |
| 39 | **Total Debt Service Disbursements** | (5,907) | (20,000) | - | - | - | - | - | - | - | (25,000) | - | - |
| 40 | | | | | | | | | | | | | |
| 41 | **TOTAL OPERATING DISBURSEMENTS** | (1,475,565) | (1,754,702) | (2,054,756) | (1,406,467) | (1,805,870) | (979,066) | (1,929,549) | (1,327,464) | (1,517,050) | (1,396,350) | (850,000) | - |
| 42 | | | | | | | | | | | | | |
| 43 | *TOTAL OPERATING CASH FLOW* | (77,178) | (404,502) | (694,856) | 103,533 | (236,073) | 606,134 | (364,349) | 237,436 | 62,447 | 198,550 | (550,000) | - |
| 44 | | | | | | | | | | | | | |
| 45 | **NON-OPERATING CASH ACTIVITY** | | | | | | | | | | | | |
| 46 | **Cash Receipts** | | | | | | | | | | | | |
| 47 | *Proceeds from Sale of the Company* | - | - | - | - | - | - | - | - | - | 13,750,000 | | |
| 48 | *Trucks* | - | - | - | - | - | - | - | - | - | 200,000 | | |
| 49 | *Real Estate (Plant & Equipment)* | - | - | - | - | - | - | - | - | - | 6,000,000 | | |
| 50 | Asset disposal proceeds *(Total)* [1] | - | - | - | - | - | - | - | - | - | 19,950,000 | | |
| 51 | Dip Financing | | 200,000 | 200,000 | 200,000 | - | 200,000 | - | 200,000 | | | | |
| 52 | **Cash Disbursements** | | | | | | | | | | | | |
| 53 | *Fort Dearborn Partners* | (50,000) | | | | | (100,000) | | | | (100,000) | | |
| 54 | *Adelman & Gettleman* | (50,000) | | | | | (100,000) | | | | (100,000) | | |
| 55 | *Livingstone* | | | | | | (25,000) | | | | (525,000) | | |
| 56 | *Creditor's Committee Fees* | | | (25,000) | | | (25,000) | | | | (25,000) | | |
| 57 | *401k Audit* | - | - | - | - | - | - | - | - | - | - | | (25,000) |
| 58 | *Tax Return Preparation* | - | - | - | - | - | - | - | - | - | - | | (50,000) |
| 59 | *Noticing Agent* | - | (20,000) | - | - | - | (20,000) | - | - | - | (25,000) | | |
| 60 | Professional fees *(Total)* | (100,000) | (35,000) | (25,000) | | - | (270,000) | - | - | (750,000) | (25,000) | (75,000) | |
| 61 | *US Trustee Fees* | - | - | - | (45,000) | - | - | - | - | - | - | (230,000) | |
| 62 | *Ombudsman* | - | - | (25,000) | - | - | - | - | - | - | - | | |
| 63 | **(Cure Costs)** | | | | | | | | | | | | |
| 64 | *Cure Costs - Rent* | - | - | - | - | - | - | - | - | - | (335,028) | | |
| 65 | *Cure Costs - Real Estate Taxes* | - | - | - | - | - | - | - | - | - | (1,102,899) | | |
| 66 | **(Super Priority)** | | | | | | | | | | | | |
| 67 | *Payments on DIP Financing* | - | - | - | - | - | - | - | - | - | (1,000,000) | | |
| 68 | **(Sr. Secured)** | | | | | | | | | | | | |
| 69 | *CIBC paydown* | - | - | - | - | - | - | - | - | - | (13,923,356) | | |
| 70 | *Paydown of other Finance Companies and Bank Debt* | - | - | - | - | - | - | - | - | - | (2,000,000) | | |
| 71 | **(Administrative Claims)** | | | | | | | | | | | | |
| 72 | *503b(9) Claims* | - | - | - | - | - | - | - | - | - | (800,000) | | |
| 73 | *Carve-out for estate* | - | - | - | - | - | - | - | - | - | (200,000) | | |
| 74 | **Total Non-Operating Cash Flows** | (100,000) | 165,000 | 150,000 | 155,000 | - | (70,000) | - | 200,000 | - | (161,283) | (255,000) | (75,000) |
| 75 | | | | | | | | | | | | | |
| 76 | **CASH FLOW** | (177,178) | (239,502) | (544,856) | 258,533 | (236,073) | 536,134 | (364,349) | 437,436 | 62,447 | 37,267 | (805,000) | (75,000) |
| 77 | *Cumulative Cash Flow* | (177,178) | (416,680) | (961,536) | (703,003) | (939,076) | (402,942) | (767,292) | (329,855) | (267,409) | (230,142) | (1,035,142) | (1,110,142) |
| 78 | | | | | | | | | | | | | |
| 79 | **LIQUIDITY** | | | | | | | | | | | | |
| 80 | | | | | | | | | | | | | |
| 81 | **Cash On-Hand** | | | | | | | | | | | | |
| 82 | Beginning Balance | 1,110,142 | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 |
| 83 | Increase/(Decrease) Operations | (177,178) | (239,502) | (544,856) | 258,533 | (236,073) | 536,134 | (364,349) | 437,436 | 62,447 | 37,267 | (805,000) | (75,000) |
| 84 | Ending Bank Balance | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 | 0 |
| 85 | Checks O/S | | | | | | | | | | | | |
| 86 | **Ending Book Balance** | 932,964 | 693,462 | 148,606 | 407,139 | 171,066 | 707,199 | 342,850 | 780,286 | 842,733 | 880,000 | 75,000 | 0 |

[1] The amount set forth in this budget for proceeds from the disposition of substantially all assets of the Debtors is an estimated amount based upon current discussions with a prospective purchaser. As of the filing hereof, an asset purchase agreement has not yet been executed. The parties continue their ongoing discussions on documentation.