**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oberweis Dairy, Inc., *et al.*,[1] | ) | Case No. 24-05385 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable David D. Cleary |
| | ) | |
| | ) | **Hearing Date: May 1, 2024** |
| | ) | **Hearing Time: 11:00 a.m.** |

<u>**NOTICE OF MOTION**</u>

PLEASE TAKE NOTICE that on **May 1, 2024, at 11:00 a.m. CDT,** we will appear before the Honorable David D. Cleary, or any judge sitting in that judge's place, **either** in courtroom 644 of the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, 60604 **or** electronically as described below, and present the **MOTION OF DEBTORS FOR ENTRY OF: (i) AN ORDER: (a) APPROVING SALE PROCESS, INCLUDING A STALKING HORSE ASSET PURCHASE AGREEMENT; (b) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (c) APPROVING FORM NOTICES; (d) EXCUSING PAGE LIMIT AND (e) SCHEDULING A PUBLIC AUCTION AND A SALE APPROVAL HEARING; AND (ii) AN ORDER: (x) APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (y) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (z) GRANTING RELATED RELIEF**, a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https:// www.zoomgov.com/. The enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

---

[1] The Debtors in this case, and the last four digits of their respective federal employer identification numbers, are Oberweis Dairy, Inc. ('7516); The Oberweis Group, Inc. ('1378); North Aurora Ice Cream, LLC ('8506); TOGI RE I, LLC ('5952); Third Millennium Real Estate L.L.C. ('1589); and TOGI Brands, LLC ('7072).

**Meeting ID and passcode.** The meeting ID for this hearing is **161 122 6457**, and the passcode is **Cleary644**. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

By: /s/ Adam P. Silverman
Proposed Counsel for the Debtors

HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
TEVIN D. BOWENS, ESQ. (ARDC 36338559)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059
**Proposed Counsel for Debtors**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that he served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method indicated on the list on April 24, 2024, at or before 11:59 p.m.

By:  /s/ Adam P. Silverman
Proposed Counsel for the Debtors

## SERVICE LIST

**VIA CM/ECF**

- **Patrick S Layng**    USTPRegion11.ES.ECF@usdoj.gov
- **Nathan E Delman**    ndelman@ktslaw.com; ecfnotices@ktslaw.com
- **Steve Jakubowski**    sjakubowski@robbinsdimonte.com
- **Jeffrey Kurtzman**    kurtzman@kurtzmansteady.com
- **Justin M Mertz**    jmmertz@michaelbest.com; jcalmes@michaelbest.com; courtmail@michaelbest.com
- **Eric S. Rein**    rrein@ktslaw.com; ecfnotices@ktslaw.com
- **Carolina Y. Sales**    csales@robbinsdimonte.com mrussell@robbinsdimonte.com; jtronina@robbinsdimonte.com
- **Charles S. Stahl**    cstahl@smbtrials.com

**VIA REGULAR U.S. MAIL**

Banc of America Leasing & Capital, LLC
c/o Patricia James
2059 Northlake Parkway, 3North
Tucker, GA 30084

BMO Harris Bank N.A.
320 S Canal Street
Chicago, IL 60606

Daimler Truck Financial Services USA LLC
14372 Heritage Pkwy, Suite 400
Fort Worth, TX 76177

DariFill,Inc.
750 Green Crest Drive
Westerville, OH 43081

First Commonwealth Equipment Finance
601 Philadelphia Street
Indiana, PA 15701

GM Financial
801 Cherry Street. Ste 3600
Fort Worth, TX 76102

TSC Equipment Finance LLC
PO Box 536705
Pittsburg, PA 15253

Wells Fargo Equipment Finance, Inc.
600 South 4th Street
Minneapolis, MN 55415

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oberweis Dairy, Inc., *et al.*,[1] | ) | Case No. 24-05385 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable David D. Cleary |
| | ) | |
| | ) | **Hearing Date: May 1, 2024** |
| | ) | **Hearing Time: 11:00 a.m.** |

**MOTION OF DEBTORS FOR ENTRY OF: (i) AN ORDER: (a) APPROVING SALE
PROCESS, INCLUDING A STALKING HORSE ASSET PURCHASE AGREEMENT; (b)
APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (c) APPROVING FORM
NOTICES; (d) EXCUSING PAGE LIMIT AND (e) SCHEDULING A PUBLIC AUCTION
AND A SALE APPROVAL HEARING; AND (ii) AN ORDER: (x) APPROVING THE
SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; (y) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (z) GRANTING RELATED RELIEF**

NOW COME Oberweis Dairy, Inc., The Oberweis Group, Inc., North Aurora Ice Cream,

LLC, TOGI RE I, LLC, Third Millennium Real Estate L.L.C., and TOGI Brands, LLC, debtors

and debtors in possession (collectively, the "**Debtors**") in their respective chapter 11 cases

(collectively, the "**Chapter 11 Cases**"), by and through their undersigned counsel, and, pursuant

to Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy

Rules**") and sections 363 and 365 of the United States Bankruptcy Code (the "**Bankruptcy

Code**"), hereby move the court for entry: of (i) an order (the "**Sale Procedures Order**," a

proposed form of which is filed herewith): (a) establishing procedures for the sale of all, or

substantially all, of the Debtors' assets (the "**Asset Sale**"), including a stalking horse asset

---

[1] The Debtors in this case, and the last four digits of their respective federal employer identification numbers, are
Oberweis Dairy, Inc. ('7516); The Oberweis Group, Inc. ('1378); North Aurora Ice Cream, LLC ('8506); TOGI RE
I, LLC ('5952); Third Millennium Real Estate L.L.C. ('1589); and TOGI Brands, LLC ('7072).

purchase agreement with a break-up fee and an initial overbid amount, together with a form asset

purchase agreement for non-stalking-horse bidders in bulk or in lots; (b) establishing procedures

relating to the assumption and assignment of executory contracts and unexpired leases; (c)

approving form notices of the sale and other form notices; (d) excusing the 15-page limit under

the Court's local rules; and (e) scheduling a public auction and sale approval hearing; and (ii) an

order (the "**Sale Approval Order**"): (x) approving the sale of the Debtors' assets free and clear

of claims, liens, and encumbrances; (y) approving the assumption and assignment of executory

contracts and unexpired leases; and (z) granting related relief (the "**Motion**"). In support of the

Motion, the Debtors respectfully state as follows:

## I.   <u>EXECUTIVE SUMMARY</u>

These Chapter 11 Cases are a metaphorical melting ice cube, although in this instance,

melting ice cream may be the more appropriate analogy. Regardless of terminology, exigent

circumstances compel the Debtors to seek approval of an immediate competitive-bid sale

process. The Debtors' projected cash burn is unsustainable. The Debtors were only able to obtain

post-petition financing for a limited duration with stringent sale milestones. Uncertainty over

future employment is creating anxiety amongst the Debtors' substantial workforce, thereby

threatening continuity of operations. As if that were not enough, all insurance policies of the

Debtors are set to lapse on June 30, 2024; and despite working closely with their insurance

broker, the Debtors have been unable to confirm whether their insurance carriers will renew or

extend beyond expiration, or the additional costs associated with same.

The Debtors must therefore request, *inter alia*, approval of a sale process implementing a

bid deadline approximately six weeks from the petition date and just over three weeks from entry

of the Sale Procedures Order. While seemingly accelerated from a post-petition perspective, the

Debtors have marketed their various business assets since November 2023 through a global investment banking firm. The Debtors have also been guided by a professional restructuring advisory firm since July 2023 and the undersigned firm as insolvency counsel since October 2023. As part of their collective sales efforts, numerous non-disclosure agreements were executed; marketing materials were distributed; access to data rooms was granted; and site visits were conducted.

Shortly after the petition date, the Debtors entered into an asset purchase agreement to sell substantially all of the Debtors' real and personal property assets for $20.0 million to a proposed stalking horse. By way of this Motion, the Debtors request approval of the stalking horse asset purchase agreement with certain bid protection, including a break-up fee, as well as approval of a form asset purchase agreement by which the Debtors may entertain higher and better offers for the Debtors' assets in one or more lots. Since commencement of the Chapter 11 Case, the Debtors and their representatives have been contacted by numerous parties expressing interest in acquiring the Debtors' assets. To capitalize on this wave of interest, the Debtors also seek approval of a sale process, bidding procedures, and other relief conventional to a section 363 asset sale to solicit competitive bids, which Debtors assert is in the best interest of the estate for the reasons set forth in this Motion.

## II.    FACTUAL BACKGROUND

### A.      The Debtors' Chapter 11 Cases

1.      On April 12, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The court has approved joint administration of each case. ECF No. 34. The Debtors remain in possession of their assets and continue to maintain their operations and financial affairs as debtors in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2.     On April 19, 2024, an official committee of unsecured creditors (the "**Committee**") was appointed in the Chapter 11 Case. The first meeting of creditors under section 341(a) of the Bankruptcy Code is currently scheduled for May 15, 2024, at 1:30 p.m.

3.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

4.     The statutory predicates for the relief requested herein are sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

**B.     Chapter 11 Objectives**

5.     After analyzing the ramifications of staying out of bankruptcy, and alternatives thereto, the Debtors determined a bankruptcy sale process would afford the Debtors the best means of preserving their enterprise value and procuring a purchaser who will ensure a maximum recovery for creditors of the Debtors' estates.  The Chapter 11 Cases stand to protect the claims and interests of the Debtors' customers, creditors, employees, and other parties in interest.

6.     The Debtors have determined that their ability to obtain the necessary long-term funding needed to support an internal plan of reorganization will not likely be forthcoming. The Debtors further believe that the time and expense needed to undertake such an effort will seriously impair the value of their assets and delay and diminish any ultimate distribution to creditors. As a result, the Debtors have concluded it is advisable to entertain offers immediately to acquire a substantial portion, or substantially all, of their assets as a going concern on an expedited basis. The Debtors believe any significant delay in embarking upon a sale process is likely to have a material adverse effect on the value of the assets being offered for sale, given what will be the ongoing administrative costs of the Chapter 11 Case, a continuing decline in

sales volumes, the resulting limitations on the cash flow needed to continue operations, potentially lapsing insurance coverage, and various similar concerns. Additionally, as part of the Debtors' agreement to obtain post-petition financing, the Debtors are required to meet certain sale milestones in connection with a Court-approved auction and sale process.

### C. The Debtors' Business

7.    The Debtors' business (the "**ODI Business**") consists of manufacturing, packaging, and distributing milk, ice cream, and other dairy and non-dairy foods and selling these products through both retail and wholesale channels, primarily in the Midwest. The Debtors' business is comprised of three distinct segments which operate in unison as the following integrated business model: (a) the operation of forty (40) "Oberweis Dairy" branded retail stores in four states; (b) the servicing of customers through direct-to-doorstep home delivery in five states; and (c) direct sales to consumers in national grocery stores and regional supermarkets in seven states. The Debtors manufacture their products from a facility located at 951 Ice Cream Drive, North Aurora, Illinois, which also serves as the Debtors operational headquarters. The nature and operations of the ODI Business, as well as the factual background relating to the Debtors' commencement of this Chapter 11 Case, is described in more detail in the *Declaration of Adam Kraber in Support of Chapter 11 Petitions and First-Day Motions* (ECF No. 19, the "**Declaration**"), which is expressly incorporated herein by reference.

### D. Prepetition Secured Indebtedness

8.    As of the Petition Date, the Debtors were primarily indebted to the following secured lenders: (a) CIBC Bank USA, an Illinois state banking association ("**CIBC**"); and (b) numerous other parties who have filed UCC financing statements and appear to have purchase-money security interests in equipment, including but not limited to (i) DariFill, Inc.; (ii) Wells Fargo Equipment Finance, Inc.; (iii) Raymond Leasing Corporation; (iv) Banc of America

Leasing & Capital, LLC; (v) BMO Harris Bank, N.A.; (vi) TSC Equipment Finance LLC; (vii) Daimler Truck Financial Services USA LLC; and (viii) Associated Material Handling Industries, Inc. (the "**Other Secured Parties**").[2]

9.      As of the Petition Date, the Debtors believe they owed CIBC the approximate amount of $14.2 million ($12.7 million of which was outstanding, and $1.5 million of which arose under a letter of credit), and the Other Secured Parties the approximate, aggregate amount of $3.7 million.

### E.      Cash Collateral and DIP Financing

10.     Shortly after the Petition Date, the Debtors filed a motion (the "**DIP/Cash Collateral Motion**") under which they sought, among other things: (a) postpetition financing by CIBC, and (b) use of the cash collateral of CIBC ("**Cash Collateral**"), as set forth in that certain *Secured Super-Priority Post-Petition Credit Agreement* (the "**DIP Agreement**"). *See* ECF No. 14. The DIP Agreement provides the Debtors access to $1,000,000 in the aggregate maximum principal amount, consisting of $400,000 on an interim basis and the balance of $600,000 on a final basis, and the consensual use of Cash Collateral. On April 18, 2024, the Court granted the DIP/Cash Collateral Motion on an interim basis and scheduled a final hearing thereon for May 1, 2024. ECF No. 36.

### F.      Pre-Petition Sale Efforts

11.     Almost exactly six months prior to the Petition Date, the Debtors retained Livingstone Partners LLC ("**Livingstone**"), a global investment banking firm well known in the Midwest and experienced in the sale of companies experiencing financial distress. The same day, October 11, 2023, the Debtors executed a new engagement with Fort Dearborn Partners, Inc.

---

[2] Nothing contained herein is intended to be, nor shall it be construed as, an admission by any of the Debtors that the Other Secured Parties hold valid security interests in any assets of the Debtors, and the Debtors reserve all rights to contest same if and as applicable.

("**FDP**"), which until then had provided financial advisory services to the Debtors. Under the new engagement, FDP agreed to provide the Debtors with a chief restructuring officer to lead the Debtors through their restructuring and sale efforts, as well as supporting staff and services. On or about October 16, 2023, Mr. Kevin Cleary of FDP was formally appointed as chief restructuring officer (the "**CRO**") of the Debtors.

12.     Commencing in November 2023, Livingstone—working in cooperation with the CRO and the Debtors' other management personnel—embarked upon a sale process to solicit suitors for all or substantially all of the ODI Business, including its real and personal property assets and operations (collectively, the "**Sale Assets**"). Livingstone prepared a detailed, 46-slide confidential information presentation showcasing the ODI Business and communicated with 160 potential buyers (86 strategic and 74 financial) known to have sufficient resources and industry knowledge to potentially realize value in purchasing it. Forty-seven of these parties ultimately signed NDAs and conducted due diligence, accessing a data room prepared by Livingstone with hundreds of relevant documents. In mid-December 2023, the Debtors' management team, with the assistance of Livingstone and FDP, hosted in-person meetings and/or facility tours with five potential purchasers.

13.     Ultimately, on January 19, 2024, the Debtors signed an exclusive letter of intent (the "**LOI**") with BAB Project O LLC, an Illinois corporation (the "**Prospective Stalking Horse**") that had offered to serve as a stalking-horse bidder for substantially all real and personal property assets of the entire ODI Business. The Prospective Stalking Horse possessed extensive resources, industry connections, and experience. And unlike other prospective bidders, the Prospective Stalking Horse had the immediate ability (through its members' existing business interests) to utilize the ODI Business's full production capacity, and thereby cause the ODI Business to operate more profitably than it ever had.

14.    Within two weeks after execution of the LOI, on January 31, 2024, the Debtors sent the Prospective Stalking Horse an initial proposed draft of an asset purchase agreement. Thereafter, throughout February and March 2024, the Debtors and the Prospective Stalking Horse engaged in significant due diligence, including regular site visits and virtually daily communications between FDP and the Debtors' management, on the one hand, and the Prospective Stalking Horse, on the other. Meanwhile, in late February 2024, counsel to the Prospective Stalking Horse sent counsel to the Debtors a list of approximately 50 comments and questions regarding the proposed asset purchase agreement. The Debtors' counsel responded promptly, and circulated a revised asset purchase agreement to the Prospective Stalking Horse in mid-March.

15.    But as the Prospective Stalking Horse's due diligence progressed, the Stalking Horse began making material changes to the terms it had initially agreed to in the LOI, including significant modifications to the assets it sought to acquire and material reductions in the purchase price. Then, in late March 2024, the Prospective Stalking Horse notified the Debtors it had decided not to submit a stalking-horse bid at all.

16.    After terminating exclusive negotiations with the Prospective Stalking Horse, the Debtors reopened their marketing process. Livingstone and FDP re-engaged with potential bidders who, during the initial marketing outreach, had expressed interest in acquiring some or all of the Debtors' assets. While no additional parties made offers for the entire ODI Business, several parties expressed an interest in purchasing large portions thereof, causing the Debtors to consider breaking the business into various lots for sale, as described below.

17.    The deteriorating financial condition of the ODI Business, however, made it advisable to file the Chapter 11 Cases without lining up another stalking horse bidder (or bidders). Informal discussions with possible stalking-horse candidates did not yield offers so

compelling as to justify postponing the bankruptcy filing (and thereby suffer a further decline in the value of the ODI Business) solely to negotiate and enter into a stalking-horse asset purchase agreement. Management of the Debtors therefore concluded that filing the Chapter 11 Cases with the purpose of setting an expedited sale process without a stalking horse was the best way to preserve the ODI Business and stave off liquidation.

18.     Shortly before the Petition Date, the Debtors and their representatives re-engaged with the Prospective Stalking Horse, with the intent of ascertaining whether there was any renewed interest in finalizing an agreement and setting a floor purchase price for the anticipated Asset Sale, contemporaneously with the filing of the Chapter 11 Cases. The Debtors explained that absent an imminently forthcoming executed asset purchase agreement, it was unlikely the Debtors would seek authority to anoint a stalking horse and provide a break-up fee or an initial overbid amount to any party.

19.     Apparently concerned over losing its ability to recoup the time and expense of its diligence endeavors over serval months prior to the Petition Date, the Prospective Stalking Horse re-engaged with the Debtors. Further negotiations and drafting ensued.

20.     On the eve of presentment for the Debtors' first-day motions, the Debtors and the Prospective Stalking Horse entered into an asset purchase agreement under which the Prospective Stalking Horse agreed to acquire substantially all of the ODI Business (the "**Stalking Horse APA**"). The Stalking Horse APA, which remains subject to Court approval, has attached to the *Notice of Filing Stalking Horse APA* filed with the Court as ECF No. 56.

III.    **APPROVAL OF PROPOSED SALE PROCESS, STALKING HORSE APA WITH BREAK-UP FEE AND INITIAL OVERBID AMOUNT, FORM OF ASSET PURCHASE AGREEMENT FOR COMPETITIVE BIDDING, AND BIDDING PROCEDURES**

A.    **The Sale Procedures Order and the Sale Approval Order**

21.    By this Motion, the Debtors request the entry of two (2) orders.  The Debtors first request entry of the Sale Procedures Order, substantially in the proposed form filed in connection herewith and made a part hereof without further notice: (a) establishing procedures for the Asset Sale, including approval of the Stalking Horse APA, break-up fee, and an initial overbid amount for the Prospective Stalking Horse, as well as approval of a form asset purchase agreement for other purchasers to compete with the Stalking Horse APA in bulk or in lots; (b) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Asset Sale; (c) approving form notices of the Asset Sale and other form notices; (d) excusing the Local Rules' page limit in connection with the Motion; and (e) scheduling a public auction for the Sale Assets (the "**Auction**") and a hearing to consider the outcome of the Auction and approval of the Asset Sale (the "**Sale Hearing**").

22.    The Debtors request that at the Sale Hearing, the Court enter a second order, the Sale Approval Order, *inter alia*: (a) approving the sale of the Debtors' assets free and clear of claims, liens, and encumbrances; (b) approving the assumption and assignment of executory contracts and unexpired leases; and (c) granting related relief.

23.    The Debtors intend for the bidding and sale process to occur in regular communication and consultation with Livingstone, the Committee, CIBC, and the Other Secured Parties (collectively, the "**Constituent Parties**"), to the extent applicable or necessary.

B.      **The Stalking Horse APA[3]**

24.      The Stalking Horse APA is a proposal to acquire substantially all of the real and personal property assets of the Debtors comprising the ODI Business. These assets are described in detail in the Stalking Horse APA but are generally described or defined therein as follows: (a) "ODI Accounts Receivable," which excludes credit card receivables and certain real estate advances to an insider;[4] (b) inventory; (c) furniture, fixtures, and equipment; (d) a fleet of vehicles defined as the "ODI Vehicles"; (e) certain "Books and Records," excepting the "Excluded Books and Records"; (f) intellectual property defined as the "ODI IP"; (g) intangible property defined as the "ODI Intangible Assets"; (h) certain customer orders defined as the "Assumed Customer Purchase Orders"; (i) real estate defined as the "North Aurora Manufacturing Plant" and the "ODI Owned Retail Stores"; (j) the right to designate "Assumed Contracts"; (k) various permits to the extent assignable, defined as the "ODI Permits"; (l) to the extent assignable, transferrable prepaid expenses and deposits as of Closing; (m) to the extent assignable, third party warranties defined as the "ODI Warranties"; and (n) all aspects of the Debtors' "Home Delivery Business."

25.      The cash component of the purchase price set forth in the Stalking Horse APA is $20,000,000, plus assumed liabilities, subject to working capital adjustments for ODI Accounts Receivable and inventory. Specifically, the purchase price will be reduced on a dollar-for-dollar basis for every dollar value at closing for ODI Accounts Receivable which is less than $1,200,000, and for inventory which is less than $4,400,000.

---

[3] The summary of the Stalking Horse APA set forth herein is not intended to be a comprehensive restatement of all material terms of the Stalking Horse APA.

[4] The Debtors have historically treated credit card receivables as a cash or cash equivalent in their financial accounting, and not as conventional accounts receivable.

26.    The Stalking Horse APA requires a $500,000 deposit, which the Debtors have received through an escrow opened with Chicago Title and Trust Company.

27.    The Stalking Horse APA provides for: (a) an initial topping bid in the amount of $250,000 (the "**Initial Overbid Amount**"); and a break-up fee in the amount of $1,000,000.00 (the "**Break-Up Fee**," and together with the Initial Overbid Amount, the "**Bid Protection**").

28.    The Stalking Horse APA permits the Prospective Stalking Horse to bid for the Debtors' property in lots but without the ability to withdraw or revoke the offer set forth in the Stalking Horse APA. Should the Debtors determine the aggregate bids in lots is higher and better than the Stalking Horse APA, the Prospective Stalking Horse would still be entitled to the Break-Up Fee even if it participates as a purchaser in such lot acquisition.

**C.    The Form APA[5]**

29.    In order to expedite the consideration of competing bids, the Debtors propose that any parties seeking to bid for the Sale Assets at the Auction (each a "**Bidder**") other than the Prospective Stalking Horse be required to submit their bid substantially in the form of the Asset Purchase Agreement attached to the *Notice of Filing Form APA*, filed with the Court as ECF No. 57 (the "**Form APA**").

30.    The Form APA is intended to be substantially similar to the Stalking Horse APA in all material respects, with a significant exception allowing for offers in lots provided such bid or bids meet or exceed a minimum bid per applicable lot. The Debtors have concluded that attracting as many prospective purchasers as possible and combining offers for the Sale Assets will be beneficial to the process. The Form APA therefore allows a Bidder to check the appropriate box describing one of the following lots (each a "**Lot**").

---

[5] The summary of the Form APA set forth herein is not intended to be a comprehensive restatement of all material terms of the Form APA.

Lot 1:  all real and personal property assets and business of the Debtors in bulk;

Lot 2:  the ODI Business segments- dairy store assets, home delivery assets, grocery retail assets, and intellectual property;

Lot 3:  the North Aurora, Illinois manufacturing assets;

Lot 4:  solely the dairy store assets;

Lot 5:  solely the home delivery assets;

Lot 6:  solely the grocery retail assets;

Lot 7:  solely the fleet of vehicles (other than home delivery vehicles);

Lot 8: solely intellectual property.

31.    Prior to and during the Auction, the Debtors and their representatives will have the right to work with potential bidders to aggregate two or more bids into a consolidated bid or otherwise work with qualified bidders to aggregate bids into higher and better offers than set forth in the Stalking Horse APA.

32.    At the Auction, the Debtors, along with the Constituent Parties, will consider whether a combination of Lot bids meets or exceeds the offer set forth in the Stalking Horse APA when taking into account the Break-Up Fee and other considerations, including execution risk.

**D.      The Bidding Procedures**[6]

33.    The Debtors propose a sale process to be completed subject to and in accordance with the proposed form of *Approved Bidding Procedures* attached to the proposed Sale Procedures Order as **Exhibit A** thereto, and made a part hereof (the "**Bidding Procedures**"). The Bidding Procedures may be summarized as follows:

---

[6] The summary of the Bidding Procedures set forth herein is not intended to be a comprehensive restatement of all material terms to the Bidding Procedures set forth in Exhibit A to the proposed Sale Procedures Order.

a.       <u>Confidentiality Agreement and Due Diligence</u>.   Upon execution of a confidentiality agreement, Bidders will be granted access to a data room maintained by Livingstone and to additional non-public information pertaining to the Sale Assets.

b.       <u>Criteria for Consideration to be Deemed a Qualified Bid</u>.   The Bidding Procedures set forth a number of criteria to be used in determining whether a bid is qualified to serve either as the Stalking Horse Bid or as a bid at the auction (a "**Qualified Bid**").   Among other things, a bid must be substantially in the form of the Form APA; be submitted prior to 5:00 p.m. (Central time) on May 24, 2024 (the "**Bid Deadline**"); be accompanied by an earnest money deposit in the amount of two and one-half percent (2.5%) of the bid (a "**Deposit**"); and contain sufficient information regarding the Bidder's creditworthiness.

c.       <u>Auction and Selection of Prevailing Bid and Back-Up Bid</u>.   The Bidding Procedures specify the date and location of the Auction, which is presently contemplated to be held at the offices of proposed counsel for the Debtors on May 29, 2024, at 10:00 a.m. (Central time). The prevailing bid at the Auction (the "**Prevailing Bid**") will be the highest and best bid, as determined by the Debtors in consultation with the Constituent Parties.   The Bidding Procedures also authorize the Debtors to choose the second-highest-and-best bid to serve as a back-up bid (the "**Back-Up Bid**").

d.       <u>Sale Hearing and Return of Deposits.</u>   The Bidding Procedures will specify the date of the Sale Hearing, at which the Prevailing Bid and Back-Up Bid (if any) will be announced and the Court will consider the entry of the Sale Approval Order.   After the Sale Hearing, all Deposits will be returned to all Bidders other than those submitting the Prevailing

Bid and the Back-Up Bid. The Sale Hearing is presently contemplated for June 5, 2024, subject to the court's calendar.

e.      <u>Closing and Failure to Close.</u>  Following entry of the Sale Approval Order, the Bidder submitting the Prevailing Bid (the "**Prevailing Bidder**") must use commercially reasonable efforts to close the Court-approved transaction on the later of June 12, 2024 or five calendar days after entry on the docket of the Sale Approval Order.  If this transaction fails to close, then the Debtors will have the right, but not the obligation, to consummate a transaction with the Bidder submitting the Back-Up Bid (the "**Back-Up Bidder**") in accordance with its bid. Deposits submitted in connection with either the Prevailing Bid or the Back-Up Bid may be forfeited irrevocably if their respective bidders fail to close as required under the Bidding Procedures.

f.      <u>Reservation of Rights and Miscellaneous.</u>  The Bidding Procedures contain a broad reservation of rights to allow the Debtors, in consultation with the Constituent Parties, to determine which bids are Qualified Bids and to take other actions regarding the Asset Sale.  In assessing Qualified Bids, the Debtors are entitled to compare the cumulative value of bids for various Lots, so as to achieve the greatest possible value for the Sale Assets as a whole. The Debtors further reserve all rights to modify or impose, at or prior to the Auction, additional terms and conditions on the sale of the Sale Assets, to extend to adjourn any deadlines set forth herein, and to take any other actions with respect to the Auction, the Sale Hearing, or the sale of the Sale Assets that, in their business judgment and after consultation with the Constituent Parties, are reasonably necessary to preserve the bankruptcy estate or maximize the value thereof.

g.      <u>Notice of Approved Bidding Procedures.</u>  Once authorized by the court, the Debtors propose to serve copies of the Bidding Procedures upon (i) counsel for each of the

Constituent Parties (or, if no appearance has been filed for a Constituent Party in the Chapter 11 Case, the Constituent Party itself); (ii) all known counterparties to the Debtors' executory contracts and unexpired leases; (iii) the United States Trustee's Office for Region 11; (iv) all entities reasonably known by the Debtors (or their representatives or retained professionals) to have an interest in the Sale Assets; (v) the District Director of the Internal Revenue Service for the Northern District of Illinois; (vi) the Office of the Attorney General of Illinois; (vii) all taxing authorities identified in the creditor matrices filed in the Chapter 11 Cases; (viii) all equity security holders of the Debtors; and (ix) all other entities that have filed requests for notices pursuant to Rule 2002 of the Bankruptcy Rules.  Additionally, the Debtors will serve the *Summary Notice of Sale of all or Substantially All Assets of Debtor* attached to the proposed Sale Procedures Order as **Exhibit B** thereto and made a part hereof (the "**Summary Notice of Sale**"), via first-class U.S. mail, upon all known creditors whose mail has not been returned as undeliverable.

## IV.    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

34.    As part of the Motion, the Debtors seek authority to assume and assign the executory contracts and unexpired leases identified in the Prevailing Bid.  Following the Bid Deadline but prior to the Auction, the Debtors intend to send notice to all non-Debtor parties to those executory contracts and unexpired leases which the Debtors may elect to assume and assign in conjunction with the Asset Sale.

35.    Because of the need to close any transactions as quickly as possible in order to maximize value, the Debtors propose the following procedures for assuming and assigning executory contracts and unexpired leases:

a.       No later than 11:59 (prevailing Central time) on the first business day immediately following the Bid Deadline, the Debtors will file a notice (the **"Assumption Notice"**) with the Court and serve same, by facsimile, overnight delivery, or any other form of notice authorized by the recipient (including CM/ECF and/or email) to any non-Debtor counterparty to an executory contract or unexpired lease whose assumption and assignment any Qualified Bidder has identified as a condition to closing (each an **"Executory Contract/Lease"**). The Assumption Notice will be substantially in the form attached to the proposed Sale Procedures Order as **<u>Exhibit C</u>** thereto and made a part hereof, and shall (i) state the cure amount that Debtors believe is necessary to assume and assign each Executory Contract/Lease pursuant to section 365 of the Bankruptcy Code (the **"Cure Amount(s)"**), and (ii) notify the non-debtor party that such party's Executory Contract/Lease may be assumed and assigned to a purchaser of the Sale Assets to be identified at the conclusion of the Auction, subject to the Sale Hearing (the **"Proposed Assumption/Assignment"**).    If the Debtors identify additional Executory Contracts/Leases that might be assumed by the Debtors and assigned to the party submitting the Prevailing Bidder not set forth in the original Assumption Notice, the Debtors will promptly send a supplemental notice (a **"Supplemental Assumption Notice"**) to the counterparties to such additional Executory Contracts/Leases.

b.       The deadline for a non-Debtor party to an Executory Contract/Lease (a **"Contract/Lease Counterparty"**) to file and serve an objection (a **"Cure Amount/Assignment Objection"**) to the Cure Amount or Proposed

Assumption/Assignment of such Executory Contract/Lease will be the later of (i) 5:00 prevailing Central time on June 3, 2024; or (ii) to the extent applicable, five (5) days after service of the relevant Supplemental Assumption Notice (the later of these being the "**Cure Amount/Assignment Objection Deadline**").

c.     Cure Amount/Assignment Objections must be both (i) filed with the clerk of the Bankruptcy Court and (ii) served upon respective counsel to the Debtors, CIBC, the U.S. Trustee's Office for Region 11, and the Committee on or before the Cure Amount/Assignment Objection Deadline. Service of a Cure Amount/Assignment Objection Deadline is effective only upon actual receipt by the party served.

d.     Unless a Contract/Lease Counterparty timely files and serves a Cure Amount/Assignment Objection as provided herein, then such Contract/Lease Counterparty:

i.     Will be forever barred from objecting to its Cure Amount and from asserting any additional cure or other amounts with respect to its Executory Contract/Lease, and the Debtors shall be entitled to rely solely upon the Cure Amount; and

ii.     Will be deemed to have consented to the assumption, assignment, and/or transfer of such Executory Contract/Lease, and will be forever barred and estopped from asserting or claiming against the Debtors, the Prevailing Bidder, the Back-Up Bidder, or any other assignee thereof, that any additional amounts are due or defaults exist, or conditions to

assumption, assignment and/or transfer must be satisfied, under such Executory Contract/Lease.

e.      If an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "**Claimed Cure Amount**") with the appropriate documentation in support thereof. Upon receipt of a Cure Amount/Assignment Objection, the Debtors are authorized, but not directed, in consultation with the Constituent Parties, to resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting party to any Executory Contract/Lease without further order of the Court. In the event that the Debtors and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection prior to the Sale Hearing, the Court will resolve any such Cure Amount/Assignment Objection at the Sale Hearing.

## V.      RELIEF REQUESTED AND AUTHORITY THEREFOR

### A.      The Asset Sale satisfies the business judgment rule.

36.      Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). To approve the use, sale or lease of property outside the ordinary course of business, there must be some "articulated business justification." *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (internal citation omitted); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Indus., Inc., v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

37.    Once a valid business justification made in the ordinary course of business is established, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal citation omitted); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").  Similarly, a court will defer the debtor's judgment to make a sale outside the ordinary course of business pursuant to section 363, when the debtor has "sound business reasons for making the sale." *Schipper*, 933 F.2d at 515.

38.    Indeed, a debtor-in-possession "has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given." *Efoora*, 472 B.R. at 481.  Therefore, the relief requested in this Motion should be granted if the Debtors demonstrate a sound business justification therefor.  *See Schipper*, 933 F.2d at 515; *Lionel Corp.*, 722 F.2d at 1071; *Del. Hudson Ry.*, 124 B.R. at 179.

39.    As explained above, the Debtors have sound business justifications for selling a substantial portion of its assets at this time.  The Debtors do not have the financial resources or access to capital necessary to maintain their operating costs indefinitely.  The uncertainties concerning the Debtors' financial condition have caused the Debtors to be in jeopardy of losing their valuable customer base.  The Debtors therefore have determined that, based upon their business judgment, the most viable option for maximizing the value of their estates is through a sale of the Sale Assets.

40. Based upon these factors and those discussed above, the Debtors have demonstrated a sound business justification for the proposed sale of the Sale Assets pursuant to the Bidding Procedures.

**B.     The Bid Protection is fair and reasonable.**

41. The Debtors believe that a compelling need exists to authorize granting of the Bid Protection and Break-Up Fee in order to induce the Prospective Stalking Horse to submit its bid for the Sale Assets as early as possible in the sale process. Moreover, the Debtors believe that the proposed Bid Protection is fair and reasonable in relation to any Qualifying Bid received and will maximize the benefit to the Debtors' estates by providing an incentive to potential purchasers to expend the resources necessary to formulate offers for the Sale Assets in excess of the Stalking Horse Bid. *See, e.g., In re Kmart Corp.*, Case No. 02-B-02474 (Bankr. N.D. Ill. Aug. 29, 2002) (approving proposed termination fee and authorizing a termination fee and overbid protections for potential bidders).

42. As has been noted, a break-up fee such as the fee proposed herein "is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *S.N.A. Nut*, 186 B.R. at 101. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers.'" *Id.* (internal citation omitted); *see also In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentive may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted).

43.    In the bankruptcy context, the test for determining whether a proposed break-up fee should be approved is whether it is in the best interests of the estate.  *See S.N.A. Nut*, 186 B.R. at 104; *see also In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (adopting the standard set forth in *S.N.A. Nut*); *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (bidding incentives should benefit the interests of the debtor, its creditors and equityholders alike).  In particular, a court should evaluate whether a break-up fee will maximize revenues and the value to be brought into the debtor's estate.  *See S.N.A. Nut*, 186 B.R. at 104; *Tiara Motorcoach*, 212 B.R. at 137.

44.    The Debtors believe that the proposed Break-Up Fee satisfies this standard.  The primary circumstances compelling allowance of the Break-Up Fee is to entice a Stalking Horse to facilitate the commencement of the bidding process as quickly as possible, so that a transaction can be consummated promptly in light of the Debtors' ongoing financial difficulties and pressures.  There are "safeguards beneficial" to the Debtors' estates insofar as the Break-Up Fee will be awarded only if the Debtors actually close on a competing bid.  *S.N.A. Nut*, 186 B.R. at 103 n.5, 106 (internal citation omitted) (denying break-up fee in the absence of any consummated sale).

45.    The Initial Overbid Amount constitutes "a fair and reasonable percentage of the proposed purchase price." *Id.* at 103 n.5 (internal citation omitted).  Indeed, the amount is customary for similar transactions of this type in the bankruptcy context and therefore is not "so substantial that it provides a 'chilling effect' on other potential bidders."  *Id.* (internal citation omitted).

46.    In sum, the Debtors' ability to offer the Bid Protection enables them to ensure the sale of the Sale Assets to a contractually committed bidder, while providing the Debtors with the

potential of even greater benefit to their estates. The Bid Protection therefore should be approved.

**C.      The Asset Sale satisfies the requirements of Bankruptcy Code section 363(f) for a sale free and clear of liens, claims, encumbrances, and interests.**

47.      Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)      such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

48.      Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the sale of the Sale Assets free and clear of any and all Interests. *See In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 827 (N.D. Ill. 1993).

49.      Here, all holders of interests in the Sale Assets, including CIBC and the Other Secured Parties, can be compelled to accept a money satisfaction of such interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to section 1129(b)(2)(A) of the Bankruptcy Code.

50.      Indeed, section 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net

proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto.  The Debtors propose that any interests in the Sale Assets attach to the net proceeds from the sale of the Sale Assets in these Chapter 11 Cases.

51.    Based upon the foregoing, the sale should be approved under section 363(f).

**D.    The Asset Sale satisfies the requirements of Bankruptcy Code section 363(m) for a sale made in good faith.**

52.    Section 363(m) reflects that the Bankruptcy Code strongly favors finality of sale orders, and the protection of good-faith purchasers maximizes the value of the assets for sale, which benefits both debtors and creditors.  *See Hower v. Molding Sys. Eng'g Corp.,* 445 F.3d 935, 938 (7th Cir. 2006).

53.    "The requirement that a purchaser act in good faith, of course, speaks to the *integrity of his conduct in the course of the sale proceedings.* Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1995, 1198 (7th Cir. 1978)).

54.    In the present case, the Bidding Procedures have been developed in consultation with CIBC.  No potential bidder has had any input into the contents of the Bidding Procedures, and the Bidding Procedures represent a fair and neutral framework for selling the Sale Assets without providing an unfair advantage to any party.

**E.    The assumption and assignment of Executory Contracts/Unexpired Leases should be authorized.**

55.    Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of
the debtor only if–

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

56.    Under section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  This subsection provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

57.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re Resource Tech. Corp.*, 624 F.3d 376, 383 (7th Cir. 2010) (internal citation omitted).  The required assurance "will fall considerably short of an absolute guarantee of performance."  *Id*. (quoting *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988)); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803-04 (Bankr. N.D. Ill. 1985).

58.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and reputation.  *Resource Tech.*, 624 F.3d at 383; *see also, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance where prospective assignee of lease from debtor had financial resources and expressed its willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

59.     To the extent that any defaults exist under any of the Executory Contracts/ Leases that are to be assumed and assigned in connection with the sale of the Sale Assets, the Debtors will either have any such default cured at closing as a condition of such assumption and assignment, or obtain consent to the assumption and assignment on such modified terms as may be agreed to by the non-Debtor party to such Executory Contracts/Leases.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Prevailing Bidder, its experience in the industry, and its willingness and ability to perform under the proposed Executory Contracts/ Leases to be assumed and assigned to it, all of which will be important considerations in evaluating Qualified Bids.

60.     The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Bidder to provide adequate assurance of future performance under the contracts to be assumed and assigned.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Executory Contracts/ Leases as will be set forth in the Prevailing Bid.

## VI.     WAIVER OF STAYS UNDER BANKRUPTCY RULES 6004(h) and 6006(d)

61.     Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or lease of estate property other than cash collateral is stayed until 14 days from its entry, unless the bankruptcy court orders otherwise. Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) imposes a similar stay upon an order authorizing the assignment of executory contracts or unexpired

leases under section 365 of the Code, also subject to waiver on the Court's order. Fed. R. Bankr.
P. 6006(d).

62.     For the same reasons the Debtors request the Asset Sale be allowed to proceed on
an expedited basis—*i.e.*, the pronounced diminution of value likely to occur if a sale process is
delayed, and the strict milestones limiting their postpetition funding by CIBC—the Debtors
request that the stays under Bankruptcy Rules 6004(h) and 6006(d) be waived by the Court.
These stays would only serve to impede the consummation of the Asset Sale, and therefore harm
the Debtors, their estates, and their creditors.

## VII.    REQUEST TO EXCUSE FIFTEEN-PAGE LIMIT

63.     The Court's Local Rule 5005-3(D) provides, "No motion, response to a motion,
brief, or memorandum in excess of fifteen pages may be filed without prior approval of the
Court." Bankr. N.D. Ill. L.R. 5005-3(D). Particularly given that this Motion requests two
separate, detailed, orders granting multiple forms of relief governed by several sections of the
Bankruptcy Code, the Debtors submit that adhering to the fifteen-page limit would have
seriously compromised their ability to convey both the relief requested and the factual
background necessitating it. The Debtors therefore request that the Court excuse the fifteen-page
limit with respect to the Motion.

## VIII.   NOTICE REQUIREMENTS

64.     The Debtors have provided a copy of this Motion via ECF filing, U.S. mail, e-
mail, and/or overnight delivery to the following persons, in the manner specific in the Notice of
Motion filed in connection with the Motion: (a) counsel for CIBC; (b) counsel for all other
secured creditors of record; (c) counsel for the United States Trustee's Office for Region 11; (d)
counsel for the Official Committee of Unsecured Creditors; and (e) all other entities that have
filed requests for notices pursuant to Rule 2002 of the Bankruptcy Rules. Coupled with

Bankruptcy Rule 2002(i) and the notice to be sent by the Debtors of the Bidding Procedures, Summary Notice of Sale, and the Assumption Notice as set forth below, the Debtors request that such notice of the Motion be deemed adequate and reasonable under the circumstances.

65. Within five (5) days after entry of the Sale Procedures Order, the Bidding Procedures will be served, by regular United States mail, upon: (a) counsel for each of the Constituent Parties; (b) all parties to the Debtors' executory contracts and unexpired leases; (c) the United States Trustee's Office for Region 11; (d) all entities reasonably known by the Debtors (or their representatives and retained professionals) to have an interest in the Sale Assets; (e) the District Director of the Internal Revenue Service for the Northern District of Illinois; (f) the Office of the Attorney General of Illinois; (g) all taxing authorities identified in the creditor matrices filed in the Chapter 11 Cases; (h) all equity security holders of the Debtors; and (i) all other entities that have filed requests for notices pursuant to Rule 2002 of the Bankruptcy Rules.

66. As additional notice of the Auction, the Asset Sale, and the Bidding Procedures, the Debtors will serve copies of the Summary Notice of Sale upon all known creditors in these Chapter 11 Cases whose mailings have not been returned as undeliverable, by regular United States mail, within five (5) business days after entry of th3 Sale Procedures Order.

67. To provide special, additional, notice of the potential assumption and assignment of Executory Contracts/Leases, the Assumption Notice will be served, by facsimile, overnight delivery, or such other method of service (including email) authorized by counterparties to Executory Contracts/ Leases, on the first business day following the Bid Deadline.

68. Under the circumstances present in this Chapter 11 Case, the Debtors request that the foregoing notice be deemed adequate and reasonable under the Bankruptcy Code and

Bankruptcy Rules for purposes of the entry of the Sale Procedures Order and the Sale Approval Order.

WHEREFORE, Oberweis Dairy, Inc., The Oberweis Group, Inc., TOGI Brands, LLC, North Aurora Ice Cream, LLC, Third Millennium Real Estate L.L.C., and TOGI RE I, LLC, debtors and debtors in possession herein, respectfully request the entry of an order in accordance with the foregoing recommendations in the form filed herewith and made a part hereof without further notice, and for such other and further relief as is just.

Respectfully Submitted:

Oberweis Dairy, Inc.
The Oberweis Group, Inc.
North Aurora Ice Cream, LLC
Togi RE I, LLC
Third Millennium Real Estate L.L.C.
TOGI Brands, LLC

By:  /s/ Adam P. Silverman
     One of its proposed attorneys

HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
HENRY B. MERENS (ARDC# 6181695)
ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
TEVIN D. BOWENS, ESQ. (ARDC 36338559)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059
**Proposed Counsel for Debtors**